Nos. 23-2234(L) & 23-2241

─────────────────

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

─────────────────

HANAN ELATR KHASHOGGI,

*Plaintiff-Appellant/Cross-Appellee*,

v.

NSO GROUP TECHNOLOGIES LIMITED;
Q CYBER TECHNOLOGIES LIMITED

*Defendants-Appellees/Cross-Appellants*.

─────────────────

On Appeals from the United States District Court
for the Eastern District of Virginia
Case No. 1:23-cv-00779, Hon. Leonie M. Brinkema

─────────────────

### JOINT APPENDIX
### VOLUME I (JA1–JA211)

─────────────────

Michael J. Quirk
MOTLEY RICE LLC
40 W. Evergreen Avenue, Suite 104
Philadelphia, PA 19118-3324
(610) 579-9932
mquirk@motleyrice.com

Michael J. Pendell
MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT 06103-1200
(860) 218-2722
mpendell@motleyrice.com

Ashley C. Parrish
Edmund Power
KING & SPALDING LLP
1700 Washington Avenue NW, Suite 900
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com
epower@kslaw.com

Joseph N. Akrotirianakis
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
(213) 443-4355
jakro@kslaw.com

*Counsel for Plaintiff-Appellant*     *Counsel for Defendants-Appellees*

## **TABLE OF CONTENTS**

## **VOLUME I** (Pages JA1–JA211)

Complete List of District Court Docket Entries ....................................................JA1

Complaint, filed June 15, 2023 (ECF No. 1) .......................................................JA7

Exhibit 1 to Complaint, Pegasus Product Description (ECF No. 1-1) ...............JA47

Limited Protective Order (ECF No. 20) .............................................................JA89

Notice of Motion and Motion of Defendants to Dismiss Complaint
       (ECF No. 26) ...........................................................................................JA90

Declaration of Yaron Shohat in Support of Defendants' Motion to Dismiss
       (ECF No. 26-1) ........................................................................................JA92

Exhibit A to Declaration of Yaron Shohat (ECF No. 26-2) ...............................JA97

Declaration of Joseph N. Akrotirianakis in Support of Defendants' Motion to
       Dismiss (ECF No. 26-3) ........................................................................JA130

Redacted Declaration of Roy Blecher in Support of Defendants' Motion
       to Dismiss (ECF No. 26-4) ....................................................................JA132

Declaration of Bill Marczak in Support of Plaintiff's Opposition to Defendants'
       Motion to Dismiss (ECF No. 44-1) .......................................................JA136

Supplemental Declaration of Joseph N. Akrotirianakis in Support of Defendants'
       Motion to Dismiss (ECF No. 48-1) .......................................................JA143

Exhibit A to Supplemental Declaration of Joseph N. Akrotirianakis,
       Shoot the Messenger Podcast, Episode 1, What Happened to Jamal
       Khashoggi (ECF No. 48-2)....................................................................JA144

Transcript of Oral Argument on Defendants' Motion to Dismiss on
       October 20, 2023 (ECF No. 61) .............................................................JA148

Memorandum Opinion, filed October 26, 2023 (ECF No. 50) ........................JA180

Order Dismissing Case with Prejudice, filed October 26, 2023
        (ECF No. 51) .........................................................................................JA205

Judgment in Favor of Defendants, filed October 26, 2023 (ECF No. 52)........JA206

Plaintiff's Notice of Appeal, filed November 21, 2023 (ECF No. 53) .............JA207

Defendants' Notice of Cross-Appeal, filed November 28, 2023
    (ECF No. 55) .......................................................................................JA210

## <u>VOLUME II</u> (Pages JA212–JA239)

Unredacted Declaration of Roy Blecher in Support of Defendants' Motion to
    Dismiss (ECF No. 23-4) .......................................................................JA212

Exhibit A to Declaration of Roy Blecher (ECF No. 23-5)...............................JA216

Exhibit B to Declaration of Roy Blecher (ECF No. 23-6) ..............................JA220

Exhibit C to Declaration of Roy Blecher (ECF No. 23-7) ..............................JA223

Exhibit D to Declaration of Roy Blecher (ECF No. 23-8) ..............................JA227

Declaration of Aaron S. Craig in Support of Defendants' Motion to Leave for File
    Under Seal (ECF No. 25) ......................................................................JA232

# U.S. District Court
## Eastern District of Virginia – (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:23–cv–00779–LMB–LRV

Khashoggi v. NSO Group Technologies Limited et al
Assigned to: District Judge Leonie M. Brinkema
Referred to: Magistrate Judge Lindsey R. Vaala
Case in other court:  4th Circuit, 23–02234
                                  4th Circuit, 23–02241
Cause: 18:1030 Computer Fraud and Abuse Act

Date Filed: 06/15/2023
Date Terminated: 10/26/2023
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

**Plaintiff**

**Hanan Elatr Khashoggi**                    represented by    **Annie Elizabeth Kouba**
Motley Rice LLC (SC–NA)
28 Bridgeside Blvd
Mt. Pleasant, SC 29464
NA
843–216–9000
Fax: 843–216–9450
Email: akouba@motleyrice.com
*ATTORNEY TO BE NOTICED*

**Charles Ross Heyl**
Motley Rice LLC (SC–NA)
28 Bridgeside Blvd
Mt. Pleasant, SC 29464
NA
843–216–9000
Fax: 843–216–9450
Email: rheyl@motleyrice.com
*ATTORNEY TO BE NOTICED*

**Michael Jon Pendell**
Motley Rice LLC (CT–NA)
One Corporate Center, 20 Church St.
17 Flr
Hartford, CT 06103
NA
860–218–2722
Fax: 860–841–1259
Email: mpendell@motleyrice.com
*ATTORNEY TO BE NOTICED*

**Michael J. Quirk**
Motley Rice LLC (PA–NA)
40 W. Evergreen Avenue
Suite 104
Philadelphia, PA 19118
**NA**
610–579–9932
Email: mquirk@motleyrice.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven T. Webster**
Webster Book LLP
300 N Washington Street
Suite 404
Alexandria, VA 22314
888–987–9991
Fax: 888–987–9991
Email: swebster@websterbook.com

JA1

*ATTORNEY TO BE NOTICED*

**Defendant**

**NSO Group Technologies Limited**          represented by   **Ashley C. Parrish**
King & Spalding (DC)
1700 Pennsylvania Ave NW
2nd FLoor
Washington, DC 20006–4707
(202) 737–0500
Fax: (202) 626–3737
Email: aparrish@kslaw.com
*ATTORNEY TO BE NOTICED*

**Edmund Paul Power**
King & Spalding (DC)
1700 Pennsylvania Ave NW
2nd FLoor
Washington, DC 20006–4707
202–626–5448
Fax: 202–626–3737
Email: epower@kslaw.com
*ATTORNEY TO BE NOTICED*

**Joseph N Akrotirianakis**
King & Spalding
633 W. Fifth Street
Suite 1600
Los Angeles, CA 90071
213–443–4313
Fax: 213–443–4310
Email: jakro@kslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Q Cyber Technologies Limited**          represented by   **Ashley C. Parrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Edmund Paul Power**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph N Akrotirianakis**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/15/2023 | 1 | Complaint ( Filing fee $ 402, receipt number AVAEDC–8984657.), filed by Hanan Elatr Khashoggi. (Attachments: # 1 Exhibit 1, # 2 Civil Cover Sheet)(Webster, Steven) (Entered: 06/15/2023) |
| 06/15/2023 | | Initial Case Assignment to District Judge Leonie M. Brinkema and Magistrate Judge Lindsey R. Vaala. (Sbro) (Entered: 06/20/2023) |
| 06/19/2023 | 2 | Motion to appear Pro Hac Vice by Randa Fahmy and Certification of Local Counsel Steven T. Webster Filing fee $ 75, receipt number AVAEDC–8987114. by Hanan Elatr Khashoggi. (Webster, Steven) (Entered: 06/19/2023) |
| 06/19/2023 | 3 | Motion to appear Pro Hac Vice by Charles Ross Heyl and Certification of Local Counsel Steven T. Webster Filing fee $ 75, receipt number AVAEDC–8987119. by |

| | | Hanan Elatr Khashoggi. (Webster, Steven) (Entered: 06/19/2023) |
|---|---|---|
| 06/19/2023 | 4 | Motion to appear Pro Hac Vice by Annie Elizabeth Kouba and Certification of Local Counsel Steven T. Webster Filing fee $ 75, receipt number AVAEDC–8987120. by Hanan Elatr Khashoggi. (Webster, Steven) (Entered: 06/19/2023) |
| 06/19/2023 | 5 | Motion to appear Pro Hac Vice by Michael Jon Pendell and Certification of Local Counsel Steven T. Webster Filing fee $ 75, receipt number AVAEDC–8987121. by Hanan Elatr Khashoggi. (Webster, Steven) (Entered: 06/19/2023) |
| 06/20/2023 | 6 | Proposed Summons *for NSO Group Technologies Limited* by Hanan Elatr Khashoggi. (Webster, Steven) (Entered: 06/20/2023) |
| 06/20/2023 | 7 | Proposed Summons *for Q Cyber Technologies Limited* by Hanan Elatr Khashoggi. (Webster, Steven) (Entered: 06/20/2023) |
| 06/20/2023 | 8 | Summons Issued as to NSO Group Technologies Limited, Q Cyber Technologies Limited, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Notice to Attorney)(Sbro) (Entered: 06/20/2023) |
| 06/20/2023 | 9 | ORDER granting 4 Motion for Pro hac vice Appointed Annie Elizabeth Kouba for Hanan Elatr Khashoggi. Signed by District Judge Leonie M. Brinkema on 6/20/2023. (Dest) (Entered: 06/20/2023) |
| 06/20/2023 | 10 | ORDER granting 3 Motion for Pro hac vice Appointed Charles Ross Heyl for Hanan Elatr Khashoggi. Signed by District Judge Leonie M. Brinkema on 6/20/2023. (Dest) (Entered: 06/20/2023) |
| 06/20/2023 | 11 | ORDER denying 2 Motion for Pro hac vice for Randa Fahmy. Signed by District Judge Leonie M. Brinkema on 6/20/2023. (Dest) (Entered: 06/20/2023) |
| 06/20/2023 | 12 | ORDER granting 5 Motion for Pro hac vice Appointed Michael Jon Pendell for Hanan Elatr Khashoggi. Signed by District Judge Leonie M. Brinkema on 6/20/2023. (Dest) (Entered: 06/20/2023) |
| 07/03/2023 | 13 | NOTICE of Appearance by Edmund Paul Power on behalf of NSO Group Technologies Limited, Q Cyber Technologies Limited (Power, Edmund) (Entered: 07/03/2023) |
| 07/03/2023 | 14 | Motion to appear Pro Hac Vice by Joseph Akrotirianakis and Certification of Local Counsel Filing fee $ 75, receipt number AVAEDC–9009519. by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Power, Edmund) (Entered: 07/03/2023) |
| 07/03/2023 | 15 | Corporate Disclosure Statement by Q Cyber Technologies Limited, NSO Group Technologies Limited. (Power, Edmund) (Entered: 07/03/2023) |
| 07/03/2023 | 16 | WAIVER OF SERVICE Returned Executed by Q Cyber Technologies Limited, NSO Group Technologies Limited. Q Cyber Technologies Limited waiver sent on 7/3/2023, answer due 10/2/2023; NSO Group Technologies Limited waiver sent on 7/3/2023, answer due 10/2/2023. (Power, Edmund) (Entered: 07/03/2023) |
| 07/04/2023 | 17 | Corporate Disclosure Statement by Q Cyber Technologies Limited, NSO Group Technologies Limited. (Power, Edmund) (Entered: 07/04/2023) |
| 07/05/2023 | 18 | ORDER granting 14 Motion for Pro hac vice Appointed Joseph Nicholas Akrotirianakis for NSO Group Technologies Limited,Joseph Nicholas Akrotirianakis for Q Cyber Technologies Limited. Signed by District Judge Leonie M. Brinkema on 7/5/2023. (swil) (Entered: 07/05/2023) |
| 09/24/2023 | 19 | Unopposed MOTION for Protective Order by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Attachments: # 1 Proposed Order) (Power, Edmund) (Entered: 09/24/2023) |

| 09/25/2023 | 20 | LIMITED PROTECTIVE ORDER. Signed by Magistrate Judge Lindsey R. Vaala on 9/25/2023. (swil) (Entered: 09/25/2023) |
|---|---|---|
| 09/29/2023 | 21 | MOTION to Seal by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Attachments: # 1 Proposed Order)(Power, Edmund) (Entered: 09/29/2023) |
| 09/29/2023 | 22 | Notice of Filing Sealing Motion LCvR5(C) by NSO Group Technologies Limited, Q Cyber Technologies Limited re 21 MOTION to Seal (Power, Edmund) (Entered: 09/29/2023) |
| 09/29/2023 | 23 | Sealed Document re 21 MOTION to Seal . (Attachments: # 1 Declaration of Yaron Shohat, # 2 Exhibit A to Shohat Declaration, # 3 Declaration of Joseph N. Akrotiriankis, # 4 Declaration of Roy Blecher, # 5 Exhibit A to Blecher Declaration, # 6 Exhibit B to Blecher Declaration, # 7 Exhibit C to Blecher Declaration, # 8 Exhibit D to Blecher Declaration)(Power, Edmund) (Entered: 09/29/2023) |
| 09/29/2023 | 24 | Memorandum in Support re 21 MOTION to Seal filed by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Power, Edmund) (Entered: 09/29/2023) |
| 09/29/2023 | 25 | Sealed Memorandum in Support re 21 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Power, Edmund) (Entered: 09/29/2023) |
| 09/29/2023 | 26 | MOTION to Dismiss *(REDACTED)* by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Attachments: # 1 Declaration of Yaron Shohat, # 2 Exhibit A to Shohat Declaration, # 3 Declaration of Joseph N. Akrotiriankis, # 4 Declaration of Roy Blecher (Redacted))(Power, Edmund) (Entered: 09/29/2023) |
| 09/29/2023 | 27 | Memorandum in Support re 21 MOTION to Seal *(REDACTED)* filed by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Power, Edmund) (Entered: 09/29/2023) |
| 09/30/2023 | | Notice of Correction: The filing user has been notified to file a Notice of Hearing or a Waiver of Oral Argument in re 26 MOTION to Dismiss (REDACTED). (jlan) (Entered: 09/30/2023) |
| 10/02/2023 | 28 | ORDER granting 21 Motion to Seal (see Order for further details). Signed by District Judge Leonie M. Brinkema on 10/2/2023. (Dest) (Entered: 10/02/2023) |
| 10/02/2023 | 29 | NOTICE of Appearance by Ashley C. Parrish on behalf of NSO Group Technologies Limited, Q Cyber Technologies Limited (Parrish, Ashley) (Entered: 10/02/2023) |
| 10/02/2023 | 30 | Notice of Hearing Date set for October 27, 2023 re 26 MOTION to Dismiss *(REDACTED)* (Power, Edmund) (Entered: 10/02/2023) |
| 10/02/2023 | 31 | CERTIFICATE of Service re 25 Sealed Memorandum in Support, 23 Sealed Document, by Edmund Paul Power on behalf of NSO Group Technologies Limited, Q Cyber Technologies Limited (Power, Edmund) (Entered: 10/02/2023) |
| 10/03/2023 | 32 | Motion to appear Pro Hac Vice by Michael J. Quirk and Certification of Local Counsel Steven T. Webster *(Receipt Number AVAEDC−9153724)* by Hanan Elatr Khashoggi. (Webster, Steven) (Entered: 10/03/2023) |
| 10/03/2023 | 34 | ORDER granting 32 Motion for Pro hac vice Appointed Michael J. Quirk for Hanan Elatr Khashoggi. Signed by District Judge Leonie M. Brinkema on 10/3/2023. (swil) (Entered: 10/04/2023) |
| 10/04/2023 | 33 | ORDER: Before the Court is defendants' Notice informing the Court that the parties are unavailable to present argument on defendants' Motion to Dismiss during the Court's routine Friday hearing schedule. Accordingly, it is hereby ORDERED that the Clerk schedule a hearing on defendants' Motion to Dismiss [Dkt.No. 26] for Tuesday, October 24, 2023 at 10:00 a.m. in courtroom 700. Signed by District Judge Leonie M. Brinkema on 10/4/2023. (yguy) (Entered: 10/04/2023) |
| 10/04/2023 | | Deadlines as to 26 MOTION to Dismiss (REDACTED). Motion Hearing set for 10/24/2023 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (yguy) (Entered: 10/04/2023) |

JA4

| 10/04/2023 | 35 | MOTION for Hearing re 26 MOTION to Dismiss *(REDACTED) (Motion for Alternate Hearing Date)* by Hanan Elatr Khashoggi. (Attachments: # 1 Proposed Order)(Webster, Steven) (Entered: 10/04/2023) |
|---|---|---|
| 10/04/2023 | 36 | NOTICE of Waiver of Hearing *on Motion for Alternate Hearing Date* re 35 MOTION for Hearing re [Dkt. 26] MOTION to Dismiss *(REDACTED) (Motion for Alternate Hearing Date) by Hanan Elatr Khashoggi (Webster, Steven) Modified on 10/5/2023 (Dest). (Entered: 10/04/2023)* |
| 10/04/2023 | 37 | ORDER: Accordingly, plaintiff's Motion 35 is GRANTED IN PART, and it is hereby ORDERED that the Clerk reschedule the hearing on defendants' Motion to Dismiss 26 for Friday, October 20, 2023 at 10:00 a.m. in courtroom 700. Signed by District Judge Leonie M. Brinkema on 10/4/2023. (tran) (Entered: 10/04/2023) |
| 10/04/2023 |  | Reset Deadlines as to 26 MOTION to Dismiss *(REDACTED)*. **Motion Hearing reset for 10/20/2023 at 10:00 AM** in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (tran) (Entered: 10/04/2023) |
| 10/12/2023 | 38 | MOTION To Permit Two Attorneys to Present Argument on Motion to Dismiss re 26 MOTION to Dismiss *(REDACTED)* by Hanan Elatr Khashoggi. (Attachments: # 1 Proposed Order)(Webster, Steven) (Entered: 10/12/2023) |
| 10/12/2023 | 39 | Waiver of re 38 MOTION To Permit Two Attorneys to Present Argument on Motion to Dismiss re 26 MOTION to Dismiss *(REDACTED) (Waiver of Hearing)* by Hanan Elatr Khashoggi (Webster, Steven) (Entered: 10/12/2023) |
| 10/12/2023 | 40 | ORDERED that the motion on oral argument is granted subject to the Court's discretion as to whether argument is needed on any particular issue in re 38 MOTION To Permit Two Attorneys to Present Argument on Motion to Dismiss. Signed by District Judge Leonie M. Brinkema on 10/12/2023. (swil) (Entered: 10/12/2023) |
| 10/12/2023 | 41 | MOTION [Unopposed] LEAVE TO HAVE TWO ATTORNEYS ENGAGE IN ORAL ARGUMENT re 26 MOTION to Dismiss *(REDACTED)*, 24 Memorandum in Support by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Attachments: # 1 Proposed Order)(Power, Edmund) (Entered: 10/12/2023) |
| 10/12/2023 | 42 | Waiver of re 41 MOTION [Unopposed] LEAVE TO HAVE TWO ATTORNEYS ENGAGE IN ORAL ARGUMENT re 26 MOTION to Dismiss *(REDACTED)*, 24 Memorandum in Support by NSO Group Technologies Limited, Q Cyber Technologies Limited (Power, Edmund) (Entered: 10/12/2023) |
| 10/13/2023 | 43 | ORDERED that the Motion is granted, subject to the Court's discretion as to whether argument is needed on any particular issue in re 41 MOTION [Unopposed] LEAVE TO HAVE TWO ATTORNEYS ENGAGE IN ORAL ARGUMENT. Signed by District Judge Leonie M. Brinkema on 10/13/2023. (swil) (Entered: 10/13/2023) |
| 10/13/2023 | 44 | Memorandum in Opposition re 26 MOTION to Dismiss *(REDACTED) (Redacted Brief in Opposition)* filed by Hanan Elatr Khashoggi. (Attachments: # 1 Affidavit (Declaration of Bill Marczak))(Webster, Steven) (Entered: 10/13/2023) |
| 10/13/2023 | 45 | Sealed Response/Reply/Opposition re 26 MOTION to Dismiss *(REDACTED)*. (Webster, Steven) (Entered: 10/13/2023) |
| 10/18/2023 | 46 | Sealed Response/Reply/Opposition re 26 MOTION to Dismiss *(REDACTED)*. (Parrish, Ashley) (Entered: 10/18/2023) |
| 10/18/2023 | 47 | Notice of Under Seal Filing LCvR5 (B) by NSO Group Technologies Limited, Q Cyber Technologies Limited re 46 Sealed Response/Reply/Opposition (Parrish, Ashley) (Entered: 10/18/2023) |
| 10/18/2023 | 48 | REPLY to Response to Motion re 26 MOTION to Dismiss *(REDACTED)* filed by NSO Group Technologies Limited, Q Cyber Technologies Limited. (Attachments: # 1 Affidavit of Joseph N. Akrotirianakis, # 2 Exhibit A)(Parrish, Ashley) (Entered: 10/18/2023) |
| 10/20/2023 | 49 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing held on 10/20/2023. Appearance of counsel. 26 MOTION to Dismiss (REDACTED) filed by NSO Group Technologies Limited, Q Cyber Technologies Limited is argued and TAKEN UNDER ADVISEMENT. (Court Reporter S. |

| | | |
|---|---|---|
| | | Austin.)(yguy) (Entered: 10/20/2023) |
| 10/26/2023 | 50 | MEMORANDUM OPINION in re Motion to Dismiss. Signed by District Judge Leonie M. Brinkema on 10/26/2023. (swil) (Entered: 10/26/2023) |
| 10/26/2023 | 51 | ORDERED that defendant's Motion to Dismiss [Dkt. No. 26] is GRANTED; and it is hereby ORDERED that plaintiff's Complaint be and is DISMISSED WITH PREJUDICE (see Order for further details). Signed by District Judge Leonie M. Brinkema on 10/26/2023. (swil) (Entered: 10/26/2023) |
| 10/26/2023 | 52 | CLERK'S JUDGMENT is hereby entered in accordance with Federal Rules of Civil Procedure 58 in favor of the Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited and against the Plaintiff Hanan Elatr Khashoggi. Entered by Clerk on 10/26/2023. (swil) (Entered: 10/26/2023) |
| 11/21/2023 | 53 | NOTICE OF APPEAL as to 51 Order on Motion to Dismiss, 52 Clerk's Judgment, by Hanan Elatr Khashoggi. Filing fee $ 505, receipt number AVAEDC−9230895. (Webster, Steven) (Entered: 11/21/2023) |
| 11/27/2023 | 54 | Transmission of Notice of Appeal to US Court of Appeals re 53 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov (Dest) (Entered: 11/27/2023) |
| 11/28/2023 | 55 | NOTICE OF CROSS APPEAL as to 50 Memorandum Opinion, 52 Clerk's Judgment, by NSO Group Technologies Limited, Q Cyber Technologies Limited. Filing fee $ 505, receipt number AVAEDC−9237886. (Parrish, Ashley) (Entered: 11/28/2023) |
| 11/29/2023 | 56 | USCA Case Number 23−2234, case manager Emily Borneisen 4th Circuit for 53 Notice of Appeal filed by Hanan Elatr Khashoggi. (swil) (Entered: 11/29/2023) |
| 11/29/2023 | 57 | Transmission of Notice of Appeal to US Court of Appeals re 55 Notice of Cross Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov (Dest) (Entered: 11/29/2023) |
| 11/30/2023 | 58 | USCA Case Number 23−2241, case manager Emily Borneisen 4th Circuit for 55 Notice of Cross Appeal filed by NSO Group Technologies Limited, Q Cyber Technologies Limited. (swil) (Entered: 11/30/2023) |
| 11/30/2023 | 59 | ORDER of USCA as to 53 Notice of Appeal filed by Hanan Elatr Khashoggi, 55 Notice of Cross Appeal filed by NSO Group Technologies Limited, Q Cyber Technologies Limited. The court consolidates Case No. 23−2241 and Case No. 23−2234(L) as cross−appeals. The appellant in Case No. 23−2234 shall be considered the appellant for purposes of the consolidated appeals and shall proceed first at briefing and at oral argument. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. (Dest) (Entered: 11/30/2023) |
| 12/14/2023 | 60 | Transcript Order Acknowledgment from USCA re 53 Notice of Appeal: Court Reporter/Transcriber Stephanie Austin. (swil) (Entered: 12/14/2023) |
| 02/19/2024 | 61 | TRANSCRIPT of proceedings for dates of 10−20−23, before Judge Leonie Brinkema, re 60 Transcript Order Acknowledgment from USCA Court Reporter/Transcriber Stephanie Austin, Telephone number 571−298−1649. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/20/2024. Redacted Transcript Deadline set for 4/22/2024. Release of Transcript Restriction set for 5/20/2024.(Austin, Stephanie) (Entered: 02/19/2024)** |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| HANAN ELATR KHASHOGGI | Civil Action No. 1:23-cv-779 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| NSO GROUP TECHNOLOGIES LIMITED | **JURY TRIAL DEMANDED** |
| and | |
| Q CYBER TECHNOLOGIES LIMITED, | |
| 22 Galgalei Haplada, Herzliya, Tel Aviv-Yafo, Israel 4672222 | |
| Defendants. | |

Hanan Elatr Khashoggi ("Hanan" or "Plaintiff"), by and through undersigned counsel, alleges the following against Defendants NSO Group Technologies Limited ("NSO Group") and Q Cyber Technologies Limited ("Q Cyber") (collectively, "NSO Group" or "Defendants"):

## I.    INTRODUCTION

1.    Defendants have long infringed upon the basic principles of personal freedom and the fundamental right to privacy through the creation, sale, and operation of highly sophisticated and malicious spyware. Those actions can—and have—resulted in disastrous outcomes, including intimidation, physical injury, and death. For Hanan Khashoggi, the ramifications of Defendants' exploits have tragically played out before her eyes, forever altering her life.

2.    NSO Group and its parent company, Q Cyber, create, market, and sell spyware and provide technical assistance and consulting to government clients that contract with them to use their spyware. Often, these clients were known authoritarian regimes working with NSO Group to use its spyware to target anyone who poses a perceived "threat" to the reigning power. Targeted persons deemed "threats" include not just criminals, but also activists, humanitarians, dissidents, and journalists. Unfortunately, the nefarious use of the spyware does not stop there—NSO Group technology is also used to track the friends, family members, and loved ones of anyone the client deems suspicious.

3.    Defendants' actions have drawn criticism—and intense fear—from reporters and activists targeted by the spyware, as well as from politicians, government officials, and the technology industry at large. Shane Huntley, Director of Google's Threat Analysis Group ("TAG") testified in front of the U.S. House Committee on Intelligence, gravely summarizing:

> While these vendors claim to vet their customers and usage carefully with the promise that the work is used to counter criminals and terrorists, what we have observed in TAG is consistent with others' reporting—that again and again these tools are found to be used by governments for purposes antithetical to democratic values, targeting dissidents, journalists, human rights workers, and political

opponents. NSO Group is the most prominent actor offering spyware and these services. . . .[1]

4.    Hanan Khashoggi suffered through the brutal kidnapping and murder of her husband, Jamal Khashoggi, at the hands of Saudi Arabian actors sent by the Crown Prince of Saudi Arabia, Mohammed bin Salman, assisted by allies in the United Arab Emirates. While she was still mourning her husband's death, in addition to dealing with the violent nature of the killing and international publicity surrounding it, she was hit with another disturbing revelation. For nearly a year leading up to Jamal's murder, Hanan's phones had been infiltrated by NSO Group spyware.

5.    Hanan was then left to deal with the knowledge that her husband's life was cut short by Saudi agents who perpetuated the killing, using, upon information and belief, knowledge about Jamal obtained by NSO Group from Hanan's own devices, which were transformed into handheld spies.

## II.    THE PARTIES

### PLAINTIFF

6.    Plaintiff Hanan Elatr Khashoggi is an Egyptian citizen and the widow of Jamal Khashoggi. Plaintiff is a lawful resident of the United States and is currently seeking the status of political asylum in the United States.

7.    Plaintiff brings this action on her own behalf.

8.    Jamal Khashoggi was a prominent and prolific writer, editor, and activist who was well-known for his thoughtful opinions on the rights of women and other minorities, and his calls for governmental reform in Saudi Arabia and the Middle East at-large.

9.    Hanan currently resides in the Commonwealth of Virginia. Before her husband Jamal's death, Hanan shared a home with him in Fairfax County, Virginia. She is currently legally employed through a work visa and is working and living full-time in Virginia.

---

[1] *Combatting the Threats to U.S. National Security from the Proliferation of Foreign Commercial Spyware Before the U.S. House of Representatives, Permanent Select Committee on Intelligence*, 117th Cong. (2022).

10.     Hanan was employed as a flight attendant for Emirates Airlines for more than twenty years.

11.     Hanan and Jamal met at a conference in the United Arab Emirates ("UAE") in 2009, and Hanan became Jamal's confidante and friend. The two communicated by phone, staying in touch for years before their relationship became romantic.

12.     As detailed herein, Jamal eventually had reason to fear for his safety in Saudi Arabia, and was forced to flee Saudi Arabia in the summer of 2017. Once in the United States, Jamal reached out to Hanan and invited her to reconnect with him in his new home in Virginia.

13.     After accepting Jamal's invitations, the two quickly began dating, and not long after began contemplating marriage. Jamal proposed to Hanan in April 2018.

14.     Shortly after the proposal, in the course of her usual flight schedule, Hanan arrived in Dubai. However, this time, she was greeted at the airport by UAE intelligence officials that confiscated her devices, questioned, and detained Hanan for two weeks.

15.      In June 2018, the couple was married by an Imam in an Islamic ceremony in Virginia. After their wedding, the newlyweds lived in their shared Tysons Corner, Virginia condominium as husband and wife.

16.     In October 2018, Hanan and Jamal's story came to a violent end when Jamal was assassinated in the Saudi Arabian consulate in Istanbul for his writings and critiques of the Saudi regime.

17.     After the murder of her husband, Hanan lost her job after experiencing continued harassment from the government of the UAE, including being interrogated and held against her will—again—for more than two months in early 2019. The UAE, the Kingdom of Saudi Arabia, and other actors have closely monitored and intimidated Jamal's loved ones even after his death.

18.     Due to the actions of Defendants and their clients, Hanan is now seeking the protections of political asylum in the United States.

19.     Continuing the advocacy that her husband began, Hanan has spoken out against the actors responsible for causing Jamal's death and seeks justice for him and on her own behalf through this action.

**DEFENDANTS**

20.     Defendant NSO Group Technologies Limited is a limited liability company incorporated in Israel on January 25, 2010. NSO Group created, developed, sold, and assisted in the deployment and use of cutting-edge spyware technology to clients around the world.

21.     Defendant NSO Group is a subsidiary of Q Cyber Technologies, and upon information and belief, sometimes conducts business under that moniker.

22.     Defendant Q Cyber Technologies Limited is a limited liability company incorporated in Israel on December 2, 2013 under the name L.E.G.D. Company Limited. The company officially changed its name to Q Cyber Technologies on May 29, 2016. Q Cyber is the parent company of NSO Group and a subsidiary of OSY Technologies SARL.

23.     Upon information and belief, NSO Group and Q Cyber Technologies are currently managed, in all material respects, by one of their founders, Omri Lavie.

24.     Upon information and belief, Omri Lavie registered Dufresne Holding, a limited liability company, in Luxembourg on or about February 2023.

25.     Upon information and belief, at the time of its registration Dufresne Holding had one shareholder, Omri Lavie.

26.     Upon information and belief, on or around April 2023 Dufresne Holding became the sole shareholder of NorthPole Newco S.a.r.l.

27.     Upon information and belief, NorthPole Newco S.a.r.l was the sole shareholder of OSY Technologies S.a.r.l at the time Dufresne Holding became the sole shareholder of NorthPole Newco S.a.r.l.

28.     Upon information and belief, the ownership and management of NSO Group and Q Cyber through groups based in Luxembourg consisted, at one time or another, of up to seven

other companies: Triangle Holdings, Square 2, Novalpina Capital Partners, Novalpina Capital Group, Northpole Holdco, NorthPole Bidco and NorthPole Newco.[2]

29.    Defendants intentionally targeted the devices of Hanan Khashoggi and caused her immense harm, both through the tragic loss of her husband and through her own loss of safety, privacy, and autonomy, as well as the loss of her financial stability and career.

30.    In addition to intentionally targeting Hanan (and through Hanan, Jamal) and her devices in Virginia, NSO Group also has significant ties to the United States. For much of the past decade, NSO Group has been primarily funded and controlled by California-based investment funds and has engaged the U.S. government (and local governments within the U.S.) as potential clients.[3] Further, NSO Group has a U.S. subsidiary company, Westbridge Technologies, Inc. that is headquartered in Virginia. NSO Group created Westbridge to help market and sell Defendants' spyware to the U.S. market.

31.    Even after being placed on a restricted entity list by the United States Department of Commerce, NSO Group has continued to aggressively lobby its services in the United States, and upon information and belief, continues that lobbying today.[4] In 2022 alone, "NSO Group paid

---

[2] *See* Cordula Schnuer, "Nine NSO entities in Luxembourg, minister confirms," *Delano*, July 21, 2021, https://delano.lu/article/nine-nso-entities-in-luxembour (last accessed June 5, 2023); *see also* Stephanie Kirchgaessner, "NSO Group co-founder emerges as new majority owner," *The Guardian*, March 1, 2023,
 https://www.theguardian.com/technology/2023/mar/01/one-of-nso-groups-founders-emerges-as-new-majority-owner (last accessed June 5, 2023).

[3] Mark Mazzetti and Ronen Bergman, "Internal Documents Show How Close the F.B.I. Came to Deploying       Spyware,"       *New       York       Times,*       November       12,       2022, https://www.nytimes.com/2022/11/12/us/politics/fbi-pegasus-spyware-phones-nso.html    (stating that FBI officials "made a push in late 2020 and the first half of 2021 to deploy the hacking tools— made by the Israeli spyware firm NSO—in its own criminal investigations.") (last accessed June 5, 2023); *see also* Joseph Cox, "LAPD Got Tech Demos from Israeli Phone Hacking Firm NSO Group," *Vice*, June 9, 2020, https://www.vice.com/en/article/n7wna7/lapd-phone-hacking-nso-group-westbridge (stating that members of the Los Angeles Police Department received a demo of Pegasus from NSO Group) (last accessed June 5, 2023).

[4] Inci Sayki, "Spyware firm NSO Group Continues Lobbying Efforts to Resume Business-as-Usual in       the       U.S.,"       *OpenSecrets.org*,       May       15,       2023, https://www.opensecrets.org/news/2023/05/spyware-firm-nso-group-continues-lobbying-efforts-

over $1.1 million to public relations companies and law firms in the U.S. . . ., more than the government of Israel . . . spent in total on its U.S. lobbying operation through the same period. . . . Since 2020, NSO Group has paid foreign agents more than $2.9 million for foreign influence and lobbying operations in the U.S."[5]

32.     Upon information and belief, at all times material to this case, each Defendant was the agent, partner, alter ego, subsidiary, parent, and/or co-conspirator of and with the other Defendant, and the acts of each Defendant were within the scope of that relationship; each Defendant knowingly and intentionally agreed with the other to carry out the acts alleged in this Complaint; and in carrying out the acts alleged in this Complaint, each Defendant acted with the knowledge, permission, and consent of the other, and each Defendant aided and abetted the other.

**III.     JURISDICTION AND VENUE**

33.     This Court has jurisdiction over Plaintiff's federal causes of action pursuant to 28 U.S.C. § 1331 because these causes of action arise under federal law—the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court has subject matter jurisdiction over Plaintiff's claims under the Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq*., claims of Trespass to Chattels, Negligence, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and claims for equitable relief pursuant to 28 U.S.C. § 1367 because these claims arise out of the same nucleus of operative fact as Plaintiff's federal law claims.

34.     This Court has personal jurisdiction over Defendants because Defendants engaged in conduct within the Commonwealth of Virginia, resulting in sufficient minimum contacts with this forum. Defendants have utilized instrumentalities located in Virginia (Plaintiff's personal devices) as well as targeting residents of Virginia (Hanan and Jamal Khashoggi) specifically, with

---

to-resume-business-as-usual-in-the-u-
s#:~:text=NSO%20Group%20paid%20over%20%241.1,operation%20through%20the%20same
%20period (last accessed June 5, 2023).

[5] *Id.*

knowledge that such targeting would result in significant harm to Plaintiff in Virginia and violate the laws of the United States.

35.    This Court also has personal jurisdiction over Defendants under the "effects" test set forth in *Calder v. Jones*, 465 U.S. 783 (1984) because Defendants have committed an intentional tort, Plaintiff suffered the harm of that act in this forum, and Defendants expressly aimed their tortious conduct at the Plaintiff in Virginia such that Virginia can be said to be the focal point of the tortious activity.

36.    Personal jurisdiction is proper under Virginia's long-arm statute, Va. Code Ann. § 8.01-328.1, which provides that a court may exercise personal jurisdiction over a party as to a cause of action arising from the party (a) transacting any business in Virginia, (b) causing tortious injury by an act or omission in Virginia, or (c) causing tortious injury in Virginia by an act or omission outside Virginia if the party regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in Virginia. Pursuant to the long-arm statute, using a computer or computer network located in Virginia constitutes an act in Virginia. Defendants are therefore subject to personal jurisdiction in Virginia because they caused tortious injury to the Plaintiff in Virginia when they infiltrated and continuously monitored Plaintiff through her devices while she lived in Virginia with her husband. Defendants are located in Israel and Defendants have gained substantial revenue by providing services to their clients, with knowledge that those clients were then likely to target individuals residing in the United States.

37.    Alternatively, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

38.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b)(3).

## IV.   FACTUAL ALLEGATIONS

### THE WORLD'S MOST POWERFUL SPYWARE—NSO GROUP'S "PEGASUS"

39.    NSO Group has made its name amongst authoritarian governments and those known for perpetuating human rights abuses by offering them "Pegasus," the world's most powerful, sophisticated, and infamous cyberweapon.[6]

40.    Pegasus is an advanced surveillance tool designed to be undetectable—it evades traditional security measures and is installed on the user's device without their knowledge or consent. Further, Pegasus can remotely infect a target's cell phone using a simple text message.

41.    The version of Pegasus installed on Plaintiff's phone was in high demand due to its unique remote "zero click" feature. That is, no interaction was required by the target to have their phone compromised. Most available spyware requires some interaction by the target, such as clicking a link or opening a file. With Pegasus, NSO Group needed only the target's phone number, and it could then see "every piece of data stored on the phone."[7]

42.    Forensic investigation performed by Citizen Lab, a research laboratory based out of the University of Toronto's Munk School of Global Affairs, provided evidence that both of Plaintiff's Android phones were infected with Pegasus by April 2018, and likely earlier, with

---

[6] Upon information and belief, Pegasus has been sold to the Governments of Ghana, Rwanda, and the United Arab Emirates, despite the questionable human rights records of each. Stephanie Kirchgaessner and Diane Taylor, "Nephew of jailed Hotel Rwanda Dissident hacked by NSO Spyware,"            *The           Guardian*,           July          18,          2022, https://www.theguardian.com/world/2022/jul/18/nephew-of-jailed-hotel-rwanda-dissident-hacked-by-nso-spyware (last accessed June 5, 2023); *see also* Ronen Bergman and Mark Mazzetti, "The Battle for the World's Most Powerful Cyberweapon," *The New York Times,* January 28, 2022,     https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html     (last accessed June 5, 2023); Omer Benjakob, "NSO Ghana Op Exposed: Never-before-seen Pegasus Spyware Footage, Workers' Passports," January 20, 2022, https://www.haaretz.com/israel-news/tech-news/2022-01-20/ty-article/nso-ghana-op-exposed-never-before-seen-pegasus-spyware-footage-workers-passports/0000017f-f1fb-df98-a5ff-f3ffb9a20000 (last accessed June 5, 2023).

[7] Ronen Bergman and Mark Mazzetti, "The Battle for the World's Most Powerful Cyberweapon," *The New York Times*, January 28, 2022, https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html (last accessed June 5, 2023).

attempts on her devices dating back to November 2017.[8] The infiltration allowed for all information stored on Plaintiff's phones to become accessible. However, it also granted access to all future phone calls, communication activity through apps, and text messages in perpetuity. Further, the infiltration gave Defendants and Defendants' client(s) the ability to activate the cameras and microphones of Plaintiff's phones without her knowledge, turning her phones into sophisticated listening and recording devices.[9]

43.      Because of the unique danger posed by Pegasus and NSO Group, the United States Commerce Department's Bureau of Industry and Security placed NSO Group on its Entity List based on evidence that it "developed and supplied spyware to foreign governments that used these tools to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers."[10] Defendants' activity has resulted in countless human rights violations and is an urgent matter of national security.

44.      John Scott-Railton, a Senior Researcher at the Citizen Lab,[11] addressed the pernicious nature of the industry in front of the U.S. House Intelligence Committee:

> When confronted with abuses the mercenary spyware industry typically has a message: Our technology is designed to fight crime

---

[8] *See infra* section IV.

[9] Dana Priest, "A UAE Agency put Pegasus spyware on phone of Jamal Khashoggi's wife months before his murder, new forensics show," *Washington Post*, December 21, 2021, https://www.washingtonpost.com/nation/interactive/2021/hanan-elatr-phone-pegasus/.

[10] U.S. Department of Commerce, "Commerce Adds NSO Group and Other Foreign Companies to Entity List for Malicious Cyber Activities," November 3, 2021, https://www.commerce.gov/news/press-releases/2021/11/commerce-adds-nso-group-and-other-foreign-companies-entity-list (last accessed June 5, 2023).

[11] Citizen Lab has been at the forefront of researching and sounding the alarm on NSO Group and other mercenary spyware companies. Citizen Lab analyzed the devices of Hanan Khashoggi for evidence of NSO Group activity and has done so for countless others as the go-to organization for detection of the extremely sophisticated spyware. According to its website, "The Citizen Lab is an interdisciplinary laboratory based at the Munk School of Global Affairs & Public Policy, University of Toronto, focusing on research, development, and high-level strategic policy and legal engagement at the intersection of information and communication technologies, human rights, and global security." *See* "About the Citizen Lab" https://citizenlab.ca/about/ (last accessed June 9, 2023).

and terror. Period. But the facts don't bear this out, in two ways. *First, abuses have been a feature of this technology and industry since day one*. Second, and as we have discussed today, the crime and terror narrative omits the fact that a significant proportion of the use that we see of mercenary spyware is state-on-state espionage, governments targeting other governments. And of course the United States has been one of those targets.[12]

45.     NSO Group publicly states that it takes a hands-off approach after selling its powerful spyware to authoritarians, and that it offers no assistance to its clients after the transaction is complete.[13]

46.     However, those statements are simply not true. NSO Group stays intimately involved in the surveillance process after providing its tools to its clients, with representatives explicitly stating, "we hear about…every phone call that is being hacked over the globe, *we get a report immediately*."[14]

47.     Also contrary to its prior assertions, NSO Group itself has boasted that it offers clients "cyber intelligence, data acquisition, *and analysis*."[15]

---

[12] *Combatting the Threats to U.S. National Security from the Proliferation of Foreign Commercial Spyware Before the U.S. House of Representatives, Permanent Select Committee on Intelligence*, 117th Cong. (2022) (emphasis added).

[13] In a post titled "Enough is Enough!" NSO Group's website states its repetitive claim for plausible deniability: "NSO is a technology company. We do not operate the system, nor do we have access to the data of our customers, yet they are obligated to provide us with such information under investigations." NSO News, Enough is Enough, NSO Group, https://web.archive.org/web/20230323182216/https://www.nsogroup.com/Newses/enough-is-enough/ (last accessed June 5, 2023).

[14] Ronan Farrow, "How Democracies Spy on their Citizens," *The New Yorker*, April 18, 2022, https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens (last accessed June 5, 2023) (emphasis added).

[15] 2019 ISS World Europe—Lead Sponsor, *TeleStrategies ISS World Europe*, https://web.archive.org/web/20190908051829/https://www.issworldtraining.com/iss_europe/sponsors.html (last accessed June 5, 2023) (emphasis added).

48.     A sales brochure for Pegasus, also filed in *WhatsApp v. NSO Group*, further outlines tactics that NSO Group suggests its clients use to infiltrate target phones.[16]

49.     Upon information and belief, NSO Group describes two remote "installation vectors" for Pegasus: Remote installation ("over-the-air" or "OTA") and Enhanced Social Engineering Messages ("ESEM").

50.     Social engineering, in the cybersecurity context, refers to a manipulative tactic to induce the target to provide their own vulnerabilities to a bad actor. One common example is phishing—where a website or email appears to be legitimate, but in fact is not, inducing the target to click on a link that exposes them to malware or spyware.

51.     NSO Group states that the ESEM method allows "the system operator [to] choose to send a regular text message (SMS) or an email, luring the target to open it." NSO Group brags that a "[s]ingle click, either planned or unintentional, on the link will result in hidden agent installation."[17]

52.     NSO Group further offers that "[t]he Pegasus solution provides a wide range of tools to compose a tailored and innocent message to lure the target to open the message."[18]

53.     NSO Group clients have multiple options when deciding how to obtain a primary target's personal information. First, they can "direct target" the primary individual in question— for example, a journalist, human rights activist, or political refugee. Direct targeting may be utilized for individuals that have exploitable security gaps on their phone. The problem with this approach for NSO Group and its clients is that most of these "direct targets" know that they may be at risk of some sort of spyware and often are more vigilant in securing their devices.

---

[16] Exhibit 1 at 13 ("When physical access to the device is an option, the Pegasus agent can be manually injected and installed in less than five minutes."). *See generally* Compl., *WhatsApp Inc. v. NSO Group Technologies Limited*, 3:19-cv-07123 (N.D. Cal. Oct. 29, 2019), ECF No. 1.

[17] Exhibit 1 at 12.

[18] *Id.* at 13.

54.    The way around this obstacle is to invoke a second option: utilization of what is known as "relational" or "off-center" targeting. Relational targeting is when "spouses, siblings, parents, staff, or close associates of primary targets [are] targeted and infected with Pegasus."[19] This allows NSO Group's clients to circumvent the security features that are typically utilized by hyper-vigilant primary targets, like Jamal Khashoggi.[20]

55.    These two options are not mutually exclusive and can be deployed in tandem by the Pegasus operator to give the best chance of success in obtaining the personal details of the primary target.

56.    Infecting a primary target's network of close, trusted associates allows NSO Group's clients to exploit the laxer security standards of individuals who would otherwise not fear targeting. Relational targeting also allows clients to develop contingency in the case that the primary target's phone cannot be hacked for technical reasons (*e.g.*, if the primary target is unable to be exploited).  Even if the primary target infiltration is successful, having a relational target close to the direct target provides security for the client in the event that connection is disrupted (*e.g.*, by the target entering a country with a different network system). Finally, relational targeting also simply provides another avenue of unfiltered information both from the direct target him or herself and through what the relational target relays about the direct target to third parties.

---

[19] John Scott-Railton, Elies Campo, Bill Marczak, Bahr Abdul Razzak, Siena Anstis, Gözde Böcü, Salvatore Solimano, and Ron Deibert, *CatalanGate, Extensive Mercenary Spyware Operation against Catalans Using Pegasus and Chandiru*, April 18, 2022 https://citizenlab.ca/2022/04/catalangate-extensive-mercenary-spyware-operation-against-catalans-using-pegasus-candiru/ (last accessed June 5, 2023).

[20] Jamal, referring to Crown Prince Mohammed bin Salman, reportedly told friends that "The kid is dangerous." Kristina Jovanovski and Saphora Smith, "Jamal Khashoggi was fearful of Saudi government before disappearing, friends say," *NBC News*, October 9, 2018, https://www.nbcnews.com/news/world/jamal-khashoggi-was-fearful-of-saudi-government-disappearing-friends-say-n917686 (last accessed June 5, 2023).  Jamal shared his fears around his safety with Hanan, beginning at least in November 2016 after Jamal was critical of Donald Trump after he was elected President of the United States.

- 12 -

JA19

57.    NSO Group knew, or should have known, that its clients routinely utilized relational targeting and that relational targeting was incredibly effective at accomplishing the goals of authoritarian regimes (*e.g.*, suppressing dissent and intimidating the public).

58.    One clear example of this tactic played out in Catalonia, Spain, where political figures were targeted by Pegasus between 2017 and 2020. This was accomplished using a WhatsApp exploit, similar to one of the attempts on Hanan's phone.[21] At the time, political figures in Catalonia were campaigning for a fully independent Catalonia, which Spain's Constitutional Court maintained was contrary to law. Catalonia's former president, Carles Puigdemont, supported a binding referendum for citizens to vote on independence. In its investigation of the hacking of pro-independence politicians, Citizen Lab was not able to confirm that Puigdemont's phone was infected with Pegasus.

59.    However, Citizen Lab concluded that "an arc of targeting" formed around Puigdemont. Eleven individuals ranging from Puigdemont's "spouse and residence staff to confidants, his lawyer, and friends" had their devices compromised.[22] Citizen Lab concluded that "monitoring their devices would have provided a detailed window into [Puigdemont's] life, movements, and thinking."[23]

60.    NSO Group publicly contends that it can identify and stop any "misuse" of its weapon (such as the targeting of activists' family members).[24] However, upon information and

---

[21] Scott-Railton, "*CatalanGate, Extensive Mercenary Spyware Operation against Catalans Using Pegasus and Chandiru*" April 18, 2022 https://citizenlab.ca/2022/04/catalangate-extensive-mercenary-spyware-operation-against-catalans-using-pegasus-candiru/ (last accessed June 5, 2023).

[22] https://catalonia.citizenlab.ca/#targeting-puigdemont (last accessed June 5, 2023) (emphasis added).

[23] *Id.*

[24] Audrey Travère, "The Rise and Fall of NSO Group," *Forbidden Stories*, July 19, 2021, https://forbiddenstories.org/the-rise-and-fall-of-nso-group/ (Co-founder Shalev Hulio states "We understand that in some circumstances our customers might misuse the system and, in some cases like we reported in the Transparency and Responsibility report, we have shut down system for customers who have misused the system.") (last accessed June 5, 2023).

- 13 -

belief, despite this claim, NSO Group has failed to do so, as evidenced by the number of times Pegasus has been used to spy on innocent individuals.

61.    For example, in May 2017, Mexican journalist Javier Valdez was shot and killed outside of his office. Valdez had been investigating the Sinaloa cartel at the time. Days after Valdez was killed, his colleagues received carefully crafted text messages (another instance of the use of ESEM) that would infect their phones with Pegasus if they clicked on the contained links.[25]

62.    Eleven days after Valdez was killed, his wife, Griselda Triana, was also targeted by ESEM links. Griselda received two messages specifically tailored to induce her to click on them and infect her phone with Pegasus.

63.    Citizen Lab concluded that the operator attempting to install Pegasus onto Valdez's wife and colleagues' phones was active until 2017. Citizen Lab further concluded that the operator was the Mexican Government. The Mexican Government's original infrastructure (dubbed 'RECKLESS-1' by Citizen Lab) was disabled in June 2017. However, while RECKLESS-1 was not re-enabled, Citizen Lab concluded that the Mexican Government continued operating Pegasus infrastructure.[26]

64.    Upon information and belief, given RECKLESS-1's closure, and the Mexican Government's subsequent use of Pegasus infrastructure, NSO Group knew or should have known at least as early as 2017 that its cyberweapon was used to target colleagues and spouses of journalists and activists. Despite this early evidence of NSO Group's actual or constructive

---

[25] John Scott-Railton, Bill Marczak, Siena Anstis, Bahr Abdul Razzak, Masashi Crete-Nishihata, and Ron Deibert, "Reckless VII, Wife of Journalist Slain in Cartel-Linked Killing Targeted with NSO Group's Spyware," Citizen Lab Research Report No. 117, University of Toronto, March 20, 2019,  https://citizenlab.ca/2019/03/nso-spyware-slain-journalists-wife/  (last accessed June 5, 2023).

[26] John Scott-Railton, Bill Marczak, Siena Anstis, Bahr Abdul Razzak, Masashi Crete-Nishihata, and Ron Deibert, "New Pegasus Spyware Abuses Identified in Mexico," Citizen Lab Research Report No. 78, University of Toronto, October 2, 2022, https://citizenlab.ca/2022/10/new-pegasus-spyware-abuses-identified-in-mexico/ (identifying infections against journalists from 2019-2021) (last accessed June 5, 2023).

knowledge of Pegasus's usefulness in targeting journalists via their friends and family, it did nothing to prevent Jamal Khashoggi's wife, Hanan, from being targeted the following year.

65.     To summarize, NSO Group outlines three technical options for its clients to gain total control of a device: (1) remote, zero-click entry via software exploit; (2) physical installation on the device; and/or (3) inducing the target to unwittingly install Pegasus on their device via ESEM. To maximize the chance of successful infiltration, clients can utilize one or more of these methods. For example, Citizen Lab found evidence that the Pegasus software was installed via physical installation on Hanan's phones **and** that she received a number of malicious ESEM texts containing links that would also install Pegasus on her phones. Upon information and belief, deployment of these three techniques often goes beyond the direct target, and targets include family members and close confidants.

66.     Upon information and belief, in addition to its design and sale of spyware, NSO Group offers four levels of support to its clients after selling Pegasus to them.

67.     The first level of technical support ("Tier 1") provides an engineer trained by NSO Group who can assist with, *inter alia*, "basic troubleshooting, configuration changes, and/or operation optimization."[27]

68.     Tier 2 support provides technical support via an NSO Group "Field Service Engineer" who provides, *inter alia*, "advanced troubleshooting."[28]

69.     Tier 3 support is provided by an NSO Group "Technical Support Specialist" who can provide, *inter alia*, "how to" support.[29]

70.     Tier 4 support is provided by an NSO Group "R&D Engineer" who can support, *inter alia*, "design level consultation and solutions."[30]

---

[27] Compl. at 108, *WhatsApp Inc. v. NSO Group Technologies Limited*, 3:19-cv-07123 (N.D. Cal. Oct. 29, 2019), ECF No. 1-1 (Exhibit 11 to *WhatsApp* Complaint).

[28] *Id.*

[29] *Id.*

[30] *Id.*

- 15 -

71.     NSO Group also provides phone and email support and a helpdesk that is available 24 hours a day, 7 days a week.[31]

### NSO GROUP'S REPEATED SALES TO THE UAE AND OTHER COUNTRIES NOTORIOUS FOR VIOLATIONS OF BASIC HUMAN RIGHTS

72.     Ahmed Mansoor is a human rights activist based in the UAE. Upon information and belief, in 2016, Ahmed Mansoor received personalized text messages consistent with NSO Group's ESEM tactics encouraging him to click on a link. Rather than clicking, Mansoor sent the messages to Citizen Lab.

73.     The link would have jailbroken Mansoor's iPhone and turned it into a 24/7 spy-device that he took with him everywhere he went.

74.     Investigation by Citizen Lab confirmed that the most likely operator behind Mansoor's targeting was the UAE Government. Mansoor had been the target of the UAE several years earlier and was imprisoned in his home country for eight months in 2011.

75.     Despite the UAE's prior targeting of human rights activists—including Mansoor— NSO Group, upon information and belief, sold its Pegasus software to the UAE in 2016.[32]

76.     Not to be dissuaded by their client's use of the world's most powerful cyberweapon to spy on activists, NSO Group continued to sell its products and services to the UAE. According to reports, the UAE had been using Pegasus for more than a year when NSO Group tried to upsell them on a new update.

77.     Intrigued by the promise of an updated Pegasus, the UAE challenged Defendants to hack the phone of an editor of a London-based Arab newspaper. In order to push its new product, NSO Group agreed to actively participate in illegally surveilling Abdulaziz Alkhamis. Days later, an NSO Group representative supplied recordings of the editor's phone calls to UAE officials.

---

[31] *Id.*

[32] Bill Marczak & John Scott-Railton, "The Million Dollar Dissident: NSO Group's iPhone Zero-Days used against a UAE Human Rights Defender," Citizen Lab Research Report No. 78, University of Toronto, August 24, 2016, https://citizenlab.ca/2016/08/million-dollar-dissident-iphone-zero-day-nso-group-uae/ (last accessed June 5, 2023).

Abdulaziz Alkhamis later confirmed that he had no idea that he was under surveillance by Defendants.[33] Defendants actively initiated spying on a journalist simply to showcase Pegasus's frightening capabilities.

78.     Despite the UAE's use of Pegasus to surveil Ahmed Mansoor, and its subsequent request (and NSO Group's compliance) to illegally surveil a journalist based in the United Kingdom, NSO Group continued to sell its software to the UAE.[34] Even without NSO Group's knowledge of, and participation in, these illegal uses of its product, NSO Group claims to vet its clients before engaging with them—specifically looking for evidence of human rights abuses.[35] However, the UAE, and several of NSO Group's other suspected clients, have well-documented and long-standing histories of human rights abuses.[36]

79.     Indeed, the UAE is not the only country with well-documented human rights violations with whom NSO Group eagerly partnered.

---

[33]David D. Kirkpatrick and Azam Ahmed, "Hacking a Prince, an Emir and a Journalist to Impress a Client," *The New York Times*, August 31, 2018, https://www.nytimes.com/2018/08/31/world/middleeast/hacking-united-arab-emirates-nso-group.html

[34] *Id.*

[35]*See NSO News*, NSO Group, https://www.nsogroup.com/Newses/following-the-publication-of-the-recent-article-by-forbidden-stories-we-wanted-to-directly-address-the-false-accusations-and-misleading-allegations-presented-there/ (last accessed June 6, 2023) ("We would like to emphasize that NSO sells it technologies solely to law enforcement and intelligence agencies of vetted governments for the sole purpose of saving lives through preventing crime and terror acts.").

[36] U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., 2018 Country Reports on Human Rights Practices: United Arab Emirates, 2018. *Available at:* https://www.state.gov/wp-content/uploads/2019/03/UNITED-ARAB-EMIRATES-2018.pdf (In 2018, the U.S. Department of State found that human rights abuses in the UAE included: "allegations of torture in detention; arbitrary arrest and detention, including incommunicado detention, by government agents; political prisoners; government interference with privacy rights; undue restrictions on free expression and the press, including criminalization of libel, censorship, and internet site blocking; substantial interference with the rights of peaceful assembly and freedom of association; the inability of citizens to choose their government in free and fair elections; and criminalization of same sex sexual activity.").

80.     Rwandan activist Carine Kanimba's phones were targeted by the Rwandan government in September 2020 and July 2021 using NSO Group's spyware.[37] Carine is the daughter of notable human rights activist Paul Rusesabagina.

81.     In 2021 the U.S. State Department noted "significant human rights issues" including credible reports of:

> unlawful or arbitrary killings by the government; forced disappearance by the government; torture or cruel, inhuman, or degrading treatment or punishment by the government; harsh and life-threatening prison conditions; arbitrary detention; political prisoners or detainees; politically motivated reprisals against individuals located outside the country, including killings, kidnappings, and violence; arbitrary or unlawful interference with privacy; serious restrictions on free expression and media, including threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship.[38]

82.     Carine Kanimba told a U.S. House Intelligence Committee that "[t]he same government that tortured my father, that is holding him hostage, and that has been trying to silence him all these years now also has access to my private messages and my conversations and my location, it is very, very scary."[39]

83.     NSO Group also contracted to provide its Pegasus infrastructure to Ghana in 2016. The Ghanaian government allegedly "planned to use Pegasus to snoop on opposition figures ahead

---

[37] Antoaneta Roussi, "Daughter of imprisoned Rwandan dissident: Governments must be 'accountable' for spyware use," *Politico*, July 28, 2022, https://www.politico.eu/article/carine-kanimba-rusesabagina-daughter-imprisoned-rwanda-dissident-government-accountable-spyware-use/ (last accessed June 5, 2023).

[38] U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., 2021 Country Reports on Human Rights Practices: Rwanda, 2021. *Available at:* https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/rwanda/.

[39] *Combatting the Threats to U.S. National Security from the Proliferation of Foreign Commercial Spyware Before the U.S. House of Representatives, Permanent Select Committee on Intelligence*, 117th Cong. 25 (2022). (statement of Carine Kanimba, Target of Foreign Commercial Spyware).

of a 2017 election."[40] Employees of NSO Group reportedly traveled to Ghana and trained locals how to use it.[41]

84.    The U.S. State Department noted in 2016 that Ghana's human rights abuses included "…excessive force by police, including torture that resulted in death and injuries; harsh and life-threatening prison conditions; trafficking in persons; and exploitative child labor, including forced child labor."[42]

85.    Notably, the State Department also assessed that there was "corruption in all branches" of Ghana's government.[43]

### NSO GROUP'S ROLE IN THE DEATH OF JAMAL KHASHOGGI

86.    Jamal Ahmid Khashoggi was a prominent and prolific Saudi Arabian journalist and activist. His work over the span of his career impacted the cultural and political landscape throughout the Middle East. While Jamal considered himself a "moderate," much of his work was at the forefront of forward-thinking philosophies and ideals, even when those points of view put him at odds with powerful people.

87.    Jamal was an intrepid journalist throughout the 1980s and was the editor of *Al Madina* magazine from 1991 to 1999. Jamal went on to become the Deputy Editor-in-Chief of *Arab News*, one of the most prominent newspapers in Saudi Arabia, and subsequently became the Editor of *Al-Watan*, a position he was terminated from only two months later after running afoul

---

[40] Omer Benjakob, "NSO Ghana Op Exposed: Never-before-seen Pegasus Spyware Footage, Workers' Passports," January 20, 2022, https://www.haaretz.com/israel-news/tech-news/2022-01-20/ty-article/nso-ghana-op-exposed-never-before-seen-pegasus-spyware-footage-workers-passports/0000017f-f1fb-df98-a5ff-f3ffb9a20000 (last accessed June 5, 2023).

[41] *Id.* ("'I coached them on how to use it,' one employee told 'Hamakor.'")

[42] U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., 2016 Country Reports on Human Rights Practices: Ghana, 2016. *Available at:* https://www.state.gov/wp-content/uploads/2019/01/Ghana-1.pdf

[43] *Id.*

of the conservative Saudi ruling entities.[44] Jamal eventually was reappointed as Editor of *Al-Watan*, but was once again fired after three years for writing articles related to the rights of women and abuses of power perpetrated by the Saudi religious police.[45] These pieces were deemed "offensive" by Saudi authorities.[46]

88.   Public discourse in Saudi Arabia is tightly controlled by the monarchy, and the news outlets for which Jamal worked were no exception. The ruling royal family in Saudi Arabia, the al-Sauds, are legitimized and supported by a council of fundamentalist Islamic religious leaders called the *ulama*, who adhere to what is commonly called the "Wahhabi" school of Islamic jurisprudence.

89.   Jamal covered the Soviet-Afghan War, and, like many Muslims the world over, was initially supportive of the resistance to the Soviet invasion.

90.   However, Jamal staunchly opposed the violence perpetuated by Osama bin Laden that grew out of the Soviet-Afghan War, and reportedly urged bin Laden to abandon *jihad* on more than one occasion during the 1990s.

91.   An avowed anti-extremist, Jamal refused to be associated with the growing radical movement and embraced the western idea of the separation of church and state, further angering the *ulama* in Saudi Arabia.

---

[44] After an Al Qaeda bombing that killed twenty-five in Riyadh, Saudi Arabia, Jamal criticized the Saudi religious establishment directly, saying those "who instigated or justified the attacks" would also "have a painful impact on the peaceful nature of our nation." *See* Ben Hubbard, *MBS: The Rise to Power of Mohammed Bin Salman* 75 (2020).

[45] Justin D. Martin, "Sidelined Speech in Saudi Arabia," May 21, 2010, https://archives.cjr.org/behind_the_news/sidelined_speech_in_saudi_arab.php (last accessed June 5, 2023).

[46] One such article asked the reader to imagine the chaos that would be caused by a girl riding a camel to university, a critique of Saudi Arabia's ban on women driving. Ben Hubbard, *MBS: The Rise to Power of Mohammed Bin Salman* 75-76 (2020).

92.     As a result, Jamal was forced out of his job as editor at Al-Watan in 2003, saying "The clergy. They didn't like me. They didn't like the way I ran the paper." Ever hopeful, Jamal also stated of his country, "I see change, and I would like to be part of that change."[47]

93.     Jamal's beliefs and advocacy never faltered. When he covered the Arab Spring,[48] Jamal was hopeful that Saudi Arabia would listen to the people and embrace change. Jamal criticized the violent response to the protests, saying "confronting—rather than acceding to—the demands for change [embodied in the Arab Spring] is what led to the current chaos in the region."[49]

94.     Just as the Arab Spring movement was getting started, Jamal and Hanan met at a conference in the UAE in 2009, and instantly connected. Hanan described meeting him like finding her "twin." Jamal was married at the time, but the two kept in touch as friends over the next eight years, often exchanging messages and sharing their viewpoints on politics and a hope for peace and democracy in the Middle East.

95.     Throughout his career, Jamal wrote thought-provoking articles concerning equal rights for women and minorities, religious freedom, and other issues challenging the status quo in the Middle East, and in Saudi Arabia in particular.  In 2016, Hanan and Jamal were constantly in touch regarding various global political matters, including the election of Donald J. Trump to the United States Presidency. Jamal shared his misgivings with Hanan, then in late 2016, publicly shared his concerns by delivering a speech critical of the election of President Trump at the Washington Institute for Near East Policy. This criticism angered the ruling Saudis, who were working to foster a friendly relationship with Trump, and Jamal was subsequently placed under

---

[47] Peter Bergen, "Jamal Khashoggi was a journalist, not a jihadist," October 22, 2018, https://edition.cnn.com/2018/10/22/opinions/khashoggi-was-journalist-not-jihadist-bergen/index.html (last accessed June 5, 2023).

[48] The "Arab Spring" was a series of anti-Government protests emerging in Tunisia in 2010, and spreading to, among other places, Egypt, Libya, Saudi Arabia, Yemen, and Bahrain.

[49] "Khashoggi: resistance to Arab Spring caused chaos and I wish Saudi Arabia would have embraced it," *MEMO*, *Middle East Monitor*, August 31, 2017, https://www.middleeastmonitor.com/20170831-khashoggi-resistance-to-arab-spring-caused-chaos-and-i-wish-saudi-arabia-would-have-embraced-it/ (last accessed June 5, 2023).

house arrest. During this time, Hanan remained in touch with Jamal, supporting him and assuaging him during his confinement. Hanan communicated with journalists around the world in an attempt to support Jamal and draw attention to his plight.

96.     In June 2017, the Saudi government lifted Jamal's house arrest and allowed him to travel to the UAE to attend a conference. Upon arrival at the Abu Dhabi airport, he was denied entry and flew back to Saudi Arabia. This action tipped him off that he was in growing danger, and as a result, Jamal made the difficult decision to flee Saudi Arabia, seeking refuge in the United States.  Once Jamal arrived in the U.S., he invited Hanan to visit and reconnect with him in person in Virginia. Shortly after his arrival, Jamal became a contributor to the Washington Post.

97.     Jamal's outspoken statements that landed him in dangerous waters in 2016 and 2017 came amid a larger crackdown on free speech in Saudi Arabia. In Jamal's own words,

> Dozens of Saudi intellectuals, clerics, journalists, and social media stars have been arrested in the past 2 months—the majority of whom, at worst, are mildly critical of the government. . . . How can we become more moderate when such extremist views are tolerated? How can we progress as a nation when those offering constructive feedback and (often humorous) dissent are banished?[50]

98.     On September 18, 2017, Khashoggi's first column for *The Washington Post* appeared with a stark opening line: "When I speak of the fear, intimidation, arrests and public shaming of intellectuals and religious leaders who dare to speak their minds, and then I tell you that I'm from Saudi Arabia, are you surprised?"[51]

99.     Jamal continued to bravely speak out against the manner in which Saudi Arabia was being ruled, writing in a November 15, 2017 opinion in *The Washington Post* that he

---

[50] Jamal Khashoggi, "Saudi Arabia's crown prince wants to 'crush extremists.' But he's punishing the wrong people," *The Washington Post*, October 31, 2017, https://www.washingtonpost.com/news/global-opinions/wp/2018/10/06/read-jamal-khashoggis-columns-for-the-washington-post/ (last accessed June 5, 2023).

[51] Jamal Khashoggi, "Saudi Arabia wasn't always this repressive. Now it's unbearable," *The Washington Post*, September 18, 2017, https://www.washingtonpost.com/news/global-opinions/wp/2017/09/18/saudi-arabia-wasnt-always-this-repressive-now-its-unbearable/ (last accessed June 5, 2023).

"champion[s] a real campaign to tackle the rampant corruption that is draining Saudi resources."[52]
This opinion in particular focused on Crown Prince Mohammed bin Salman ("MBS")—explicitly
stating that he was "acting like Putin" by "imposing very selective justice" in his "crackdown on
even the most constructive criticism."[53]

100.    It was during this same time period that Jamal and Hanan's longtime friendship
evolved into romance, and Hanan encouraged Jamal to "make use of his freedom" after fleeing
Saudi Arabia. The two continued to bond over shared political beliefs, and often discussed the
fraught state of much of the Middle East. Jamal confided in Hanan that he did not consider himself
a "dissident," but rather he had a profound love for Saudi Arabia, and for that reason, he felt he
must keep writing and raising his voice to effect change there. Jamal told Hanan he was lonely in
the United States, and he longed to be able to return to his home.

101.    Upon information and belief, in November 2017, the first Pegasus attempts were
made on one of Hanan's cell phones, just as she was growing closer with Jamal. These were ESEM
text messages that were personalized to induce her to follow the malicious link containing Pegasus.

102.    In one instance, at 06:46:59 GMT on November 26, 2017, Hanan received a text
message stating that a flower bouquet was sent to her. She later clicked and followed the link and
was rerouted to a disabled Pegasus link. Citizen Lab attributed the domain name in these links to
an agency of the UAE.

103.    At least five more attempts were made via ESEM text messages sent to Hanan's
phone in November 2017.

---

[52] Jamal Khashoggi, "Saudi Arabia's crown prince is acting like Putin," *The Washington Post*,
November 5, 2017, https://www.washingtonpost.com/news/global-
opinions/wp/2017/11/05/saudi-arabias-crown-prince-is-acting-like-putin/ (last accessed June 5,
2023).

[53] *Id.*

104.    Jamal and Hanan continued their relationship, and in April 2018, Jamal proposed to Hanan and gave her an engagement ring. He later also bought her a wedding ring in Tysons Corner, Virginia.

105.    Upon information and belief, in April 2018, more malicious text messages using Pegasus spyware were sent to Plaintiff's phone.

106.    In April 2018, while working as a flight attendant, Hanan arrived at the Dubai International Airport and found seven Emirati intelligence officers waiting for her. Hanan was blindfolded, handcuffed, and transported to a remote interrogation cell where she was questioned about Jamal and his activities for over 17 hours. Hanan was detained and her captors took both of her cell phones that she had been using to communicate with Jamal. Citizen Lab later confirmed in its analysis that it was likely during this time that Pegasus was manually installed onto at least one of her phones. NSO Group touts the ability for Pegasus to be installed through multiple mechanisms, and physical installation is advertised explicitly by NSO Group.[54]

107.    Hanan was placed under house arrest in the UAE until May 2018, when she returned to the United States to be with Jamal. In her long tenure as a flight attendant, with many trips into and out of the UAE, Hanan had never been detained or questioned by the authorities before becoming engaged to Jamal. Hanan later stated that she feared for her life, and it was apparent to her immediately that she was being held because of her relationship to Jamal. She was never charged with a crime, nor offered any justification for her imprisonment.

108.    Unbeknownst to Hanan, upon information and belief, the Kingdom of Saudi Arabia had leveraged its relationship with a key ally, the United Arab Emirates, to install Pegasus on her phones, which would then allow MBS to monitor and track Jamal.[55]

---

[54] Dana Priest, "A UAE agency put Pegasus spyware on phone of Jamal Khashoggi's wife months before his murder, new forensics show," *The Washington Post*, December 21, 2017, https://www.washingtonpost.com/nation/interactive/2021/hanan-elatr-phone-pegasus/; *see also* Exhibit 1 at 13.

[55] This is not the first time that the UAE has acted at the behest of Saudi Arabia to silence critics of the Kingdom. In 2018, security officers in the UAE pulled over Saudi women's rights activist

109.    Once Hanan arrived back in the United States, Jamal warned her that it would not be easy for her to be with him, and again asked if she truly wanted to spend her life with him. For Hanan, it was no question—"yes." Unbeknownst to either of the two at the time, the depth of their relationship would put them both in danger through the now-constant avenue Defendants and their clients had into their everyday lives, communications, and intimate conversations.

110.    On June 2, 2018, Hanan and Jamal were married according to Islamic tradition by Imam Anwar Hajjaj of the Open University in Alexandria, VA, which was observed and attended by two witnesses. However, due to the level of threat Jamal was under, and the recent experience Hanan endured in the UAE, the two kept their relationship, and marriage, very quiet, alerting only select family members and friends. They spent the next weeks moving into and decorating their shared apartment in Virginia and making it their home.

111.    Although Hanan's job as a flight attendant kept her traveling often, anytime she was able to be, she was home with Jamal. When the two were forced to be apart, they were in frequent contact through text messages, WhatsApp, phone calls, and various other apps Jamal insisted they use for privacy. Unfortunately, Jamal's suspicions were well-founded, but use of multiple apps or frequently changing SIM cards was no match for NSO Group's technology. Neither suspected that Hanan herself might become a target.

112.    During this time, Jamal continued to stoke the ire of MBS, writing that MBS was "punishing the wrong people."[56] After MBS rounded up and detained a number of "intellectuals

---

Loujain al-Hathloul in Abu Dhabi and deported her to Saudi Arabia. Loujain al-Hathloul has also been surveilled using the Pegasus spyware. *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., 2018 Country Reports on Human Rights Practices: United Arab Emirates, 2018. *Available at:* https://www.state.gov/wp-content/uploads/2019/03/UNITED-ARAB-EMIRATES-2018.pdf at 11; Joel Schectman and Christopher Bing, "How a Saudi woman's iPhone revealed hacking around the world," *Reuters*, February 17, 2022, https://www.reuters.com/technology/how-saudi-womans-iphone-revealed-hacking-around-world-2022-02-17/ (regarding the UAE surveilling al-Hathloul with Pegasus) (last accessed June 5, 2023).

[56] Jamal Khashoggi, "Saudi Arabia's crown prince wants to 'crush extremists.' But he's punishing the wrong people," *The Washington Post*, October 31, 2017,

---

- 25 -

JA32

and religious leaders who dare to express opinions," contrary to his own safety, Jamal wrote "…I am raising my voice. To do otherwise would betray those who languish in prison. I can speak when so many cannot."[57] Hanan continued to support him, encouraging him to use his freedom in the United States to speak out.

113.    Upon information and belief, during this time, MBS became increasingly obsessed with Jamal. Upon information and belief, all of Jamal and Hanan's conversations—by phone, message, or in person—were available to NSO Group and ultimately relayed to the Saudis, via the UAE, providing key information and proof of Jamal's persistent belief that Saudi Arabia needed reform.

114.    On September 6-7, 2018, Jamal and Hanan spent what would be their last days together in a hotel in New York City. Hanan knew that Jamal was planning to go to Turkey and Jamal shared with Hanan his full travel plans, including his planned return that tragically never occurred. They discussed their future together, including having property both in Turkey and in Virginia, keeping their Tysons Corner home.

115.    The two remained in contact by phone while Jamal was traveling. Their last communications occurred on September 30, 2018, a message Hanan did not receive until October 1, 2018, only 24 hours before Jamal's death.  That last communication from Jamal to Hanan wished her a happy birthday.

116.    Translated from Arabic to English, their last messages state:

> *Hanan*: On October 20, 2018 I will arrive in Washington at 9 am.  Good Luck Jamal Have a good Day
>
> *Jamal*: (September 30) Happy Birthday, with happiness and peacefulness

---

https://www.washingtonpost.com/news/global-opinions/wp/2018/10/06/read-jamal-khashoggis-columns-for-the-washington-post/ (last accessed June 5, 2023).

[57] Jamal Khashoggi, "Saudi Arabia wasn't always this repressive. Now it's unbearable," *The Washington Post*, September 18, 2017, https://www.washingtonpost.com/news/global-opinions/wp/2017/09/18/saudi-arabia-wasnt-always-this-repressive-now-its-unbearable/ (last accessed June 5, 2023).

*Hanan*: (October 1) thank You I hope you are fine and happy. I am in the aircraft headed to Dubai[58]



117.    On October 2, 2018, Jamal Khashoggi disappeared after visiting the Saudi consulate in Istanbul.

118.    Back home, Hanan was shocked and terrified. Her worst fears were becoming reality—and being broadcast on a global stage. As the days and weeks passed, it became apparent that Jamal had been assassinated. Hanan watched in indescribable grief and growing fear for her own safety.

119.    The details of Jamal's death were well-documented and publicized by nearly every major news outlet in the world. Hanan was forced to relive the grisly death and dismemberment of her husband time and time again.

---

[58] Screenshot provided courtesy of Hanan Khashoggi.

120.    The CIA ultimately concluded that Saudi Arabia's Crown Prince Muhammad bin Salman orchestrated and approved of the operation to kill Jamal, and members of MBS's personal security team made up the 15-member hit squad.

121.    The CIA's assessment aligned with what much of the general public already knew: "[t]he Crown Prince viewed Khashoggi as a threat to the Kingdom and broadly supported using violent measures if necessary to silence him."[59]

122.    Regarding Jamal Khashoggi, NSO Group has publicly maintained that it had "nothing to do with this horrible murder," despite significant evidence to the contrary.[60]

123.    Upon information and belief, Defendants and their clients were aware that Jamal and Hanan were living together in Virginia and that Hanan has continued to reside in Virginia, where she was monitored for—at least—a year through NSO Group's product on her devices.

**THE NSO GROUP REVEALED**

124.    In July of 2021, multiple media outlets partnered with "Forbidden Stories," on the "Pegasus Project." [61] The group consisted of a network of journalists with a mission to "protect, pursue and publish the work of other journalists facing threats, prison, or murder" to expose NSO Group's technology and use of that spyware on journalists and activists around the world.[62]

---

[59] U.S. Office of the Director of National Intelligence, Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi, February 11, 2021. *Available at:* https://www.dni.gov/files/ODNI/documents/assessments/Assessment-Saudi-Gov-Role-in-JK-Death-20210226v2.pdf.

[60] Stephanie Kirchgaessner, "Saudis behind NSO spyware attack on Jamal Khashoggi's family, leak suggests," *The Guardian*, July 18, 2021, https://www.theguardian.com/world/2021/jul/18/nso-spyware-used-to-target-family-of-jamal-khashoggi-leaked-data-shows-saudis-pegasus#:~:text=The%20phone%20analysis%20discoveries%20and,Turkish%20inquiry%20into%20his%20murder (last accessed June 5, 2023).

[61] The Pegasus Project media partners: The Guardian, Le Monde, The Washington Post, Süddeutsche Zeitung, Die Zeit, Aristegui Noticias, Radio France, Proceso, OCCRP, Knack, Le Soir, Haaretz/TheMarker, The Wire, Daraj, Direkt36, PBS Frontline.

[62] "About the Pegasus Project," https://forbiddenstories.org/about-the-pegasus-project/. (last accessed June 6, 2023).

125.    Around this time, Hanan was approached by a journalist from the Washington Post to inform her that analysis from Amnesty International showed evidence that Hanan's phones may have been infiltrated. Further, more in-depth analysis performed by Citizen Lab confirmed that suspicion in November of 2021.

126.    Defendants have been the subject of significant media and political attention for several years. In addition to being placed on the U.S. Department of Commerce's "Entity List," NSO Group and Q Cyber have been named as Defendants in several pending cases in the United States and internationally. The facts of those cases have significant overlap with Hanan's claims in this present action. In the United States, Plaintiffs Apple and WhatsApp (Meta) have filed suit against NSO Group for alleged infiltrations of their servers, impacting thousands of Apple and WhatsApp users. WhatsApp has successfully proceeded past the motion to dismiss phase and all other matters are currently pending.[63] In *Dada v. NSO Group Technologies Limited*, a consortium of journalists from El Salvador working for the news publication *El Faro* have brought suit against NSO Group and Q Cyber for the targeting, infiltration, and breaches of privacy of their own devices. Much like Hanan's case, the Plaintiffs in *Dada* were allegedly targeted as a result of their perceived threat to the Salvadoran government.[64]

### NSO GROUP'S HARMS TO HANAN KHASHOGGI CONTINUE

127.    As a result of being targeted by NSO Group and its client(s), Hanan's life has been irrevocably altered.

128.    Not only has Hanan suffered the unimaginable loss of her husband, she has also had to rearrange her life to adjust to the reality of being a target of dangerous, violent, and powerful authoritarian actors, including the loss of her career and livelihood.

---

[63] *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th 930 (9th Cir. 2021), *cert. denied*, 214 L. Ed. 2d 333, 143 S. Ct. 562 (2023).

[64] Amended Compl., *Dada v. NSO Group Technologies*, 3:22-cv-07513-WHA (N.D. Cal. December 16, 2022), ECF No. 31.

129.    Defendants violated Hanan's privacy in one of the most pervasive fashions imaginable. All of her messages, app activity, emails, financial information, medical information, and more were available to Defendants, and upon information and belief, made available to Defendants' clients. Additionally, Hanan's private conversations in the intimacy of her own home and marriage were invaded by agents of an authoritarian government that, upon information and belief, ultimately used that information to murder her husband. Hanan was violated in a way few others could even fathom—NSO Group laid every intimate detail of her life bare.

130.    Hanan was forced to leave her job of over 20 years due to the harassment and intimidation she suffered from alleged client(s) of NSO Group. Even after Jamal's death, Hanan continued to be targeted for her relationship with him. Hanan eventually lost her career as a flight attendant due to the risks to her safety and the time she (involuntarily) spent away from work. Several months after Jamal was murdered, in February 2019, Hanan was again confronted by UAE officials and again detained and placed under house arrest, this time for more than two months. When the time came for Hanan's contract to be renewed with Emirate Airlines, her boss told her they were letting her go.

131.    Due to the physical risks of travel, and fear for her family's safety, Hanan has been unable to see her family in the Middle East for several years.

132.    Hanan is still suffering from the effects of the NSO Group infiltration of her devices today. She lives in a state of constant hyper-vigilance, unable to safely participate in social activities, constantly looking over her shoulder.

133.    As a result of the intimidation and threat of danger to Hanan's life, she is currently seeking the legal protection of political asylum in the United States.

- 30 -

JA37

## V.    CAUSES OF ACTION

### COUNT 1:
### VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030 *et seq.*

134.    Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135.    As detailed in this pleading, between November 8, 2017 and July 10, 2018, Defendants accessed or attempted to access Plaintiff's devices on multiple occasions, without authorization. Plaintiff owned the affected devices, and those devices contained a plethora of private information, including personal communications, photographs, and videos.

136.    Pursuant to the Computer Fraud and Abuse Act ("CFAA"), the intentional access of a computer without authorization, or in excess of authorized access, to obtain information from any protected computer is prohibited. 18 U.S.C. § 1030(a)(2)(C).

137.    The devices storing Plaintiff's data and personal information are "protected computers" because they are used in or affected interstate commerce or communications. 18 U.S.C. § 1030(e)(2).

138.    Defendants violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing and/or causing to be accessed Plaintiff's devices without authorization and obtaining information from those devices.

139.    Defendants accessed and/or caused to be accessed Plaintiff's devices without authorization through attacks that enabled the surreptitious installation of Pegasus on Plaintiff's devices.

140.    Defendants infiltrated Plaintiff's devices with Pegasus to enable real-time surveillance of Plaintiff and her husband, including through unauthorized use of the device's microphone and camera, and to exfiltrate private data from those devices to Defendants and their clients. Once installed, Pegasus provided Defendants and their clients with nearly unfettered access to Plaintiff's devices.

141.     Although by its very nature and design, Pegasus leaves very little trace, if any, of its presence on a device, forensic investigation completed by Citizen Lab on December 20, 2021 confirmed the presence of Pegasus and NSO Group-related infiltration evidence on Plaintiff's devices. Upon information and belief, Defendants and their clients obtained both stored and real-time data and surveillance from Plaintiff's targeted devices.

142.     A private right of action exists for any person who suffers damage or loss by reason of a violation of the CFAA, provided that one of the statutorily enumerated factors are present. 18 U.S.C. §1030(g).

143.     Plaintiff suffered both damage and loss as a result of the infiltration of her devices by NSO Group and its clients.

144.     Among the factors enumerated for civil recovery are: "(I) loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value. . . (III) physical injury to any person; [and] (IV) a threat to public health or safety.  18 U.S.C. § 1030(c)(4)(A)(i)(I, III-IV).

145.     Plaintiff's total economic loss stemming from the Pegasus attacks exceeded $5,000 in aggregate during a one-year period, including, but not limited to, the costs of fleeing to the United States, the loss of her and her husband's income, and the costs of replacing her devices.

146.     There is no economic loss requirement for factors (III) and (IV) listed above, although Plaintiff has experienced significant damage and loss falling into those categories.

147.     Plaintiff experienced the suffering, both physical and mental, of being held and interrogated by UAE officials (who, upon information and belief, used that time to physically install Pegasus on Plaintiff's devices) resulting in physical injury to Plaintiff.

148.     Jamal Khashoggi was also physically injured as a result of Defendants' violations of the CFAA. Defendants contributed to Jamal's death by knowingly providing Pegasus and other products to clients with known human rights violations, by aiding them and providing support to those clients, and by intentionally, recklessly, and/or negligently aiding and abetting in the commission of the crimes of torture and murder.

149.     Defendants further contributed to a threat to public health or safety by perpetuating their client(s)' crimes and human rights violations.

150.     Defendants violated 18 U.S.C. § 1030(b) by conspiring and attempting to commit the violations alleged in the preceding paragraphs.

151.     In the alternative, Defendants knowingly and intentionally aided and abetted their clients in the violations of 18 U.S.C. § 1030 alleged in the preceding paragraphs.

**COUNT 2:**
**VIOLATIONS OF THE VIRGINIA COMPUTER CRIMES ACT**
**Va. Code § 18.2-152.1 *et seq.***

152.     Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

153.     Pursuant to the Virginia Computer Crimes Act ("VCCA"), Va. Code § 18.2-152.1 *et seq.*, any person whose property or person is injured by a provision of the Act "may sue therefor and recover any damages sustained and the costs of the suit." Va. Code § 18.2-152.12(A).

154.     The VCCA further states that it is unlawful to "[i]nstall or cause to be installed, or collect information through, computer software that records all or a majority of the keystrokes made on the computer of another." Va. Code § 18.2-152.4 (A)(8).

155.     As alleged in the preceding paragraphs, Defendants accessed Plaintiff's devices and personal information without authorization, in violation of the VCCA. Defendants and their clients knew that Hanan and Jamal were living in Virginia at the time Pegasus was installed on Plaintiff's devices. Defendants installed, or caused to be installed, Pegasus on Plaintiff's devices.

156.     Defendants and their clients used false pretenses to commit larceny regarding private messages, emails, conversations, location information, and other personal information of both Plaintiff and her husband.

157.     Upon information and belief, Defendants and their clients used false pretenses by sending ESEM messages to Plaintiff's devices in order to entice her to engage with the links thus activating Pegasus on her devices.

158.    Defendants then used the personal information gleaned from this infiltration to cause substantial harm to Plaintiff, as enumerated in the preceding paragraphs.

159.    Defendants further violated Va. Code § 18.2-152.4, under which it is unlawful to "remove [] or otherwise disable any computer data . . . from a computer. . . ." It is also unlawful for a person to use a computer to "make . . . an unauthorized copy, in any form, . . . of computer data."

160.    As alleged in the preceding paragraphs, Defendants also violated the VCCA through their actions in illegally accessing and misappropriating Plaintiff's personal data.

161.    Plaintiff has sustained substantial damages and costs, as alleged herein, related to investigating and responding to Defendants' offenses, severe mental anguish and emotional distress, the physical injury to herself and her husband, and the resulting loss of her husband, loss of her income and job, and other consequential damages.

162.    Evidence of consequential damages falls within the "any damages" language of the VCCA. *A.V. ex rel Vanderhye*, 562 F.3d 630, 647 (4th Cir. 2009).

163.    Pursuant to Va. Code § 18.2-152.3, Plaintiff is also entitled to recover the costs of this suit.

## COUNT 3:
## NEGLIGENCE

164.    Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

165.    At all relevant times, Defendants developed, set up, maintained, marketed, advertised, controlled, and sold their spyware infrastructure to nation-state clients.

166.    Defendants owed Plaintiff a duty to exercise reasonable care in the development, set up, maintenance, operation, marketing, advertisement, control, and sale of its spyware infrastructure to not create an unreasonable risk of harm from the use of its infrastructure and to protect Plaintiff from unreasonable risk of injury from and in the use of its spyware infrastructure.

167.    Imposing a duty on Defendants is not burdensome and would benefit the community of journalists, activists, dissidents, and their family members and loved ones, at large.

168.    Plaintiff was a foreseeable victim of the Defendants' spyware infrastructure. Defendants sought out, marketed, and sold its spyware infrastructure to countries with disturbing human rights records.

169.    As a result of Defendants' failure to exercise reasonable care when they repeatedly sold Pegasus to clients that were widely known to violate human rights and do harm to dissenters, Defendants caused and proximately caused harm to Plaintiff.

170.    Defendants have breached their duties of care owed to Plaintiff through their affirmative malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control, and sale of its spyware infrastructure.

171.    As a direct and proximate result of Defendants' breach of one or more of their duties, Plaintiff was harmed. Specifically, Defendants breached their duty by knowingly marketing and selling their spyware to countries with long histories of human rights abuses.

172.    Defendants' breach of one or more of their duties was a substantial factor in causing harms and injuries to the Plaintiff.

173.    Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of the likely targets of their clients, and warrants an award of punitive damages in an amount sufficient to punish the Defendants and deter others from like conduct.

174.    Plaintiff demands judgment against Defendants for injunctive relief as described below, and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT 4:
## TRESPASS TO CHATTELS

175.    Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

176.    At all times mentioned in this Complaint, Plaintiff had legal title to and actual possession of her cell phones, except where explicitly indicated.

177.    Plaintiff owned two cell phone devices targeted in the Pegasus attack in which she had a possessory interest in and the exclusive right to use the targeted devices. These devices contained Plaintiff's private information, including phone calls, text messages and other communications.

178.    Defendants intentionally intermeddled with Plaintiff's phones/devices when they gained access to Plaintiff's devices by use of their proprietary "Pegasus" spyware which allowed all information on Plaintiff's phone to be downloaded and provided to Defendant's clients.

179.    The technology used allowed Defendants and their clients to review in real time any phone call, text, or other communication, GPS activity, as well as turn Plaintiff's phones into a remote listening device by surreptitiously activating her microphone and camera at any time. The value of the devices was thus impaired for Plaintiff's use, becoming effectively valueless to Plaintiff.

## COUNT 5:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

180.    Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

181.    Defendants acted negligently as detailed above.

182.    Defendants' conduct was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional and physical distress.

183.    Plaintiff suffered severe emotional distress and the Plaintiff's severe emotional distress was proximately caused by the Defendants' conduct.

JA43

184.    Plaintiff continues to suffer from fear, anxiety, and extreme stress as a result of having both of her phones hacked and turned into continuously operating spy devices.

185.    As a further proximate result of Defendants' actions and the consequences proximately caused by them, as alleged above, Plaintiff suffered severe humiliation, mental anguish, and emotional and physical distress, resulting in damages.

**COUNT 6:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

186.    Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

187.    Defendants acted negligently as detailed above.

188.    Defendants knew, or should have known, that failure to exercise due care in the selling of their spyware infrastructure would cause Plaintiff severe emotional distress.

189.    As a further proximate result of Defendants' actions and the consequences proximately caused by them, as alleged above, Plaintiff suffered severe emotional distress and mental suffering, resulting in damages.

**COUNT 7:**
**EQUITABLE RELIEF**

190.    Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

191.    Plaintiff demands the identities of Defendants' clients and any of their agents that targeted and accessed her devices.

192.    Plaintiff demands disclosure of all contracting documents between Defendants and their clients that targeted and accessed her devices.

193.    Defendants publicly claim that they can monitor and forbid any misuse of their spyware infrastructure. As such, Plaintiff demands permanent cessation, in the form of an injunction, of all monitoring of her personal electronic devices.

VI.    **PRAYER FOR RELIEF**

Plaintiff demands judgment against Defendants to the full extent of the law, including but not limited to:

1.    Judgment for Plaintiff and against Defendants on all Counts enumerated herein;

2.    damages (both past and future) to compensate Plaintiff for injuries sustained as a result of Defendants' conduct, including but not limited to physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments other economic harm that includes but is not limited to lost earnings and loss of earning capacity;

3.    damages to compensate Plaintiff for loss of consortium, companionship, services, society, love, and comforts, and alteration their martial association, and mental anguish and emotional distress;

4.    exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

5.    attorneys' fees;

6.    experts' fees;

7.    costs of litigation;

8.    pre-judgment and post-judgment interest at the lawful rate;

9.    injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein,

10.    any other relief as this Court may deem equitable and just, or that may be available.

VI.    **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

JA45

Dated: June 16, 2023                    Respectfully submitted,

                                        MICHAEL PENDELL (*pro hac vice forthcoming*)
                                        **MOTLEY RICE LLC**
                                        One Corporate Center
                                        20 Church S., 17TH Floor
                                        Hartford, CT 06103
                                        T: 860.882.1681
                                        mpendell@motleyrice.com

                                        ANNIE E. KOUBA (*pro hac vice forthcoming*)
                                        ROSS HEYL (*pro hac vice forthcoming*)
                                        **MOTLEY RICE LLC**
                                        28 Bridgeside Blvd
                                        Mt. Pleasant, SC 29464
                                        T: 843.216.9000
                                        akouba@motleyrice.com
                                        rheyl@motleyrice.com

                                        RANDA FAHMY (*pro hac vice forthcoming*)
                                        282 35th Street
                                        Avalon, NJ 08202
                                        T: 202.352.2186
                                        Randa@fahmyhudome.com

                                        */s/ Steven T. Webster*
                                        Steven T. Webster (VSB No. 31975)
                                        swebster@websterbook.com
                                        Aaron S. Book (VSB No. 43868)
                                        abook@websterbook.com
                                        Webster Book LLP
                                        300 N. Washington St., Suite 404
                                        Alexandria, Virginia 22314
                                        (888) 987-9991 (telephone and fax)

# EXHIBIT 1

Case 1:23-cv-00779   Document 1-1   Filed 06/15/23   Page 2 of 41 PageID# 42



# Pegasus – Product Description

# Contents

**Introduction** ........................................................................................................................ **1**
    Overcoming Smartphone Interception Challenge ................................ 1
    Standard Interception Solutions Are Not Enough ................................ 1
**Cyber Intelligence for the Mobile World** ................................................................ **3**
    Benefits of Pegasus ................................................................................ 3
    Technology Highlights ............................................................................ 3
    High Level Architecture .......................................................................... 4
**Agent Installation** .......................................................................................................... **6**
    Agent Purpose ........................................................................................ 6
    Agent Installation Vectors .................................................................... 6
    Agent Installation Flow .......................................................................... 7
    Supported Operating Systems & Devices ............................................ 8
    Installation Failure ................................................................................ 8
    Remote Installation Benefits ................................................................ 9
**Data Collection** .............................................................................................................. **10**
    Initial Data Extraction .......................................................................... 11
    Passive Monitoring................................................................................ 11
    Active Collection .................................................................................... 11
    Description of Collected Data .............................................................. 12
    Collection Buffer ....................................................................................15
**Data Transmission** ........................................................................................................ **16**
    Data Transmission Security ................................................................ 17
    Pegasus Anonymizing Transmission Network .................................. 17
**Data Presentation & Analysis** .................................................................................. **18**
    Rules & Alerts ........................................................................................21
    Data Export ............................................................................................22
**Agent Maintenance** ...................................................................................................... **23**
    Agent Upgrade ...................................................................................... 23
    Agent Settings ........................................................................................23
    Agent Uninstall ...................................................................................... 23
**Solution Architecture** ..................................................................................................**25**
    Customer Site ........................................................................................25
    Public Networks .................................................................................... 26
    Target Devices ...................................................................................... 27
**Solution Hardware** ........................................................................................................ **28**
    Operators Terminals ............................................................................ 28
    System Hardware .................................................................................. 28
**System Setup and Training** ........................................................................................**31**
    System Prerequisites ............................................................................ 31
    System Setup ........................................................................................31
    Training .................................................................................................. 31
    High Level Deployment Plan ................................................................ 32
    System Acceptance Test (SAT) .......................................................... 33

**Maintenance, Support and Upgrades** ......................................................................... **34**

Maintenance and Support .................................................................................. 34

Upgrades   ......................................................................................................... 34

# List of Tables

Table 1: Collection Features Description ........................................................................ 12
Table 2: Presentation of Collected Data ...................................................................... 20
Table 3: Pegasus Deployment Plan .............................................................................. 32

# List of Figures

Figure 1: Pegasus High Level Architecture ..................................................................... 5
Figure 2: Agent Installation Flow .................................................................................... 7
Figure 3: Agent Installation Initiation ............................................................................. 8
Figure 4: Collected Data ............................................................................................... 10
Figure 5: Data Transmission Process ........................................................................... 16
Figure 6: Data Transmission Scenarios ....................................................................... 16
Figure 7: Calendar Monitoring ..................................................................................... 18
Figure 8: Call Log & Call Interception .......................................................................... 19
Figure 9: Location Tracking........................................................................................... 19
Figure 10: Solution Architecture .................................................................................. 25
Figure 11: Pegasus Hardware ...................................................................................... 29

# Introduction

Pegasus is a world-leading cyber intelligence solution that enables law enforcement and intelligence agencies to remotely and covertly extract valuable intelligence from virtually any mobile device. This breakthrough solution was developed by veterans of elite intelligence agencies to provide governments with a way to address the new communications interception challenges in today's highly dynamic cyber battlefield. By capturing new types of information from mobile devices, Pegasus bridges a substantial technology gap to deliver the most accurate and complete intelligence for your security operations.

# Overcoming Smartphone Interception Challenge

The rapidly growing and highly dynamic mobile communications market - characterized by the introduction of new devices, operating systems and applications on virtually a daily basis – requires a rethinking of the traditional intelligence paradigm. These changes in the communications landscape pose real challenges and obstacles that must be overcome by intelligence organizations and law enforcement agencies worldwide:

- **Encryption:** Extensive use of encrypted devices and applications to convey messages

- **Abundance of communication applications:** Chaotic market of sophisticated applications, most of which are IP-based and use proprietary protocols

- **Target outside interception domain:** Targets' communications are often outside the organization's interception domain or otherwise inaccessible (e.g., targets are roaming, face-to-face meetings, use of private networks, etc.)

- **Masking:** Use of various virtual identities which are almost impossible to track and trace

- **SIM replacement:** Frequent replacement of SIM cards to avoid any kind of interception

- **Data extraction:** Most of the information is not sent over the network or shared with other parties and is only available on the end-user device

- **Complex and expensive implementation:** As communications become increasingly complex, more network interfaces are needed. Setting up these interfaces with service providers is a lengthy and expensive process, and requires regulation and standardization

# Standard Interception Solutions Are Not Enough

Until the above mentioned challenges are addressed and resolved, criminal and terrorist targets are likely "safe" from standard and legacy interception systems, meaning that valuable intelligence is being lost. These standard solutions (described in the sections below) deliver only partial intelligence, leaving the organizations with substantial intelligence gaps.

## Passive Interception

Passive interception requires very deep and tight relationships with local service providers (cellular, Internet and PSTN providers) and traditionally has allowed for proper monitoring of text messages and voice calls. However, most contemporary communications is comprised of IP-based traffic, which is extremely difficult to monitor with passive interception due to its use of encryption and proprietary protocols.

Even when this traffic is intercepted, it typically carries massive amounts of technical data that is not related to the actual content and metadata being communicated. Not only does this result in frustrated analysts and wasted time wading through irrelevant data, it also provides a partial snapshot (at best) of the target's communications. In addition, the number of interfaces required to cover the relevant service providers broadens the circle of entities exposed to sensitive information and increases the chance of leakage.

## Tactical GSM Interception

Tactical GSM interception solutions effectively monitor voice calls and text messages in GSM networks. When advanced cellular technologies are deployed (3G and LTE networks), these solutions become less efficient. In such cases, it is required to violently downgrade the target to a GSM-based network, which noticeably impacts the user experience and functionality.

These solutions also require a well-trained field tactical team located near the monitored target. Thus, in the majority of cases where the target location is unknown, these solutions become irrelevant. In other cases, placing a tactical team close to the target may pose serious risk both to the team and to the entire intelligence operation.

## Malicious Software (Malware)

Malware presumably provides access to the target's mobile device. However, it is not completely transparent and requires the target's involvement to be installed on their devices. This type of engagement usually takes the form of multiple confirmations and approvals before the malware is functional. Most targets are unlikely to be fooled into cooperating with malware due to their high level of sensitivity for privacy in their communications.

In addition, such malware is likely to be vulnerable to most commercially available anti-virus and anti-spyware software. As such, they leave traces and are fairly easily detected on the device.

# Cyber Intelligence for the Mobile World

Pegasus is a world-leading cyber intelligence solution that enables law enforcement and intelligence agencies to remotely and covertly extract valuable intelligence from virtually any mobile device. This breakthrough solution was developed by veterans of elite intelligence agencies to provide governments with a way to address the new communications interception challenges in today's highly dynamic cyber battlefield.

By capturing new types of information from mobile devices, Pegasus bridges a substantial technology gap to deliver the most accurate and complete intelligence for your security operations. This solution is able to penetrate the market's most popular smartphones based on BlackBerry, Android, iOS and Symbian operating systems.

Pegasus silently deploys invisible software ("agent") on the target device. This agent then extracts and securely transmits the collected data for analysis. Installation is performed remotely (over-the-air), does not require any action from or engagement with the target, and leaves no traces whatsoever on the device.

# Benefits of Pegasus

Organizations that deploy Pegasus are able to overcome the challenges mentioned above to achieve unmatched mobile intelligence collection:

- **Unlimited access to target's mobile devices:** Remotely and covertly collect information about your target's relationships, location, phone calls, plans and activities – whenever and wherever they are

- **Intercept calls:** Transparently monitor voice and VoIP calls in real-time

- **Bridge intelligence gaps:** Collect unique and new types of information (e.g., contacts, files, environmental wiretap, passwords, etc.) to deliver the most accurate and complete intelligence

- **Handle encrypted content and devices:** Overcome encryption, SSL, proprietary protocols and any hurdle introduced by the complex communications world

- **Application monitoring:** Monitor a multitude of applications including Skype, WhatsApp, Viber, Facebook and Blackberry Messenger (BBM)

- **Pinpoint targets:** Track targets and get accurate positioning information using GPS

- **Service provider independence:** No cooperation with local Mobile Network Operators (MNO) is needed

- **Discover virtual identities:** Constantly monitor the device without worrying about frequent switching of virtual identities and   replacement of SIM cards

- **Avoid unnecessary risks:** Eliminate the need for physical proximity to the target or device at any phase

# Technology Highlights

The Pegasus solution utilizes cutting-edge technology specially developed by veterans of intelligence and law enforcement agencies. It offers a rich set of advanced features and sophisticated intelligence collection capabilities not available in standard interception solutions:

- Penetrates Android, BlackBerry, iOS and Symbian based devices

- Extracts contacts, messages, emails, photos, files, locations, passwords, processes list and more
- Accesses password-protected devices
- Totally transparent to the target
- Leaves no trace on the device
- Minimal battery, memory and data consumption
- Self-destruct mechanism in case of exposure risk
- Retrieves any file from the device for deeper analysis

# High Level Architecture

The Pegasus system is designed in layers. Each layer has its own responsibility forming together a comprehensive cyber intelligence collection and analysis solution.

The main layers and building blocks of the systems are:

- **Installations:** The Installation layer is in charge of issuing new agent installations, upgrading and uninstalling existing agents.

- **Data Collection:** The Data Collection layer is in charge of collecting the data from the installed device. Pegasus offers comprehensive and complete intelligence by employing four collection methods:

  – **Data Extraction:** Extraction of the entire data that exists on the device upon agent installation

  – **Passive Monitoring:** Monitor new arrival data to the device

  – **Active Collection:** Activate the camera, microphone, GPS and other elements to collect real-time data

  – **Event-based Collection:** Define scenarios that automatically triggers specific data collection

- **Data Transmission:** The Data Transmission layer is in charge of transmitting the collected data back to the command and control servers, using the most efficient and safe way.

- **Presentation & Analysis:** The Presentation & Analysis component is a User Interface that is in charge of presenting the collected data to the operators and analysts, turning the data into actionable intelligence. This is done using the following modules:

  – **Real-Time Monitoring:** Presents real-time collected data from specific or multiple targets. This module is highly important when dealing with sensitive targets or during operational activities, where each piece of information that arrives is crucial for decision making.

  – **Offline Analysis:** Advanced queries mechanism that allows the analysts to query and retrieve any piece of information that was collected. The advanced mechanism provides tools to find hidden connections and information.

  – **Geo-based Analysis:** Presents the collected data on a map and conduct geo-based queries.

  – **Rules & Alerts:** Define rules that trigger alerts based on specific data that arrives or event that occurred.

- **Administration:** The administration component is in charge of managing the entire system permission, security and health:

– **Permission:** The permissions mechanism allows the system administrator to manage the different users of the system. Provide each one of them the right access level only to the data they are allowed to. This allows to define groups in the organization that handle only one or more topics and other groups which handles different topics.

– **Security:** The security module monitors the system security level, making sure the collected data is inserted to the system database clean and safe for future review.

– **Health:** The health component of the Pegasus solution monitor the status of all components making sure everything is working smoothly. It monitors the communication between the different parts, the system performance, the storage availability and alerts if something is malfunction.

The system layers and components are shown in Figure 1.

**Figure 1: Pegasus High Level Architecture**

# Agent Installation

In order to start collecting data from your target's smartphone, a software based component ("Agent") must be remotely and covertly installed on their device.

## Agent Purpose

The "Agent", a software based component, resides on the end point devices of the monitored targets and its purpose is to collect the data it was configured to. The agent is supported on the most popular operating systems: BlackBerry, Android, iOS (iPhone) and Symbian based devices.

Each agent is independent and is configured to collect different information from the device and to transmit it via specific channels in defined timeframes. The data is sent back to the Pegasus servers in a hidden, compressed and encrypted manner.

The agent continuously collects the information from the device and will transmit it once reliable internet connection becomes available.

Communications encryption, the use of many applications and other communications concealing methods are no longer relevant when an agent is installed on the device.

## Agent Installation Vectors

Injecting and installing an agent on the device is the most sensitive and important phase of intelligence operation conducted on the target device. Each installation has to be carefully planned to ensure it is successful. The Pegasus system supports various installation methods. The installation methods variety answers the different operational scenarios which are unique to each customer, resulting in the most comprehensive and flexible solution. Following are the supported installation vectors:

### Remote Installation (range free):

- **Over-the-Air (OTA):** A push message is remotely and covertly sent to the mobile device. This message triggers the device to download and install the agent on the device. During the entire installation process no cooperation or engagement of the target is required (e.g., clicking a link, opening a message) and no indication appears on the device. The installation is totally silent and invisible and cannot be prevented by the target.  This is NSO uniqueness, which significantly differentiates the Pegasus solution from any other solution available in the market.

- **Enhanced Social Engineering Message (ESEM):** In cases where OTA installation method is inapplicable[1], the system operator can choose to send a regular text message (SMS) or an email, luring the target to open it. Single click, either planned or unintentional, on the link will result in hidden agent installation. The installation is entirely concealed and although the target clicked the link they will not be aware that software is being installed on their device.

  The chances that the target will click the link are totally dependent on the level of

---

1 e.g., some devices do not support it; some service providers block push messages; target phone number in unknown.

content credibility. The Pegasus solution provides a wide range of tools to compose a tailored and innocent message to lure the target to open the message.

NOTE: Both OTA and ESEM methods require only a phone number or an email address that is used by the target. Nothing else is needed in order to accomplish a successful installation of the Pegasus agent on the device.

## Close to the target (range limited):

- **Tactical Network Element:** The Pegasus agent can be silently injected once the number is acquired using tactical network element such as Base Transceiver Station (BTS). The Pegasus solution leverages the capabilities of such tactical tools to perform a remote injection and installation of the agent. Taking a position in the area of the target is, in most cases, sufficient to accomplish the phone number acquisition. Once the number is available, the installation is done remotely.

- **Physical:** When physical access to the device is an option, the Pegasus agent can be manually injected and installed in less than five minutes. After agent installation, data extraction and future data monitoring is done remotely, providing the same features of any other installation method.

NOTE: Tactical and Physical installations are usually used where no target phone number or email address are available.

## Agent Installation Flow

Remote agent installation flow is shown in Figure 2.

**Figure 2: Agent Installation Flow**

In order to initiate a new installation, the operator of the Pegasus system should only insert the target phone number. The rest is done automatically by the system, resulting in most cases with an agent installed on the target device.

Agent installation initiation is shown in Figure 3.

**Figure 3: Agent Installation Initiation**



# Supported Operating Systems & Devices

| Operating System (OS) | OS Version | Device | Comments |
|---|---|---|---|
| Android | 2.1 – 4.2 | ▪ Samsung Galaxy series<br>▪ Sony Ericsson Xperia series<br>▪ Others (refer to note below) | Support is based on local firmware versions, which must be defined with the customer |
| iOS | 4.x – 6.1.4 | ▪ iPhone 4<br>▪ iPhone 4S<br>▪ iPhone 5 | |
| BlackBerry | 5.0 – 7.1 | ▪ Curve (8520, 9300, 9350, 9360)<br>▪ Bold (9000, 9700, 9780, 9790, 9900, 9930)<br>▪ Torch (9800, 9810, 9850, 9860)<br>▪ Pearl (9100) | |
| Symbian | Version S60 OS9 3rd edition FP1, FP2, 5th edition and Symbian^3 | Variety of devices | Support is based on local firmware versions, which must be defined with the customer |

NOTE: Android-based devices are often added to the supported list. An updated list can be sent upon customer request.

# Installation Failure

The installation can sometimes fail due to following reasons:

1. Unsupported device: the target device is not supported by the system (which appears above).

2. Unsupported OS: the operating system of the target device is not supported by the system.

JA61

3. Unsupported browser: the default browser of the device was previously replaced by the target. Installation from browsers other than the device default (and also Chrome for Android based devices) is not supported by the system.

In any of the above mentioned cases, if the operator initiates a remote installation to a non-supported device, operating system or browser, the injection will fail and the installation will be aborted. In these cases the process is finished with an open browser on the target device pointing and showing the URL page which was defined by the operator prior the installation.

The device, OS and browser are identified by the system using their HTTP user agent. If by any reason the user agent was manipulated by the target, the system might fail to correctly identify the device and OS and provide the wrong installation payload. In such case, the injection will fail and the installation will be aborted, showing again the above mentioned URL page.

# Data Collection

Upon successful agent installation, a wide range of data is monitored and collected from the device:

- **Textual:** Textual information includes text messages (SMS), Emails, calendar records, call history, instant messaging, contacts list, browsing history and more. Textual information is usually structured and small in size, therefore easier to transmit and analyze.

- **Audio:** Audio information includes intercepted calls, environmental sounds (microphone recording) and other audio recorded files.

- **Visual:** Visual information includes camera snapshots, photos retrieval and screen capture.

- **Files:** Each mobile device contains hundreds of files, some bear invaluable intelligence, such as databases, documents, videos and more.

- **Location:** On-going monitoring of the device location (Cell-ID and GPS).

The variety of data that is collected by the Pegasus system is shown in Figure 4.

**Figure 4: Collected Data**



The data collection is divided into three levels:

- Initial data extraction
- Passive monitoring
- Active collection

## Initial Data Extraction

Once the agent is successfully injected and installed on the device, the following data that resides and exists on the device can be extracted and sent to the command and control center:

- SMS records
- Contacts details
- Call history (call log)
- Calendar records
- Emails
- Instant Messaging
- Browsing history

As opposed to other intelligence collection solutions which provide only future monitoring of partial communications, Pegasus allows the extraction of all existing data on the device. As a result the organization benefits from accessing historical data about the target, which assists in building a comprehensive and accurate intelligence picture.

---

NOTE: Initial data extraction is an option and not a must. If the organization is not allowed to access historical data of the target, such option can be disabled and only new arrival data will be monitored by the agent.

---

## Passive Monitoring

From the point the agent was successfully installed it keeps monitoring the device and retrieves any new record that becomes available in real-time (or at specific condition if configured differently). Below is the full list of data that is monitored by the agent:

- SMS records
- Contacts details
- Call history (call log)
- Calendar records
- Emails
- Instant Messaging
- Browsing history
- Location tracking (Cell-ID based)

## Active Collection

In addition to passive monitoring, upon successful agent installation a wide set of active collection features becomes available. Active collection refers to active requests sent by the operator to collect specific information from the installed device. These set of features are called active, as they carry their collection upon explicit request of the operator. Active collection allows the operator to perform real-time actions on the target device, retrieving unique information from the device and from the surrounding area of the target, including:

- Location tracking (GPS based)

- Voice calls interception
- File retrieval
- Environmental sound recording (microphone recording)
- Photo taking
- Screen capturing

Active collection differentiates Pegasus from any other intelligence collection solution, as the operator controls the information that is collected. Instead of just waiting for information to arrive, hoping this is the information you were looking for, the operator actively retrieves important information from the device, getting the exact information he was looking for.

# Description of Collected Data

The different types of data available for extraction, passive monitoring and active collection with their respective features are listed in Table 1.

**Table 1: Collection Features Description**

| Application Type | Features Description | Data Extraction | Passive / Active Collection |
|---|---|---|---|
| Instant Messaging (IM):<br>1. WhatsApp<br>2. Viber<br>3. Skype<br>4. BlackBerry Messenger (BBM) | Agent extracts and monitors all the incoming and outgoing instant messages to/from the device.<br>Full 1-on-1 conversation extraction and monitoring including group chat.<br>Indication for file transfer (file name). | ✔ | ✔ |
| Location Tracking | The system provide two types of location information about the device:<br>GPS:<br>1. Upon user request, a defined timeframe for sampling location is opened. GPS data is retrieved when applicable (available reception). In case GPS signal is not accessible, Cell-ID is retrieved.<br>2. If GPS is disabled by the target, the system enable it for sampling and immediately turn it off<br><br>Cell-ID:<br>Devices constantly transmit their location (Cell-ID) every time they communicate with the server.<br>The retrieved location data is analyzed at the server and placed on map. Location-based queries and alerts are easily set. | ✔ | ✔ |
| Calendar | Agent extracts all the calendar records from the device and monitors any change or new event added to the calendar. | ✔ | ✔ |
| Contact details | Agent extracts all contacts available on the device. From this point the agent monitors any change/deletion of existing contacts and the addition of new contact. | ✔ | ✔ |

JA65

| Application Type | Features Description | Data Extraction | Passive / Active Collection |
|---|---|---|---|
| | The agent extracts and monitors all values assigned in each contact field that is available (based on vCard fields), including photo if assigned. | | |
| Environmental sound recording (microphone recording) | The user can request to turn on the device microphone and listen in real-time to the surrounding sounds. The surrounding sounds are recorded and can be analyzed and replayed at a later stage.<br><br>Turning on the microphone is based on an incoming silent call to the device from the server (PBX). Such call is allowed only after the agent assured that the device is in idle mode (device is not in active use and the screen is turned off).<br><br>Any action by the target that turns on the screen will result in immediate call hang-up and cease of capturing surrounding sounds.<br><br>No indication of the recording or the incoming silent call appears on the device at any point.<br><br>The quality of the recording depends on the device's microphone sensitivity, the surrounding noise and the device model. This sensitivity varies between the different mobile phone models and is set by the phone manufacturer.<br><br>Usually the content of a conversation held a few meters next to the device can be heard. | N/A[2] | ✔ |
| SMS | Agent extracts and monitors all the incoming and outgoing text messages (SMS). | ✔ | ✔ |
| Call Interception (call recording) – Android only | The user can request to record incoming and outgoing calls of the target device.<br><br>The calls are recorded locally on the device and then sent to the system servers upon completion. | N/A | ✔ |
| Email:<br>1. Main email application in all platforms<br>2. Gmail application in Android | Agent extracts and monitors all the emails that reside on the device.<br><br>The main email application (stock) on the device is monitored, thus all accounts which are defined there are monitored (e.g., exchange, Gmail, etc.).<br><br>For Android-based devices both the main email stock application and the Gmail application are monitored. | ✔ | ✔ |
| File retrieval | Upon user request a full list of files and folders is extracted from the device (internal storage and SD card). When the operator spots a file of interest he can immediately request to retrieve it. | N/A | ✔ |
| Photo taking | Upon user request snapshots using the front and rear camera are taken from the device and sent to the servers. The snapshots are taken only after the agent assured that the | N/A | ✔ |

2 For active collection features, initial data is not extracted before a request is initiated by the user.

| Application Type | Features Description | Data Extraction | Passive / Active Collection |
|---|---|---|---|
| | device is in idle mode.<br><br>During photo taking no indication appears on the device and flash is never used.<br><br>The quality of the photo can be chosen by the operator to reduce data usage and faster photo transmission. Since flash is not used and the phone might be in motion or inside rooms with low light, the photos are sometimes out of focus. | | |
| Screen capturing | Upon user request a screen capture is taken and sent to the Pegasus servers. The device screenshots can provide insights on the applications used by the target, wallpaper image used and more intimate information about the target. | N/A | ✔ |
| Browsing history | Agent extracts and monitors the history of browsed websites from the default browser of the device. | ✔ | ✔ |
| Browsing favorites | Agent extracts and monitors the favorites websites saved in the default browser of the device. | ✔ | ✔ |
| Call history (call log) | Agent extracts the history of all incoming/outgoing calls made to/from the device. The data includes the caller and callee numbers and the duration of the call.<br><br>Calling attempts which did not result with a conversation will show duration of 0 (zero) seconds. | ✔ | ✔ |
| Device information | Upon agent installation all device, network and connection details are extracted to monitor the general information of the device, including battery level.<br><br>This provides a summarized view to help understand at-a-glance the device status. | ✔ | ✔ |

The above mentioned data is the potential data that could be collected by an agent. The agent will collect the data that is applicable and available on the device. If one or more of the above mentioned applications does not exist and/or removed from the device, the agent will operate in the same manner. It will collect the data from the rest of the services and applications which are in use in the device. Also, all the collected data from the removed application will still be saved on the servers or at the agent, if it was not yet transmitted back to the servers.

In addition, the above mentioned data that is collected by the agent covers the most popular applications used worldwide. Since applications popularity differs from country to country, we understands that data extraction and monitoring of other applications will be required as time evolves and new applications are adopted by targets. When such requirement is raised, we can fairly easily extract the important data from virtually any application upon customer demand and release it as a new release that will become available to the customer.

## Collection Buffer

The installed agent monitors the data from the device and transmits it to the servers. If transmission is not possible₃ the agent will collect the new available information and transmits it when connection will become available. The collected data is stored in a hidden and encrypted buffer. This buffer is set to reach no more than 5% of the free space available on the device. For example – if the monitored device has 1GB of free space, the buffer can store up to 50MB. In case the buffer has reached its limit, the oldest data is deleted and new data is stored (FIFO). Once the data has been transmitted, the buffer content is totally deleted.
.

3 No data channels are available; Device is roaming; Device is shut down.

# Data Transmission

By default, the collected data (initial data extraction, passive monitoring and active collection) is sent back to the command and control center in real-time. The data is sent via data channels, where Wi-Fi is the preferred connection to use when it is available. In other cases data is transmitted via cellular data channels (GPRS, 3G and LTE). Extra thought was put into compression methods and focusing on textual content transmission whenever possible. The data footprints are very small and usually take only few hundred bytes. This is to make sure that the collected data is easily transmitted, ensuring minimal impact on the device and on the target cellular data plan.

If data channels are not available, the agent will collect the information from the device and store it in a dedicated buffer, as explained in Data Collection section.

Data transmission is automatically ceased in the following scenarios:

- **Low battery:** When the device battery level is below the defined threshold (5%) all data transmission processes are immediately ceased until the device is recharged.
- **Roaming device:** When the device is roaming, cellular data channels become pricy, thus data transmission is done only via Wi-Fi. If Wi-Fi does not exist, transmission will be ceased.

When no data channels are available, and no indication for communication is coming back from the device, the user can request the device will communicate and/or send some crucial data using text messages (SMS).

CAUTION: Communication and/or data transmission via SMS may incur costs by the target and appear in his billing report thus should be used sparingly.

The communication between the agent and the central servers is indirect (through anonymizing network), so trace back to the origin is non-feasible.

The Pegasus system data transmission process is shown in Figure 5.

**Figure 5: Data Transmission Process**



The channels and scenarios for transmitting the collected data are shown in Figure 6.

**Figure 6: Data Transmission Scenarios**



## Data Transmission Security

All connections between the agents and the servers are encrypted with strong algorithms and are mutually authenticated. While data encryption is probably the most urging issue, extra care was given to ensure minimal data, battery and memory are consumed within the agents requirements. This is meant to make sure that no concerns are raised by the target.

Detecting an operating agent by the target is almost impossible. The Pegasus agent is installed at the kernel level of the device, well concealed and is untraceable by antivirus and antispy software.

The transmitted data is encrypted with symmetric encryption AES 128-bit.

## Pegasus Anonymizing Transmission Network

Agent transparency and source security are the guiding principles of the Pegasus solution. To assure that trace back to the operating organization is impossible, the Pegasus Anonymizing Transmission Network (PATN), a network of anonymizers is deployed to serve each customer. The PATN nodes are spread in different locations around the world, allowing agent connections to be redirected through different paths prior to reaching the Pegasus servers. This ensures that the identities of both communicating parties are highly obscured.

# Data Presentation & Analysis

Successful data collection from hundreds of targets and devices generates massive amounts of data for visualization, presentation and analysis. The system provides a set of operational tools to help the organization to transform data into actionable intelligence. This is to view, sort, filter, query and analyze the collected data. The tools include:

- **Geographical analysis:** Track target's real-time and historical location, view several targets on map
- **Rules and alerts:** Define rules to generate alerts upon important data arrival
- **Favorites:** Mark important and favorite events for subsequent review and deeper analysis
- **Intelligence dashboard:** View highlights and statistics of target's activities
- **Entity management:** Manage targets by groups of interest (e.g., drugs, terror, serious crime, location, etc.)
- **Timeline analysis:** Review and analyze collected data from a particular time frame
- **Advanced search:** Conduct search for terms, names, code words and numbers to retrieve specific information

The collected data is organized by groups of interest (e.g., drugs group A, terror group B, etc.) and each group consists of targets. Each target consists of several devices which some have installed agents on them.

The collected data is displayed in an easy-to-use intuitive user interface and when applicable emulates popular display of common applications. The intuitive user interface is designed for a day-to-day work. Operators can easily customize the system to fit their preferred working methods, define rules and alerts for specific topics of interest.

The operator can choose to view the entire collected data from specific target or only specific type of information such as location information, calendar record, emails or instant messages.

Pegasus calendar monitoring screen is shown in Figure 7.

**Figure 7: Calendar Monitoring**



Pegasus call log and call interception screen is shown in Figure 8.

**Figure 8: Call Log & Call Interception**



Pegasus location tracking screen is shown in Figure 9.

**Figure 9: Location Tracking**



The presentation fields of the collected data are listed in Table 2.

**Table 2: Presentation of Collected Data**

| Service / Application Type | Extracted data | Display method |
|---|---|---|
| Instant Messaging (IM):<br>1. WhatsApp<br>2. Viber<br>3. Skype<br>4. BlackBerry Messenger (BBM) | ▪ Chat participants (Names & phones)<br>▪ Conversation content<br>▪ Date & Time<br>▪ Attachments metadata (without the attachment) | ▪ Grid<br>▪ Conversation mode |
| Location Tracking | ▪ Data source (GPS/Cell-ID)<br>▪ Latitude<br>▪ Longitude<br>▪ Date & Time | ▪ Grid<br>▪ Map:<br> - On map display<br> - Full trail<br> - Type of location data (GPS or Cell-ID based) |
| Calendar | ▪ Meeting subject<br>▪ Event date and start time | ▪ Grid<br>▪ Monthly calendar view (emulates popular calendar clients) |
| Contact details | ▪ Entire values stored in the contact entry including photo if available | ▪ Grid<br>▪ Contact card with the entire details |
| Environmental sound recording (microphone recording) | ▪ Recorded audio<br>▪ Recording Date & Time<br>▪ Duration | ▪ Grid<br>▪ Playback interface |
| SMS | ▪ Direction (incoming, outgoing)<br>▪ Contact name<br>▪ Phone number<br>▪ Message content<br>▪ Date & Time | ▪ Grid |
| Call Interception | ▪ Direction<br>▪ Contact name<br>▪ Phone number<br>▪ Duration<br>▪ Date & Time | ▪ Grid<br>▪ Playback interface |
| Email:<br>1. Main email application in all platforms<br>2. Gmail application in Android | ▪ From<br>▪ To<br>▪ CC<br>▪ BCC<br>▪ Subject<br>▪ Folder<br>▪ Account<br>▪ Message content<br>▪ Date & Time | ▪ Grid<br>▪ HTML (emulates popular email clients) |
| File retrieval | ▪ List of folders (tree)<br>▪ List of files (grid):<br>▪ Filename | ▪ Grid<br>▪ Tree view |

| Service / Application Type | Extracted data | Display method |
|---|---|---|
| | ▪ Modified date<br>▪ File size | |
| Photo taking | ▪ Date & Time<br>▪ Photo | ▪ Grid<br>▪ Photo viewer |
| Screen capturing | ▪ Date & Time<br>▪ Screen capture image | ▪ Grid<br>▪ Photo viewer |
| Browsing history | ▪ Website name (as saved by the target, usually the default website name)<br>▪ Website URL address | ▪ List |
| Browsing favorites | ▪ Website name (as saved by the target, usually the default website name)<br>▪ Website URL address | ▪ List |
| Call history (call log) | ▪ Direction<br>▪ Contact name<br>▪ Phone number<br>▪ Duration<br>▪ Date & Time | ▪ Grid |
| Device information | ▪ Battery level<br>▪ Connection type (e.g., 3G, WiFi)<br>▪ MSISDN<br>▪ IMEI<br>▪ IMSI<br>▪ Device Manufacturer<br>▪ Device model<br>▪ Operating System version<br>▪ Installation date<br>▪ Last communication time<br>▪ Device current country<br>▪ Device home country<br>▪ Serving network<br>▪ Home serving network | ▪ Dashboard |

# Rules & Alerts

The Rules & Alerts module in the system alerts when important event takes place. Rules must be defined in advance and they help the operators to review and take actions in real-time, for example:

- ▪ Geo-fencing:
    - ○ Access hot zone - Alert when target reached an important location
    - ○ Leave hot zone - Alert when target left a certain location
    Geo-fence alerts are based on a perimeter around a certain location, where the operator defines the size of the perimeter.
- ▪ Meeting detection: Alert when two targets meet (share the same location)

JA74

- Connection detection:
  - Alert when a message is sent from/to a specific number
  - Alert when a phone call is performed from/to a specific number
- Content detection: Alert when a defined word/term/code word is used in a message

# Data Export

The system is designed as an end-to-end system, providing its users with collection and analysis tools. However, we understands that there are advanced analysis capabilities and data fusion requirements from other sources, therefore the system allows the exporting of the collected information and seamless integration with 3rd party backend or analysis systems available.

# Agent Maintenance

Once agent is installed on a certain device, it has to be maintained in order to support new features and change its settings and configurations or to be uninstalled when it is no longer providing valuable intelligence to the organization.

## Agent Upgrade

When agents' updates are released they become available to install. These new agents are now ready for installation on new targets' devices or as upgrades for existing agents installed on target's devices. These updates provide new functionalities, bug fixing, support for new services or improve the agents overall behavior. Such updates are crucial to keep the agent functional and operational in the endless progress of the communication world and especially the smartphone arena.

There are two types of agent upgrades:

- Optional upgrade: agent upgrade is not mandatory by the system. The user decides when, if at all, to upgrade the agent.
- Mandatory upgrade: agent upgrade is mandatory by the system. The supervisor must upgrade the agent otherwise no new information will be monitored from the device.

Upgrade sometimes requires an installation of a new agent and sometimes just a small update of the existing agent. In both cases the user is the only one to decide when to conduct the upgrade, and therefore should plan this accordingly.

Once the command for upgrade was sent by the user, the process should take only few minutes. The process might take longer if the device is turned off or has bad data connection. In either case, the upgrade will be accomplished once a decent data connection becomes available.

## Agent Settings

Agent settings are set for the first time during its installation. From this point, these settings serve the agent, but can always be changed if required. The settings include the IP address for transmitting the collected data, the way commands are sent to the agent, the time until the agent is automatically uninstall itself (see self-destruct mechanism for more details) and more.

## Agent Uninstall

When the intelligence operation is done or in case where the target is no longer with interest to the organization, the software based component ("Agent") on the target's device can be removed and uninstalled. Uninstall is quick, requires a single user request and has no to minimal effect on the target device. The user issues a request for agent uninstall which is sent to the device.

Once agent is uninstalled from a certain device it leaves no traces whatsoever or indications it was ever existed there[4]. As long as the agent is operational on the device and a connection exists between him and the servers it can be easily and remotely uninstalled.

Uninstall can always be done remotely no matter what was the method used for installation. Physical uninstall is also an option, if needed.

Uninstalling an agent does not mean losing the entire collected data – the entire data that was collected during the time that the agent was installed on the device will be kept in the servers for future analysis.

## Self-Destruct Mechanism

The Pegasus system contains self-destruct mechanism for the installed agents. In general, we understand that it is more important that the source will not be exposed and the target will suspect nothing than keeping the agent alive and working. The mechanism is activated in the following scenarios:

- **Risk of exposure:** In cases where a great probability of exposing the agent exists, a self-destruct mechanism is automatically being activated and the agent is uninstalled. Agent can be once again installed at a later time.
- **Agent is not responding:** In cases where the agent is not responding and did not communicate with the servers for a long time[5], the agent will automatically uninstall itself to prevent being exposed or misused.

4 In some cases, uninstall can result in device reboot. If reboot takes place, it happens once agent removal is done. The device comes up clean with no agent installed.
5 The default time is 60 days, but can be reconfigured for any period of time required

# Solution Architecture

The Pegasus system's major architectural components are shown in Figure 10.

**Figure 10: Solution Architecture**



# Customer Site

NSO is responsible to deploy and configure the Pegasus hardware and software at the customer premises, making sure the system is working and functioning properly. Below are the main components installed at the customer site:

## WEB Servers

Residing at the customer's premises, the servers are responsible for the following:

- Agent installation and monitoring
- Agent maintenance: Remotely control, configure and upgrade installed agents
- Data transmission: Receive the collected data transmitted from the installed agents
- Serve the operators' terminals

## Communications Module

The communications module allows interconnectivity and internet connection to the servers.

## Cellular Communication Module

The cellular communication module enables remote installation of the Pegasus agent to the target device using cellular modems and/or SMS gateways.

## Permission Module

The Pegasus permission management module defines and controls the features and available content allowed for each user based on their role, rank and hierarchy.

## Data Storage

The collected data that was extracted and monitored by the agents is stored on an external storage device. The data is well backed-up and with full resiliency and redundancy to prevent failures and downtime.

## Servers Security

All the servers reside inside the customer's trusted network, behind any security measures it may deploy as well as security measures that we supply specifically for the system.

## Hardware

The system standard hardware is deployed on several servers connected together on couple of racks. The equipment takes care of advanced load balancing, content compression, connection management, encryption, advanced routing, and highly configurable server health monitoring.

## Operator Consoles

The operator's end-point terminals (PC) are the main tool which the operators activate the Pegasus system, initiate installations and commands, and view the collected data.

## Pegasus Application

The Pegasus application is the user interface that is installed on the operator terminal. It provides the operators with range of tools to view, sort, filter, manage and alert to analyze the large amount of data collected from the targets' agents.

# Public Networks

Apart from local hardware and software installation at the customer premises, the Pegasus system does not require any physical interface with the local mobile network operators. However, since agent installations and data are transferred over the public networks, we makes sure it is transferred in the most efficient and secured way, all the way back to the customer servers:

## Anonymizing Network

Pegasus Anonymizing Transmission Network (PATN) is built from anonymizing connectivity nodes which are spread in different locations around the world, allowing agent connections to be directed through different paths prior to reaching the Pegasus servers. The anonymized nodes serve only one customer and can be set up by the customer if required.

See more information in Pegasus Anonymizing Transmission Network section.

## Target Devices

The above mentioned architecture allows the operators to issue new installations, extract, monitor and actively collect data from targets' devices. See more details in Supported Operating Systems & Devices.

---

NOTE: The Pegasus is an intelligence mission-critical system, therefore it is fully redundant to avoid malfunctions and failures. The system handles large amounts of data and traffic 24 hours a day and is scalable to support customer growth and future requirements.

---

# Solution Hardware

The hardware specifications for operating the Pegasus system depends on the number of concurrent installed agents, the number of working stations, the amount of data stored and for how long should it be stored.

All the necessary hardware is supplied with the system upon deployment and may require local customization that has to be handled by the customer based on we directions. If required, hardware can be purchased by the customer based on the specifications provided by we.

## Operators Terminals

The operator terminals are standard desktop PCs, with the following specifications:

- **Processor:** Core i5
- **Memory:** 3GB RAM
- **Hard Drive:** 320GB
- **Operating System:** Windows 7

## System Hardware

To fully support the system infrastructure, the following hardware is required:

- Two units of 42U cabinet
- Networking hardware
- 10TB of storage
- 5 standard servers
- UPS
- Cellular modems and SIM cards

The system hardware scheme is shown in Figure 11.

**Figure 11: Pegasus Hardware**





42 U

12 U          Storage Array FS

12 U          Storage Array FS

12 U          Storage Array FS

7 U           UPS

# System Setup and Training

We are responsible for the system setup and training before its hand-over to the customer.

## System Prerequisites

Successful installation of the Pegasus system requires the following preparations of the servers' room:

- Sufficient room to contain two 42U racks cabinet, 5x5x2.5m (LxWxH)
- Air conditioned (18°C) room
- Access restriction
- Routing from end-point terminals to servers room
- Reliable cellular network reception (at least -95 dBm)
- 2 x Electrical outlets (20A) per rack
- 2 x Symmetric ATM lines from different ISP's. Each line with a bandwidth of 10MB containing 8 external static IP addresses:
  - ISP #1: Fiber optic-based network
  - ISP #2: Ethernet category-7 cable-based network

  The mission-critical system requires two parallel networks to ensure system resilience and downtime is kept to an absolute minimum.

- 2 x E1 PRI connections, each contains 10 extensions (two different service providers is recommended)
- 2 x anonymous SIM cards for each local Mobile Network Operator
- 3rd party services registration as required

## System Setup

- The solution will be deployed at the customer site by we personnel
- Deployment duration usually requires 10-15 working weeks
- Operating environment prerequisites must be met
- System setup includes hardware and software installation, and in addition integration to local environment and systems
- Support and adaptations to the different local device firmware versions

## Training

Upon system installation, we personnel will conduct full training sessions. Training can take place onsite or in any other location required by the customer, including we headquarters. Training session includes the following:

- Basic system usage
- System architecture
- Advanced system usage and roles

- ▪ Real-world simulation exercises

The recommended number of attendees is with respect to the number of installed operator consoles.

# High Level Deployment Plan

The process of adapting, installing and testing the system in a new customer site in listed in Table 3.

**Table 3: Pegasus Deployment Plan**



## Phase 1 – Preparations:

- ▪ Requirements for an Acceptance Test Procedure (ATP) are defined together with the customer
- ▪ Hardware and software acquisition and customization to answer customer requirements and needs
- ▪ When required, the Pegasus system is integrated with local infrastructures and systems
- ▪ System adaptations to the local mobile networks

## Phase 2 – Implementation:

- ▪ System testing
- ▪ Hardware installation
- ▪ System adaptations to local device firmware versions

### Phase 3 – Training and Completion:

- Detailed system training, real-life scenarios practicing and simulation
- Customer ATP as defined during phase 1

## System Acceptance Test (SAT)

We have gained substantial experience in installing and implementing the Pegasus system. The following acceptance test plan verifies that the system works as required and validates that the correct functionality has been delivered. It describes the scope of the work to be performed and the approach taken to execute the proper tests to validate that the system functions as mutually agreed with the customer.

The tests are divided into 3 stages:

- Functionality tests
- Network and providers tests
- Customer tailor specific tests

An official system hand-over from we to the customer is done once the system has been deployed, tested and demonstrated.

# Maintenance, Support and Upgrades

We provides, as default, one year of maintenance, support and upgrades services. These
services include:

## Maintenance and Support

We provides maintenance services and three-tier level support that includes:

- **Tier-1:** Standard system operations problems
  - Email and phone support
- **Tier-2:** Proactive resolving of technical problems
  - Dedicated engineers will inspect, examine and resolve common technical issues, putting their best efforts
  - Remote assistance using remote desktop software and a Virtual Private Network (VPN) where requested
- **Tier-3:** Bug fixing and system updates of substantial system malfunctions
- **Phone support:** In addition to the above mentioned, we provide phone and email support to any question and problem that is raised.

In addition, the customer will be able to add the following support:

- Planned or emergency onsite assistance
- Health monitoring system

## Upgrades

We have releases major upgrades to the Pegasus system few times a year. Such upgrades
usually include:

- New features
- New devices/operating system support
- Tailored features based on customer requirements
- Bugs fix

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HANAN ELATR KHASHOGGI,

**(b)** County of Residence of First Listed Plaintiff   Fairfax County, VA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Steven T. Webster, Webster Book LLP,
300 N Washington St, Ste 404, Alexandria, VA 22314,
(888) 987-9991, swebster@websterbook.com

## DEFENDANTS

NSO GROUP TECHNOLOGIES LIMITED and
Q CYBER TECHNOLOGIES LIMITED

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
     Plaintiff
- ☒ 3  Federal Question
     *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government
     Defendant
- ☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Protection Act |
| ☐ 195 Contract Product Liability | ☒ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | Exchange |
| | Medical Malpractice | | Leave Act | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1030 et seq.

Brief description of cause:
Computer Fraud and Abuse Act and associated state law claims.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
06/15/2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Steven T. Webster

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

HANAN ELATR KHASHOGGI,                    )
                                          )
          Plaintiff,                     )
                                          )
v.                                        )    Case No. 1:23-cv-00779-LMB-LRV
                                          )
NSO GROUP TECHNOLOGIES                    )
LIMITED, et al.,                          )
                                          )
          Defendants.                    )
_____)

## LIMITED PROTECTIVE ORDER

Having reviewed Defendants' Unopposed Motion for Entry of a Limited Protective Order, the Court orders Plaintiff's counsel not to publish or share with anyone other than counsel of record in this matter the materials in support of a response to the pleadings designated by Defendants as "Highly Confidential Attorney's Eyes Only," (the "AEO Materials"), except as agreed to in writing by Defendants, until such time as the Court enters a confidentiality protective order, at which point the terms of that confidentiality protective order shall govern the treatment of the AEO Materials. If no such confidentiality protective order is entered, Plaintiff's counsel shall return or destroy all copies of the AEO Materials within 60 days of the final disposition of this litigation, with final disposition deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

It is SO ORDERED.

Date:   September 25, 2023

                            /s/
                            Lindsey Robinson Vaala
                            United States Magistrate Judge

                    UNITED STATES MAGISTRATE JUDGE

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

HANAN ELATR KHASHOGGI,

        Plaintiff,

    v.

NSO GROUP TECHNOLOGIES LTD.
and Q CYBER TECHNOLOGIES LTD.,

        Defendants.

Case No. 1:23-cv-779-LMB-LRVVAED

Action Filed:  June 15, 2023

---

### NOTICE OF MOTION AND MOTION OF DEFENDANTS TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Defendants NSO Group Technologies LTD. ("NSO") and Q Cyber Technologies LTD. ("Q Cyber" and, collectively, "NSO") will move the Court, the Honorable Leonie M. Brinkema, United States District Judge, for an order dismissing Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), and the common law doctrine of *forum non conveniens*. This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Yaron Shohat ("Shohat Decl."), Roy Blecher ("Blecher Decl."), and Joseph N. Akrotirianakis ("Akro. Decl.") submitted herewith, the pleadings, papers and records on file in this case, and such oral argument as may be presented at any hearing on this motion.

Counsel for Defendants is available for a hearing on this motion on October 27, 2023, but have been informed that Counsel for Plaintiff is not available on that day. Counsel for Defendants is not available for hearing on November 3, 2023, because Defendants are required to be present in the U.S. District Court for the Northern District of California for a hearing in another matter involving NSO. The Court will be closed on November 10, 2023, in honor of Veterans Day. Accordingly, Defendants respectfully request that the Court schedule a hearing on this motion for a date and time that is convenient to the Court.

DATED: September 29, 2023                          KING & SPALDING LLP

                                                  By: */s/ Edmund Power*
                                                  ASHLEY C. PARRISH (Bar No. 43089)
                                                  aparrish@kslaw.com
                                                  EDMUND POWER (Bar No. 65841)
                                                  epower@kslaw.com
                                                  KING & SPALDING LLP
                                                  1700 Washington Ave., NW, Suite 900
                                                  Washington, DC 20006
                                                  Telephone:    (202) 737-0500
                                                  Facsimile:    (202) 626-3737

                                                  JOSEPH N. AKROTIRIANAKIS (pro hac vice)
                                                  jakro@kslaw.com
                                                  KING & SPALDING LLP
                                                  633 West Fifth Street, Suite 1700
                                                  Los Angeles, CA 90071
                                                  Telephone:    (213) 443-4355
                                                  Facsimile:    (213) 443-4310

                                                  *Attorneys for Defendants NSO GROUP TECHS.*
                                                  *LTD. and Q CYBER TECHS. LTD.*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| HANAN ELATR KHASHOGGI, | Case No. 1:23-cv-779-LMB-LRVVAED |
| Plaintiff, | Action Filed:  June 15, 2023 |
| v. | |
| NSO GROUP TECHNOLOGIES LTD. and Q CYBER TECHNOLOGIES LTD., | |
| Defendants. | |

**DECLARATION OF YARON SHOHAT IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS**

I, Yaron Shohat, declare as follows:

1.      I am a citizen and resident of Israel. I am currently the Chief Executive Officer of Defendant NSO Group Technologies Limited ("NSO"), and I was the Chief Operating Officer of NSO at all times relevant to this case. Defendant Q Cyber Technologies Limited ("Q Cyber" and, collectively with NSO, "Defendants") is NSO's sole director and majority shareholder.

2.      I have personal knowledge of the facts set forth herein and, except as otherwise stated, could testify competently to each fact averred herein.

3.      NSO is a technology company that designs and licenses technology to governments and their authorized agencies for national security and law enforcement purposes.

4.      Defendants are incorporated and have their principal places of business in Israel. As a result, Hebrew is the primary language used in the ordinary course of company operations. NSO's internal communications and documents are generally prepared in Hebrew. Many of NSO's employees, however, have at least some proficiency in English and are capable of reading and writing (to varying degrees) in English.

5.      As Israeli corporations, Defendants are subject to service of process in Israel. Defendants have no presence in any other country. Defendants do no business in Virginia and have no offices or employees in Virginia or elsewhere in the United States. Defendants have not performed any actions relevant to Plaintiff's lawsuit in Virginia, and they have not targeted any activities relevant to the lawsuit at Virginia. All of Defendants' employees with knowledge relevant to this lawsuit reside in Israel, and any documentary evidence relevant to the case is located in Israel.

6.      Sales of Defendants' Pegasus technology are strictly monitored and regulated by the Government of Israel. The export of the technology is regulated under Israel's Defense Export Control Law ("DECL"), with which I am very familiar as NSO's CEO. A copy of the DECL is attached as **Exhibit A**.

7.      To export its Pegasus technology, NSO is required to register with the Israeli Ministry of Defense ("MoD"). Under the DECL, the MoD is empowered to investigate NSO and

1

its business, refuse or cancel NSO's registration, or deny NSO's license, taking into account several factors, including the intended use of NSO's Pegasus technology and the identity of NSO's customers. The MoD can and does ask NSO to provide documentation about its customers and prospective customers and the intended uses of NSO's Pegasus technology by NSO's customers and potential customers. The MoD requires this documentation from NSO for each export of NSO's technology.

8.    NSO's contracts require Pegasus end-user customers to demonstrate that they are a government or an authorized agency for national security and law enforcement purposes of a government and to provide any other necessary documentation for approval by the MoD.

9.    The MoD requires NSO to provide it with signed certificates from the end-users of NSO's Pegasus technology, in which the end-users declare that NSO's Pegasus technology will be used only for prevention and investigation of terrorism and criminal activity.

10.    NSO markets and licenses its Pegasus technology exclusively to sovereign governments and authorized agencies for national security and law enforcement purposes of governments and does so only after receiving the necessary export control licenses from the MoD. NSO does not market or sell its Pegasus technology for use by any private entities.

11.    At all times relevant to this case, Defendants did not operate NSO's Pegasus technology. Instead, NSO marketed and licensed the Pegasus technology to its sovereign government customers, which then operated the Pegasus technology themselves, to advance their own sovereign interests of fighting terrorism and serious crime. Defendants' role was limited to NSO providing advice and technical support to assist customers in setting up—not operating—the Pegasus technology.[1] When Defendants provided those support services, they did so entirely at the direction of their government customers, and Defendants followed those directions completely. Defendants' operation of the Pegasus technology NSO has licensed to sovereign governments and

---

[1] Defendants do not participate in any NSO customer's installation of the Pegasus technology on any device.

2

agencies for national security and law enforcement purposes is also prohibited under each export control license NSO has been granted. Each of the licenses NSO has been granted provides that operational use or ongoing operation of Pegasus by NSO employees (or their subcontractors) is prohibited, and that operation of Pegasus by NSO employees (or their subcontractors) is permitted only for demonstration purposes and on devices owned by NSO. Each export control license NSO has been granted further requires that NSO's remote access to Pegasus technology licensed to a customer is permitted solely for purposes of maintenance (which is not related to operation of Pegasus).

12.    NSO also takes into account U.S. and European Union export control restrictions. NSO conducts due diligence potential customers, including examining publicly available information, evaluating questionnaires, and considering the potential customer's record of respecting rule-of-law concerns. Government customers must provide due diligence materials before receiving NSO's Pegasus technology.

13.    NSO's Pegasus technology also has technical safeguards, such as general and customer-specific geographic limitations. One of the limitations relevant to this case is that NSO's Pegasus technology cannot be used against U.S. mobile phone numbers. Another such limitation is that the Pegasus technology cannot be used against a device within the geographic bounds of the United States.

14.    Plaintiffs allege that Defendants used Pegasus to monitor journalists, human rights activists, political dissidents, diplomats, and other senior government officials. That is false. At all times relevant to this case, Defendants did not monitor anyone, and Defendants prohibited their customers from using the technology for purposes other than fighting terrorism and serious crime, by contractual prohibitions against such behavior and required end-user certificates signed by the customer. If a government ever misused NSO's Pegasus technology to monitor users of mobile devices for purposes other than fighting terrorism and serious crime, that would be a violation of that government's contract with NSO. If Defendants suspected any improper use of Defendants' Pegasus technology outside these parameters, service to that customer would be suspended pending investigation. If investigation revealed such ongoing misuse, that customer would be

terminated. NSO does not collect or store any information collected by its customers.

15.     At all times relevant to this case, because NSO's government customers used Defendants' technology to investigate and prevent terrorism and crime, discovery into Defendants' customers' use of the technology would require sovereign governments to reveal sensitive information about their national-security, intelligence, and law enforcement operations.

16.     If any of NSO's government customers have witnesses or evidence relevant to this lawsuit, those witnesses and that evidence would be located outside of the United States.

17.     On June 8, 2023, NSO applied to the Israeli Ministry of Defense ("MoD") for a license to export information relating to Pegasus to Plaintiffs, and their counsel, and the Court.  To date, the MoD has not granted NSO's requested license.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed 28 September, 2023, at _HERZLIYA_ , Israel.


_____
YARON SHOHAT

4

# EXHIBIT A

# Defense Export Control Law, 5766-2007

Unofficial Translation

**Office of the General Counsel**

**Ministry of Defense**

October 2007

UNOFFICIAL TRANSLATION (October 29th , 2007)

## Defense Export Control Law, 5766-2007

### Chapter A: Objective

**Objective**    1.    The objective of this law is to regulate state control of the export of defense equipment, the transfer of defense know-how and the provision  of defense services, for reasons of national security considerations, foreign relations considerations, international obligations and other vital interests of the State.

### Chapter B: Definitions

**Definitions**    2.    In this law –

|  |  |
|---|---|
| **"Defense export control division"** | The defense export control division at the ministry of defense; |
| **"Israeli citizen"** | as implied in the Law of Citizenship, 5712 – 1952; |
| **"Means of control"** | In a corporation - each one of the following - |

(1) The right to vote at a general assembly of a company or analogous entity of another corporation;

(2) The right or the capacity to appoint, alone or with another entity, a Director or Director General, and similar officers in a corporation which is not a company;

(3) The right to hold a share granting the rights specified in paragraphs (1) or (2)  or a similar right in a corporation which is not a company;

3

| | |
|---|---|
| **"Foreign entity"** | A foreign state, including a person located in a foreign state; |
| **"The director general"** | The Director General of the Ministry of Defense; |
| **"Wassenaar Arrangement"** | Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-use Goods and Technologies; |
| **"Transfer of defense know-how"** | As applied in section 15(a)(2); |
| **"The licensing authority"** | The Director General or the Head of the Defense Export Control Division as authorized by the Director General for the purpose of this law, partially or fully, and, with regard to export licenses for defense equipment in transit and transfer licenses to the Palestinian Civil jurisdiction areas - the Director General or the Head of the Defense Export Control Division, or anyone authorized by them; |
| **"Criminal law"** | The Criminal Law, 5736-1977; |
| **"Defense know-how"** | (1) Information that is required for the development or production of defense equipment or its use, including information referring to design, assembly, inspection, upgrade and modification, training, maintenance, operation and repair of defense equipment or it's handling in any other way as well as technology included in the order under paragraph (1) of |

|  |  | the "Controlled Dual-use Equipment" definition and in the orders under the "Missile Technology" and "Defense Equipment" definitions; for this purpose, information – including technical data or technical assistance; |
|---|---|---|
|  | (2) | Know-how relating to defense forces, including know-how concerning their organization, build-up and operation, combat doctrine or training and drill methods defense policy or their methods of action, as well as know-how relating to defense policy anti-terror combat and security methods; |
| **"Export of defense equipment"** |  | Transfer outside of Israel, including transfer to the Palestinian Civil Jurisdiction areas, as well as the transfer within Israel to a diplomatic or consular representation of a foreign state; |
| **"Defense export"** |  | Each of the following: |
|  | (1) | Export of defense equipment; |
|  | (2) | Transfer of defense know-how; |
|  | (3) | Provision of defense services; |
| **"Production"** |  | Including production engineering, integration, assembly, inspection, trials and quality assurance. |

| | |
|---|---|
| **"Defense forces"** | Military forces or police forces of a state, as well as other entities of a state engaging in defense, internal security or intelligence; |
| **"Basic scientific research"** | Trial or theoretical work mainly intended to obtain new knowledge regarding basic principles of observable phenomena and facts, and which is not aimed at a particular goal or target; |
| **"Information in the public domain"** | Information in the public domain, which was legally made available to the public, without restrictions on its further dissemination; intellectual property ristrictions do not exempt information from being in the public domain; |
| **"Defense export registry"** | As applied in section 3; |
| **"Interim user"** | Anyone in possession of defense equipment or defense know-how, during the period of time from leaving the holder of a defense export license until transferred to the end-user; |
| **"End-user"** | The final entity that is destined to receive the defense equipment, defense know-how or defense service, regarding which a license is requested under chapter D or was such granted; |
| **"Technical data"** | Prototypes, plans, sketches, models, formulas, tables, engineering content and specifications, written operating instruction manuals or manuals |

| | |
|---|---|
| | documented on magnetic, optic or any other media; |
| **"Technical assistance"** | Instruction, qualification, training, consultation, transmission of proficiency or technical data; |
| "**Defense export transaction"** | A transaction involving a defense export; |
| **"Development"** | Including all the pre-production stages, including design, design study and its analysis, design perception, assembly and prototype trial, experimental production sequences and design data, process of transforming the design data into a product, configuration design, integration and layout sketches; |
| "**Defense marketing action"** | As applied in section 14; |
| **"Defense equipment"** | **M**issile equipment, combat equipment and controlled dual-use equipment; |
| "**Defense equipment in transit"** | As applied in section 19; |
| "**Dual-use equipment"** | Materials and equipment initially intended for civilian use and which are also compatible for defense use" |
| **"Controlled dual-use equipment"** | One of the following:<br><br>(1)    Dual-use equipment listed in the Wassenaar Arrangement Dual-Use Goods and Technologies list, as periodically |

|  |  |
|---|---|
|  | updated, intended for a defense use, or other dual-use equipment, as shall be set forth in the Minister's order; |
|  | (2)   Regarding section 20 – dual-use equipment as shall be set forth in the Minister's order; |
| **"Missile equipment"** | Equipment and software regarding missiles, set forth in the appendix on equipment, software and technologies of the International Missile Technology Control Regime (MTCR), periodically updated, as shall be set forth in the Minister's order; |
| **"Combat equipment"** | Equipment included in the Munitions List of the Wassenaar Arrangement, as periodically updated, or other equipment initially intended for a defense use, as shall be set forth in the Minister's order; |
| **"Transfer license to the Palestinian Civil Jurisdiction areas"** | As applied in section 20; |
| **"Re-transfer license"** | As applied in section 17; |
| **"Defense export license"** | As applied in section 15; |
| **"License for defense equipment in transit"** | As applied in section 19; |
| **"Defense marketing license"** | As applied in section 14; |

8

| | |
|---|---|
| **"End-use modification license"** | As applied in section 18; |
| **"Brokering license"** | As applied in section 21; |
| **"Palestinian Civil Jurisdiction areas"** | Judea and Samaria, excluding the settlements and military compounds as implied in the agreement, as well as the complete area of the Gaza Strip; "agreement" – the Israeli-Palestinian Interim Agreement regarding the West Bank and the Gaza Strip that was signed in Washington between the State of Israel and the Palestinian Liberation Organization, on the 4th of Tishrei 5756 (28th of September 1995), including its appendices and related documents; |
| **"Use"** | Including operation, installation, maintenance, repair and renovation. |
| **"Defense use"** | Use made by defense forces or intended for them; |
| **"End-use"** | Use of the defense equipment, defense know-how or reception of defense services, by the end-user; |
| **"Defense service"** | As applied in section 15(a)(3); |
| **"Control"** | With regard to a corporation - the capacity, whether on one's own or along with others, to steer the corporation's activity, with the exception of the capacity which derives only from the fulfillment |

of the position of Director or of another officer in the corporation; Without derogating from the generality of the aforesaid -

(1) A person shall be considered to be in control of the corporation if he/she holds half or more of a certain type of means of control in the corporation;

(2) It is held that the person controls the corporation if one of the following is fulfilled:

(a) He/she holds the largest part of any kind of means of control in the corporation at any time, or there is no other entity, which individually owns or owns with others a means of control of any kind, at a share that exceeds his/her holdings of the same kind of means of control;

(b) He/she has the capacity to prevent business decision making in the corporation by virtue of a provision in the code or in the contract, with the exception of the power to prevent decision making regarding the issuing of means of control in the

|  | corporation or the power to prevent decision making regarding the sale or liquidation of most of the corporation business or a material change therein; |
| --- | --- |
| **"Israeli resident "** | As defined in the Population Registry Law, 5725-1965[2]; |
| **"Foreign corporation"** | A corporation other than an Israeli corporation; |
| **"Israeli corporation"** | One of the following: |
|  | (1) A corporation incorporated in Israel; |
|  | (2) A corporation that has its center of business in Israel, and which the control over it is, directly or indirectly, by an Israeli citizen or resident; |
| **"The Minister"** | The Minister of Defense. |

### Chapter C: Defense Export Registry

| **Registration obligation with the defense export registry** | 3. | (a) | (1) | No person shall be entitled to receive a defense marketing license or a defense export license, unless he/she is registered with the registry administered by the licensing authority (in this law - defense export registry). |
| --- | --- | --- | --- | --- |

11

(2) No person shall be entitled to receive a license for brokering between foreign entities, unless he/she is registered with the defense export registry as a broker between foreign entities.

(b) The licensing authority is authorized to request, from a person wishing to register with the defense export registry, any relevant information or document that it requires for the purpose of reaching a decision regarding registering.

**Refusal to register and removal of existing registration** 4. (a) The licensing authority is authorized to refuse to register a person in the defense export registry, to approve the registration under conditions, as well as to remove his/her registration from the defense export registry or to suspend the registration, and in so doing may take into account, amongst others, the following considerations:

(1) The applicant's criminal record;

(2) The applicant's violation of the provisions of this law or the violation of the terms of a license that was issued under Chapter D, or the violation by the applicant of an order under law or of the terms of a license given before the entry into force of this law, regarding an action regulated under this law;

(3) If the applicant has not met the rules set by the Minister in the regulations;

(4) If the applicant is a corporation, the licensing authority is entitled to take into account considerations that are enumerated in sections (1) to (3) above also with regard to the controlling shareholder, interested party and officers in the said corporation. For this purpose, "interested party", "officer" – as defined in the Corporations Law, 5758 – 1999.

(b) The licensing authority shall not make its decision under this section, prior to giving the

12

person regarding whom the decision is made the opportunity to voice his/her arguments.

**Contestation**    5.    The person regarding whom a decision was taken under section 4, by the director general in his capacity as licensing authority, may demand a review of the decision by the director general, and regarding such decision taken by the director of the defense export control division, - before the director general – all as set forth in the minister's order.


### Chapter D: Licensing

### Sign A: General Provisions regarding Licenses


**License application**  6.    (a)    An applicant for a license under this chapter, will include in his/her application, details, declarations and documents as set forth by the minister in regulations.

(b)    The licensing authority may, in addition to the details and documents set forth in section (a) above, demand any information, document or defense equipment required for its decision regarding the license application, and, amongst others –

(1) The applicant's declaration regarding the identity of the end-user and the interim users, and the intended end-use of the defense equipment, defense know-how or defense service regarding which the license is requested;

(2) A declaration by the end-user regarding the intended end-use of the defense equipment, defense know-how or defense service regarding which the license is requested;

(3) A certificate by the government of the state where the end-user is located, regarding the identity of the end-user and the intended end-use of the defense equipment, defense know-how or defense service regarding which the license is requested;

(4) A certificate by the government of state where the end-user is located, authorizing the import of the defense equipment, defense know-how or defense service regarding which the license is requested, to that state.

**License stipulations** 7. (a) The licensing authority may include stipulations in a license issued under this chapter, including stipulations to be fulfilled prior to the activity included in the license and including stipulations intended to increase oversight on the license holder, and is also authorized, at all times, to add stipulations to a license, to remove or amend stipulations, for the purpose of fulfilling the objectives of this law and its provisions.

(b) Without derogating from the above, a license under this chapter may include the following stipulations:

(1) The technical characteristics and scope of the defense equipment, defense know-how or defense service provided under the license, and the scope of the licensed transaction;

(2) The intended end-use of the defense equipment, defense know-how or defense service regarding which the license is requested, and the identity of the end-user or the interim users of the said equipment, know-how or service.

**Refusal to grant licenses** 8. The licensing authority is authorized to refuse to grant a license under this chapter or to condition the granting of a license under certain stipulations, taking into account, amongst others, the following considerations:

(1) The applicant's criminal record;

(2) The applicant's violation of the provisions of this law or the violation of the terms of a license that was issued under Chapter D, or the violation by the applicant of an order under law or of the terms of a license given before the entry into force of this law, regarding an action regulated under this law;

14

(3)    If the applicant has not met the rules set by the Minister in the regulations;

(4)    If the applicant is a corporation, the licensing authority is entitled to take into account considerations that are enumerated in sections (1) to (3) above also with regard to the controlling shareholder, interested party and officers in the said corporation. For this purpose, "interested party", "officer" – as defined in the Corporations Law, 5758 – 1999;

(5)    The end-users' observance of the obligations undertaken under section 6(2);

(6)    Considerations regarding the type of defense equipment, defense know-how or defense service for which the license is required;

(7)    Considerations regarding the end-user or the end-use.

An announcement regarding a decision by the licensing authority under this section will be made known to the applicant in a manner and time period as set forth by the minister in regulations.

**License revocation and suspension or restriction of a license**    9.    (a)    The licensing authority is authorized to revoke a license that is granted pursuant to this chapter or to suspend it including on probation or according to stipulations it shall set forth, as well as to restrict the license, taking into account, amongst others, the considerations listed in section 8 above.

(b)    The licensing authority shall not cancel, suspend or restrict a license, prior to affording the license holder the opportunity to voice his/her arguments.

(c)    Despite the provisions in section (b), under special circumstances and due to urgency, the licensing authority may suspend or restrict a license prior to affording the license holder to voice his/her arguments.

(d)    Reasons of state security, foreign relations considerations or international obligations will

not constitute as an argument against the licensing authority's decision under this section.

(e) An announcement regarding a decision by the licensing authority under this section will be made known to the applicant in a manner and time period as set forth by the minister in regulations.

**Contesting the refusal to issue a license, or its revocation, suspension or restriction**

10. (a) In case of refusal to grant a license under section 8, or revocation, suspension or restriction of a license under section 9, the applicant or license holder may contest such decision of the licensing authority in a manner as set forth in section (b) below.

(b) A decision on the contest will be taken after consultation with the advisory committee, by one of the following as detailed below, in a manner and time period as set forth by the minister in regulations:

(1) Regarding a decision taken by the director-general – through a review before the director-general;

(2) Regarding a decision by the director of the defense export control division – by the director-general;

(3) Regarding a decision on an export license for defense equipment in transfer, or regarding a transfer license to the Palestinian Civil Jurisdiction areas, taken by the person authorized by the director-general or the director of the defense export control division – by a person authorized by the director-general.

(c) Reasons of state security, foreign relations considerations or international obligations will not constitute as an argument against the licensing authority's decision under this section.

**General licenses or specific licenses**

11. Licenses pursuant to this chapter may be general, or granted for types of activities or transactions involving defense equipment, defense   know-how or defense

services or specific activities, transactions, equipment, know-how or services.

| | | |
|---|---|---|
| **Prohibition against transfer, lien or seizure of the license** | 12. | A license granted under this chapter, including any rights vested in it, is non-transferable, and may not be liened or seized. |

**Sign B: Licenses**

| | | |
|---|---|---|
| **Actions requiring licensing** | 13. | Actions listed under this sign require a license from the licensing authority, and any such action shall be in accordance with the stipulations in the license, unless otherwise set forth under this law. |

| | | |
|---|---|---|
| **Defense marketing license** | 14. | (a) | An Israeli citizen, an Israeli resident or an Israeli corporation shall not conduct a defense marketing activity without a marketing license (hereinafter – defense marketing license) that is granted pursuant to this law, and pursuant to the conditions of the marketing license; in this law – |

"Defense marketing activity" - An activity aimed at promoting a defense export transaction, including brokering activity towards a defense export transaction, whether in Israel or outside of Israel,  in writing or orally or via any other means, directly or indirectly, in exchange for remuneration or not, whether transfer of defense know-how occurs or not, or the holding of negotiations towards such transaction; the activity can be geared toward a certain customer or toward a general public,  and may or may not result in a defense export transaction.

"Brokering activity towards a defense export transaction" – one of the following activities:

    (1) Forging ties between parties to contract in a defense export transaction;

    (2) Participating in negotiations toward a contract between the parties involved in the defense export transaction;

(3) Representation of a party involved in the defense export transaction;

(b)   The licensing authority is authorized to exempt an applicant from the obligation of receiving a defense marketing license under this section, for categories of defense marketing activities or for certain defense marketing activities, as set forth in regulations.

(c)   If a defense marketing license was granted to a corporation included in the Minister's order issued under item 3 of the first annex of the Security Regulation in Public Bodies Law, 5757-1998, an individual license for each employee of that corporation shall not be required, regarding the licensed defense marketing activity.

**Defense export license**   15.   (a)   A person as listed below shall not be involved in the following activities, unless he/she received a license for such activity from the licensing authority (in this law – defense export license) and pursuant to the provisions of that license:

(1)   Export of defense equipment;

(2)   Transfer of defense know-how through any means, including orally - from Israel to outside of Israel, or in Israel to a person who is neither an Israeli citizen or an Israeli resident, or to a foreign corporation; however, transfer of defense know-how relating to equipment included in section (1) of the "controlled dual-use equipment" definition that is information in the public domain as well as basic scientific research, does not require a defense export license, unless the licensing authority requires, in regulations, that transfer of such defense know-how or such type of defense know how or such basic scientific research requires a defense export license.

(3)   Provision of a defense service - if the service provider is an Israeli citizen or an Israeli corporation  - outside of Israel, or

within Israel to a person who is not an Israeli citizen or an Israeli resident, or to a foreign corporation; in this law, "defense service" – a service relating to defense equipment, including its design, development, production, assembly, review, upgrade, modification, repair, maintenance, operation and packaging, as well as instruction related to said equipment, and service regarding defense know-how, including instruction, training and consulting regarding said know-how.

(b) The licensing authority may exempt an applicant from the requirement to obtain a defense export license under this section, with regard to types of defense exports or a certain defense export, as set forth in regulations.

**Defense marketing license required to obtain a defense export license**

16. The licensing authority shall not grant a defense export license for a defense export transaction unless the applicant obtained a defense marketing license for that transaction, unless an exemption from the requirement to obtain a defense marketing license was set forth pursuant to section 14(b); a defense marketing license that was granted does not obligate the licensing authority to grant a defense export license for the same transaction.

**Re–transfer license**

17. A defense export license holder whose license includes a stipulation with regard to the identity of the end-user, shall not allow the end-user to transfer the defense equipment or the defense know-how in his possession to a different person, unless the defense export license holder obtains a license for such transfer from the licensing authority (in this law – re-transfer license), and in accordance with the provisions of said license.

**End-use modification license**

18. A defense export license holder whose license includes a stipulation with regard to the end-use, shall not allow the end-user to modify the end-use of the defense equipment or the defense know-how in his possession, unless the defense export license holder obtains a license for such modification from the licensing

authority (in this law – end-use modification license), and in accordance with the provisions of said license.

| | | |
|---|---|---|
| **License for defense equipment in transit** | 19. (a) | A person shall not export equipment in transit without obtaining a license from the licensing authority (in this law – license for export of defense equipment in transit), and in accordance with the provisions of said license; in this law, "defense equipment in transit" - defense equipment originating from outside of Israel, through one of the border stations as implied in section 7 of the Entry Into Israel Law, 5711-1952, on its way outside of Israel, as well as said defense equipment entering into Israel or intended to enter into Israel in other ways, on its way outside of Israel, as long as it is unloaded from its means of transportation prior to its departing from Israel. |
| | (b) | The licensing authority may exempt an applicant from the requirement to obtain a license for export of defense equipment in transit under this section, with regard to types of defense equipment in transit or a specific defense equipment in transit, as set forth in regulations. |
| | (c) | The provisions of section 15 shall not apply to an export of equipment as described in this section. |
| **License for transfer to Palestinian Civil Jurisdiction areas** | 20. (a) | A person shall not transfer controlled dual-use equipment included in an order pursuant to paragraph (2) of the "controlled dual-use equipment" definition unless he has obtained a license for such transfer from the licensing authority, (in this law – transfer license to the Palestinian Civil Jurisdiction areas), and in accordance with the provisions of said license. |
| | (b) | Section 7 of this law shall not apply to the transfer pursuant to this paragraph. |
| **License for Brokering Between Foreign Entities** | 21. (a) | An Israeli resident or an Israeli corporation shall not engage in a brokering activity between foreign entities, unless they have obtained a license from the licensing authority (in this law – license for brokering between foreign entities), |

and in accordance with the provisions of that license; however, the provisions of this section do not derogate from the provisions of section 15 of the Criminal Law; for this purpose –

"brokering between foreign entities activity" - one of the following activities, taking place in Israel or outside of Israel, whether the combat equipment or the defense equipment regarding to which the said activity occurs leaves Israel before the activity or not:

(1)   Forging ties between parties to contract in a transaction regarding the transfer of combat equipment or missile equipment; from one foreign state to another foreign state;

(2)   Participating in negotiations toward a contract between parties in a transaction as described in paragraph (1) above;

(3)   Representation of a party to a transaction as described in paragraph (1) above;

(4)   Purchasing of defense equipment or defense know-how for the purpose of contracting in a transaction as described in paragraph (1) above;

(5)   Assisting activities aimed to realize a transaction as described in paragraph (1) above, as set forth by the minister in regulations.

"combat equipment or missile equipment" – including defense know-how or a defense service regarding such equipment.

(b)   The licensing authority may exempt an applicant from the requirement to obtain a license for brokering between foreign entities under this section, with regard to types of brokering between foreign entities activities or with regard to types of combat equipment and missile equipment, or with regard to brokering activities between certain foreign entities, as set forth in regulations.

| | | | |
|---|---|---|---|
| **Brokering between foreign entities subject to Security Council resolution** | 22. | (a) | Without derogating from the provisions of section 21, no Israeli citizen, Israeli resident or Israeli corporation shall engage in brokering activities between foreign entities in violation of a resolution of the Security Council of the United Nations (in this law – the security council) forbidding or limiting the transfer of combat equipment or missile equipment to those entities. |
| | | (b) | Security council resolutions as described in section (a) shall be published on the Licensing Authority's website and in the official gazette. |

### Chapter E: The Licensing Authority and Advisory Committees

| | | | |
|---|---|---|---|
| **Tasks of the licensing authority** | 23. | | The licensing authority shall control defense export according to the provisions of this law, shall administer the defense export registry according to the provisions of chapter C, shall decide on license applications submitted under chapter D, and shall conduct other activities it requires under this law. |
| **Advisory committees** | 24. | (a) | The minister shall appoint advisory committees to make recommendations to the licensing authority with regards to the granting of defense marketing licenses, re-transfer licenses, licenses for end-use modification, licenses for export of defense equipment in transit and licenses for brokering between foreign entities (in this law – advisory committees): |
| | | (b) | And these are the members of the advisory committees: |
| | | (1) | Employees of the ministry of defense appointed by the minister, one of whom shall serve as chairperson; |
| | | (2) | Two employees of the ministry of foreign affairs; |
| | | (3) | In advisory committees regarding controlled dual-use equipment – an employee of the ministry of industry, |

(4)    trade and labor appointed by the minister of industry, trade and labor;

     Employees of defense forces, as determined by the minister, authorized for the purpose of this section by the head of the defense force where they are employed; for this purpose, "defense forces" – each of the following: Israel Defense Forces, Israel Security Agency, Mossad, Israel Police and the Penitentiary Service.

(c)    A member of an advisory committee can be appointed only after it was determined by the authorized official under the Israel Security Agency Law, 5761-2002, that he holds the required security clearance for that position.

### Chapter F: Coordination with the Ministry of Foreign Affairs

**Participation of the Ministry of Foreign Affairs in the advisory committees**     25.    Each of the advisory committees shall include as its members employees of the ministry of foreign affairs, as set forth in section 24.

**Coordination with The Ministry of Foreign Affairs regarding granting of licenses**     26.    (a)    Should the representative of the minister of foreign affairs voice his/her reservation regarding an advisory committee's recommendation and the advisory committee considered not to take into account this reservation, or should the advisory committee recommend the granting or the refusal to grant a defense marketing license, a re-transfer license, an end-use modification license, a license for export of defense equipment in transit or a license for brokering between foreign entities, and the licensing authority should decide after consideration not to accept this recommendation, the reservation or committee recommendation, as appropriate, will be brought before the director of the defense export control division at the ministry of defense and the director of the strategic affairs division at the

ministry of foreign affairs for their joint deliberation.

(b)   In case the joint deliberation as described in paragraph (a) did not reach a conclusion, the matter shall be resolved between the director-general and the director general of the ministry of foreign affairs; should no agreement be reached between the director-general and the director general of the ministry of foreign affairs, the matter will be resolved by the sub-committee of the ministerial committee for national security as implied in section 47(c).

**Consultation with The Ministry of Foreign Affairs on export licenses**   27.   The licensing authority shall consult with the representative of the ministry of foreign affairs in a manner set forth in regulations, prior to the issuance of an export license.

### Chapter G:  Reporting Requirements and Inspection Authority

**Reporting obligations**   28.   (a)   A license holder under chapter D shall submit to the licensing authority written reports once a year regarding his activities requiring a license under chapter D, in accordance with forms set forth in regulations.

(b)   The licensing authority may require a person who was exempt from the requirement of obtaining a defense marketing license under chapter D, to submit reports as set forth in section (a) above, regarding his defense marketing activities.

(c)   The aforesaid reports in section (a) and section (b) shall include amongst others details regarding the defense marketing or defense export activities, as applicable, including defense marketing destinations, details regarding the identity of the interim users and the end-user, and regarding the end-use of the defense equipment, defense know-how or the defense service, as applicable.

(c)   A corporation registered in the Defense Export Registry shall notify the licensing authority

about any change in the controlling shareholders of the corporation.

| | | |
|---|---|---|
| **Inspection authority** | 29. | For the purpose of supervision of execution of the provisions of this law, the licensing authority or whom it shall authorize amongst the employees of the ministry of defense, is authorized – |

(1) to demand from any relevant person included in the registry to supply it with information or documents concerning a person conducting an activity requiring a license under chapter D; for this purpose "documents" – including a certification, report or ledger or output as implied in the Computers Law, 5755 – 1995;

(2) to enter any premises if it has reasonable grounds to assume that a person included in the registry or someone on his behalf are keeping defense equipment or defense know-how or are providing a defense service at that locations, in order to check whether the provisions of this law are fulfilled, as long as it does not enter a place that is used for solely for residential purposes unless a court injunction is issued; entry onto a premises under this section will take place with the accompaniment of the holder of the property or his representative, however refusal to the request of the representative of the licensing authority to accompany him, can not hinder the licensing authorities' activity under this section.

| | | |
|---|---|---|
| **Inspecting defense equipment** | 30. | (a) The licensing authority or whom it shall authorize amongst the employees of the ministry of defense for this purpose is authorized to request defense equipment from its owner or holder for the purpose of inspecting whether the defense equipment meets the conditions of the license that has been granted pursuant to this law. |

(b) Inspection of the defense equipment by the licensing authority or whom it has authorized for this purpose under section (a), will be conducted, if possible, in the offices of the holder of the defense equipment or in the offices of the licensing authority provided the defense

equipment will be returned to its holder no later than fifteen days from the day it was taken.

| | | | |
|---|---|---|---|
| **Obligation to keep records** | 31. | (a) | An export license holder shall administer a record of the information concerning any defense export transactions that he/she has conducted. The said record shall include details concerning the licensed defense equipment, defense know-how or defense service, as well as details regarding the interim users and the end-user, and the end-use of the licensed defense equipment, defense know-how or defense service, dates when the defense export was carried out and additional details as shall be set forth in regulations. |
| | | (b) | The defense export license holder will keep the record as described in section (a) above, as well as any document related to the executed defense export transaction, for ten years from the date of completion of the defense export; manner of record keeping shall be set forth in regulations. |

### Chapter H : Criminal Penalties

| | | | |
|---|---|---|---|
| **Offences** | 32. | (a) | A person who has committed one of the following will be sentenced to – three years' imprisonment or a fine which is thirty times greater than the fine set out in section 61(a)(4) of the Criminal Law: |
| | | (1) | Commits an act of defense marketing without holding a defense marketing license or not pursuant to the conditions of the license, contrary to the provisions of section 14; |
| | | (2) | Carries out a defense export, without holding a defense export license or not pursuant to the conditions of the license, contrary to provisions of section 15; |
| | | (3) | Exports defense equipment in transit without holding a license |

for exporting defense equipment in transit or not pursuant to the conditions of the license, contrary to the provisions of section 19.

(4) Transfers to the Palestinian Civil Jurisdiction areas controlled dual-use equipment included in an order issued under paragraph (2) of the "controlled dual-use equipment" definition without holding a license for transfer to the Palestinian Civil Jurisdiction areas or not pursuant to the conditions of the license, contrary to section 20.

(5) Engages in brokering between foreign entities without holding a license for brokering between foreign entities or not pursuant to the conditions of the license, contrary to section 21.

(b) A person who engages in brokering between foreign entities in violation of a security council resolution as stated in section 22, will be sentenced to 5 years imprisonment or to a fine fifty times the fine set forth in section 61(a)(4) to the Criminal Law.

**Offenses in severe circumstances** 33. For an offense committed pursuant to section 32(a) in severe circumstances, the sentence will be five years imprisonment or a fine that is fifty times greater than the fine set out in section 61(a)(4) of the Criminal Law. In this section "severe circumstances" – one of the following:

(1) The defense marketing activity subject as an offence was intended to advance a defense export transaction with the enemy, or the entity destined to receive the defense equipment, defense know-how or defense service regarding which the defense export transaction subject as an offence was carried out is an enemy; in this section, "enemy" - as defined in the Enemy Trade Ordinance, 1939;

(2) The defense know-how, defense equipment or defense service was classified, according to the determination of

<div style="margin-left: 2em;">

      the security entity authorized to make security classifications;

(3)    The defense marketing activity subject as an offence was intended to advance a defense export transaction with a foreign entity regarding to whom a security council resolution was adopted as set forth in section 22, or that the defense export subject as an offence was destined to said foreign entity;

(4)    The defense marketing activity or defense export activity subject as an offence was in violation to any one of the stipulations of the defense marketing license or the defense export license, as applicable, pertaining to the restriction on marketing or export to certain countries.

(5)    The brokering activity between foreign entities was intended to further a transaction with the enemy.

</div>

**Responsibility of company officer**  34.  (a)  An officer in a corporation must supervise and do everything possible to prevent offenses pursuant to section 32 by the corporation or by any one of its employees; a person who violates this provision, is sentenced to a fine as stated in section 61(a)(4) of the Criminal Law; for this purpose, "an officer"– is an active director, partner, with the exception of a limited partner, or other official whose responsibilities on behalf of the corporation include the areas of responsibility of the committed offense.

(b)  Should an offense pursuant to section 32 be committed by the corporation or by any one of its employees, it is held that the officer in the corporation violated his duty pursuant to sub-section(a), unless he/she prove that he/she did their utmost to fulfill his/her duty.

### Chapter I : Civil Fines and Financial Sanctions

**Civil fine**  35.  Should the licensing authority have reasonable grounds to assume that an act or a failure to act, that is set out as an offense pursuant to section 32, has occurred, it is authorized to impose a civil fine in the amount of 15% of the fine set out in the same section, upon the person who commits the act or who fails to act.

| | | | |
|---|---|---|---|
| **Financial sanction** | 36. | (a) | Should the licensing authority have reasonable grounds to assume that a person did not fulfill his/her reporting obligation pursuant to section 28(a) and (b), it is authorized to impose a financial sanction upon the person in the amount of 3% of the fine set out in section 61(a)(3) of the Criminal Law for every day in which the violation continues. |
| | | (b) | Should the licensing authority have reasonable grounds to assume that a person did not fulfill his/her reporting obligation pursuant to section 28(d), or did not fulfill his/her obligation to keep records pursuant to section 31 of this law, it is authorized to impose a financial sanction upon the person in the amount of the fine as set forth in section 61(a)(4) of the Criminal Law. |
| **Continued violation and repeated violation** | 37. | (a) | In a continued violation, except for a violation as stated in section 36(a) above, the fiftieth part of the financial sanction or the civil fine that is set out for the same violation, will be added for each day the violation continues. |
| | | (b) | In a repeated violation, a sum that is equal to half the financial sanction or the said fine shall be added to the financial sanction or the civil fine that could have been imposed if it were a first violation; regarding this section "repeated violation" – is the violation of one of the provisions of this law, within two years of the previous violation of the same provision for which a financial sanction or civil fine was imposed upon the violator or for which he/she was convicted. |
| **Reduced sums** | 38. | (a) | The licensing authority is not authorized to impose a financial sanction or civil fine that is less than the financial sanction or civil fine set out in this chapter unless it is pursuant to sub-section (b). |
| | | (b) | The Minister, with the Minister of Justice's consent, is authorized to set forth in regulations cases, circumstances and considerations, for which a financial sanction or civil fine may be imposed in an amount that is less than that which is set out in this law, and at rates to be determined by him. |

| **Payment requirement** | 39. | (a) | A financial sanction or civil fine shall be paid, according to a written demand by the licensing authority, within thirty days of its submittal; the demand will be issued following an advance notice to the person to whom the demand is designated, and he/she has been afforded the opportunity to make his/her arguments; such notice shall state that due to continued violation the violator will be imposed an additional civil fine or financial sanction according to section 37. |
| | | (b) | The filing of an appeal to the court for administrative matters against the payment of a civil fine or financial sanction, in accordance with items 21(23) or 32(4) of the first addendum to the Law on the Courts of Administrative Affairs, 5760 – 2000, does not delay the payment of the financial sanction or civil fine, unless the licensing authority has consented to this or the court has instructed so. |
| | | (c) | Should an appeal as stated in section (b) above be accepted, the financial sanction or civil fine shall be returned, with the addition of linkage and interest differentials from the day of its payment until its return. |
| **Updated sum of the financial sanction and civil fine** | 40. | | The financial sanction and civil fine shall be according to the sum updated on the day of the request of payment, and if an appeal has been filed and the court discussing the appeal has instructed upon a delay in its payment – according to its updated sum on the day of the decision of the appeal. |
| **Linkage and interest differentials** | 41. | | Should the financial sanction or civil fine not be paid on time, linkage differentials shall be added thereto for the arrears period until it is paid. |
| **Collection** | 42. | | Financial sanctions and civil fines shall be collected to the State Treasury and the Tax Ordinance (collection) shall apply to their collection. |
| **Maintaining criminal responsibility** | 43. | (a) | A civil fine payment shall not derogate from the criminal responsibility of a person for an offense pursuant to this law. |

(b)   Should an indictment be filed against a person for an offense pursuant to this law, this person shall not be charged with a civil fine. In case a civil fine was already paid - the sum paid shall be reimbursed with the addition of linkage and interest differentials from the day of its payment until its reimbursement.

### Chapter J : Additional Provisions

**Preserving law**          44.   This law does not derogate from the provisions of any other law.

**Implementation and regulations**     45.   The Minister is in charge of implementing this law and is authorized, upon approval of the Knesset foreign relations committee, to establish regulations for its implementation and to issue orders; regulations regarding sections 14(b), 15(b), 19(b) and 21(b) shall be established in consultation with the minister of foreign affairs and regulations regarding sections 27 and 47(c) shall be established with the consent of the minister of foreign affairs.

**Fees**          46.   The Minister may establish in regulations, following authorization by the Knesset Foreign Relations and Defense Committee, fees for license requests and contestation filings pursuant to this law, that shall be paid to the Defense Export Control Division at the Ministry of Defense.

**Applicability to the State**     47.   (a)   The provisions of this law shall not apply to the state, however  they shall apply to defense marketing or defense export activities regarding defense equipment, defense know-how or a defense service, when executed by the party that developed or produced said equipment or know-how  or provided said service, pursuant to an agreement between the State of Israel and another state.

(b)   A procedure overseeing defense exports pursuant to an agreement between the State of Israel and another state, outside the scope of section (a), shall be set forth in a government decision; the minister of defense shall notify the

Knesset foreign relations committee on that procedure.

(c)   Defense exports pursuant to an agreement between the State of Israel and another state, of a scope to be determined in regulations, shall be submitted by the minister of defense for the approval of a sub-committee of the ministerial committee for national security; chaired by the Prime minister and with the membership of the minister of defense, the minister for foreign affairs, the minister of justice and the minister of finance.

**Amendment to the Law of the Courts of Administrative Affairs** **48.** In the Courts of Administrative Affairs Law, 5760-2000, in the first addendum following section 29 the following shall appear:

(1) In item 21, following paragraph 22 shall be written:

"(23)   Defense Export Control Law, 5766-2007";

(2) In item 32 –

(a)   In the headline, following "financial transaction shall be written "and civil fines";

(b)   Following paragraph (3) shall be written:

"(4)   The decision of the licensing authority under chapter I of the defense export control law, 5766-2007."

**Entry into force and transition provisions** **49.** (a)   This law shall enter into force on December 31st, 2007, (in this section – date of entry into force), accept for the following sections, which shall enter into force on a later date as stated below:

(1) Section 19 as well as all other sections in this law relating to licenses for defense exports in transit - 30 days from the day the minister shall publish a notice in the official gazette;

32

(2) Sections 3(a)(2), 21 and 32(a)(5) and (b) - 30 days from the day the minister shall publish a notice in the official gazette, following consultation with the minister of foreign affairs and with the approval of the Knesset foreign relations committee.

(b)    Initial regulations under this law will be presented to the Knesset foreign relations committee for its approval no later than October 31st, 2007.

(c )    Despite the provisions of this law, a negotiation permit or an export permit,  or a transfer permit to  the Palestinian civilian jurisdiction, which were granted prior to the date of entry into force, pursuant to the Control of Commodities and Services Order (Defense Equipment and Defense know-how Export), 5752 – 1991 shall be deemed as though they were granted pursuant to the provisions of this law and shall continue to be valid until their expiry, unless cancelled under the provisions of this law

Ehud Olmert
Prime Minister

Ehud Barak
Minister of Defense

Shimon Peres
President of the State of Israel

Dalia Itzik
Speaker of the Knesset

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| HANAN ELATR KHASHOGGI,<br><br>                    Plaintiff,<br><br>          v.<br><br>NSO GROUP TECHNOLOGIES LTD.<br>and Q CYBER TECHNOLOGIES LTD.,<br><br>                    Defendants. | Case No. 1:23-cv-779-LMB-LRVVAED<br><br>Action Filed:  June 15, 2023 |

**DECLARATION OF JOSEPH N. AKROTIRIANAKIS IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

I, Joseph N. Akrotirianakis, declare as follows:

1.      I am an attorney licensed to practice law in the State of California.  I am a partner at the law firm of King & Spalding LLP, and I am counsel for Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (collectively "NSO Defendants") in the above-entitled action and, since February 2020, I have been NSO's lead counsel in other litigation pending in the United States District Court for the Northern District of California.  I submit this declaration in support of the NSO Defendants' Motion to Dismiss.  Except as otherwise stated, I have personal knowledge of the facts set forth below and could competently testify to each fact averred.

2.      On February 21, 2023, King & Spalding LLP applied to the Department of Commerce's Bureau of Industry and Security ("BIS") for a license to export information to the NSO Defendants.  The license was intended to permit King & Spalding to discuss the Pegasus software, technology, and related information with the NSO Defendants, as well as similar items and information received from third parties, so that King & Spalding could prepare the NSO Defendants' defense in actions filed against the NSO Defendants in the United States.  The application was returned without action on April 20, 2023.  King & Spalding's subsequent discussions with BIS have not resulted in a license grant.

3.      NSO's e-discovery consultant in another lawsuit filed against the NSO Defendants

JA130

in the United States, Deloitte, is represented by separate counsel.  Based on my discussions with those counsel, I understand that Deloitte, separately and independently from King & Spalding or the NSO Defendants, on May 26, 2023, applied to BIS for a license that would permit Deloitte to provide the NSO Defendants with industry-standard e-discovery technology that would be required for the NSO Defendants to comply with their discovery obligations.  My understanding based on my discussions with Deloitte's counsel is that Deloitte has not yet been able to obtain the requested license from BIS.  As of the date of this declaration, that remains the case.

I declare under penalty of perjury that the foregoing is true and correct.  Executed September 29, 2023, at Paris, France.

*/s/Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| HANAN ELATR KHASHOGGI, | Case No. 1:23-cv-779-LMB-LRVVAED |
| Plaintiff, | |
| v. | Action Filed:  June 15, 2023 |
| NSO GROUP TECHNOLOGIES LTD. and Q CYBER TECHNOLOGIES LTD., | |
| Defendants. | |

<u>**DECLARATION OF ROY BLECHER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**</u>

**FILED UNDER SEAL**

JA132

I, Roy Blecher, declare as follows:

1.     I am an attorney licensed to practice law in the State of Israel.  I represent NSO Group Technologies Limited and Q Cyber Technologies Limited (together, the "NSO Defendants") in connection with this matter. I have also represented the NSO Defendants in a number of other matters in Israel. I submit this declaration in support of the NSO Defendants' Motion to Dismiss. I have personal knowledge of the facts set forth below and, except as otherwise stated, could competently testify to each fact averred.

2.     I am a partner in, and co-founder of, the law firm of Krispin, Rubinstein, Blecher, Kadouch & Partners.  I have 29 years of experience handling both civil and criminal matters in Israel, including having participated in hundreds of trials.  I am fluent in Hebrew and English.



3.

4.

A _____ is attached as **Exhibit A.**

5.

A true and correct _____ is attached as **Exhibit B.**

6.

7

8.

1

True and correct translations of ▮▮▮▮▮▮ are attached as **Exhibit C** and **Exhibit D**, respectively.

9.    Under Israeli law, parties may sue for breach of contract. They may also assert claims under the Israeli Computers Law (5755-1995), which permits tort claims to be brought for unlawful interference with the use of a computer or computer material, in any way, including by stealing something embodying computer material; and unlawfully deleting computer material, causing a change in it or disrupting it in any other way. If successfully asserted, those claims could permit a plaintiff to recover damages and to obtain injunctive relief.

10.    Israeli courts are also competent to interpret and apply U.S. and California law when such law applies. [CA 8946/04 Warner Bros. International Television Distribution v. Yochman.]

11.    In civil and criminal matters in Israel, there are no pretrial depositions or any other means to examine a witness under oath prior to trial. Despite the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Israeli witnesses are very rarely compelled to testify under oath at depositions as part of American civil proceedings.

12.    Israeli law includes a privilege against self-incrimination. Moreover, a witness testifying before an Israeli court would have the right not to give testimony that would constitute a criminal offense under Israeli law. This could include, for example, testimony about information subject to Israel's Defense Export Control Law. There are procedures available under Israeli law—such as in camera hearings, gag orders, and requiring security clearances for counsel in the matter—that could enable a willing witness to testify as to such information without fear of prosecution. Certain agreements, however, would also be required from the Government of Israel. Based on my experience practicing law in Israel, I do not believe the Israeli government would be willing to make such agreements concerning testimony to be given in a deposition for use in a foreign court that may be more reluctant to employ stringent security procedures.

13.    If this lawsuit were brought in Israel, the trial is likely to be held in less than three years.

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed September 28, 2023, at Bnei Brak, Israel.

ROY BLECHER

JA135

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| HANAN ELATR KHASHOGGI, | Case No. 1:23-cv-779-LMB-LRVVAED |
| Plaintiff, | |
| v. | |
| NSO GROUP TECHNOLOGIES LTD. and Q CYBER TECHNOLOGIES LTD., | |
| Defendants. | |

**DECLARATION OF BILL MARCZAK**

I, Bill Marczak, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I obtained my PhD in Computer Science from the University of California at Berkeley, and I currently reside in El Cerrito, California.

2. I am a Senior Researcher at the Citizen Lab, an interdisciplinary laboratory based at the Munk School of Global Affairs & Public Policy, University of Toronto, focusing on research and development at the intersection of information and communication technologies, human rights, and global security.

3. In my role at the Citizen Lab, I conduct research into government use of spyware and hacking tools to carry out espionage against journalists, dissidents, and civil society targets. "Spyware" refers to any software or hardware component that is installed on a target's electronic device, without their consent, to facilitate third-party access to data stored on the device, or to the device's functions (e.g., turning on the device's microphone to record audio in the device's vicinity). I focus on companies that sell spyware and hacking tools and services directly and

JA136

exclusively to governments, including NSO Group. Companies in this industry typically represent that their spyware products are intended to be used by governments exclusively for tracking serious organized crime and terrorism, though the reality of their use is somewhat different.

4.     In 2016, I co-published the first public report on NSO Group's Pegasus spyware. The report, entitled "The Million Dollar Dissident," describes how I clicked on a Pegasus installation link sent via SMS to United Arab Emirates (UAE) activist Ahmed Mansoor (who was immediately suspicious of the SMS and forwarded it to me for analysis), and obtained a full copy of NSO Group's Pegasus spyware. The report received substantial media coverage at the time, as it was the first publicly documented case of a "zero-day remote jailbreak" used to install spyware. A "zero-day remote jailbreak" is a chain of zero-day exploits (malicious code that takes advantage of unintentional software vulnerabilities unknown to the software's developer) designed to subvert the iPhone's security features and permit the installation of apps on the device not approved by Apple. We at Citizen Lab shared this code with Apple, who issued an emergency update (iOS 9.3.5) to fix the specific flaws exploited by Pegasus in this case.

5.     Following "The Million Dollar Dissident," NSO Group reportedly released a new major version of Pegasus ("Pegasus 3"). NSO Group continues to regularly release new versions of Pegasus containing new zero-day exploits, designed to install Pegasus on the latest iPhone and Android devices. Since "The Million Dollar Dissident" report, I have examined phones belonging to numerous civil society targets around the world, in an effort to determine whether they have been compromised with Pegasus. While I have authored multiple reports chronicling the abuse of Pegasus around the world, these findings are typically based on *forensic traces* of Pegasus infection (i.e., partial fragments of Pegasus code, artifacts in system logs showing

communication with Internet servers used by Pegasus, or other evidence that Pegasus ran on a device). NSO Group implements several layers of safeguards in an effort to prevent security researchers like me from recovering full samples of Pegasus.

6.    Around July 23, 2021, I began a forensic analysis of Hanan Khashoggi's devices in order to determine whether the devices were targeted or hacked with Pegasus, or other types of spyware.

7.    Thus far, I have spent approximately 40 hours performing research and analysis into Mrs. Khashoggi's devices. I attest that the value of my time and services exceeded $5,000 for the examination and investigation of Hanan Khashoggi's devices.

**8.**    My analysis concluded that Mrs. Khashoggi's Android phones had been targeted by Pegasus multiple times beginning on November 8, 2017, and extending through at least April 22, 2018. On December 21, 2021, I shared the conclusions of my analysis with Mrs. Khashoggi and her attorney, Randa Fahmy.

**Findings of My Analysis**

9.    On April 22, 2018, a user manually typed in a URL associated with a Pegasus installation website into the address bar of the Chrome web browser on one of Mrs. Khashoggi's Android phones and visited this URL. This occurred shortly after the phone was carried into the United Arab Emirates (UAE). This is consistent with Mrs. Khashoggi's reported detention upon arrival in the UAE, indicating that authorities likely would have had physical access to her device.

10.    As a result of visiting the URL, Pegasus installation commenced on Mrs. Khashoggi's Android phone, and the Chrome web browser on her device successfully sent 27 pieces of telemetry to the Pegasus installation server over a period of 40 seconds, updating the

server on the progress of Pegasus installation (the installation of any spyware is a complex process involving multiple steps). Because modern versions of Pegasus communicate this telemetry using numbers whose meaning is opaque to third parties (e.g., "204", as opposed to a legible message like "exploit succeeded"), it is not currently possible to understand from this information alone whether the final Pegasus payload was installed on Mrs. Khashoggi's device. Additionally, I have not noticed the presence of (nor the conspicuous absence of) indicators that would be associated with the final Pegasus payload on Mrs. Khashoggi's phone. Phones are not typically designed to preserve log information for such an extended period of time, and forensic traces of spyware discovered far in the past are often due to "luck" (e.g., particular usage patterns of the device that lead to old log fragments not being deleted or overwritten).

11.     However, based on the analysis described in my forensic report, and my prior studies of the Pegasus software suite, the likelihood that the Pegasus infection succeeded is high. In my experience, if a device does not support installation of the Pegasus spyware, for example because the particular device model or installed software versions are not vulnerable to exploits employed by Pegasus at the time of infection, then this will often be detected *immediately* when a Pegasus installation URL is visited, and the user will be redirected to a benign website before installation commences. Of course, more complex failure cases can arise during Pegasus installation, but an adversary with physical access to the phone could remedy certain issues that might cause Pegasus installation to fail (such as by uninstalling an app conflicting with Pegasus, or by changing various settings on the device) and then make a second installation attempt by visiting a second link shortly thereafter. There is no evidence of a second installation attempt around the same time.

12.     In November 2017, six separate Pegasus infection attempts were made through SMS text messages sent to Mrs. Khashoggi's phone. A similar attempt was made on Mrs. Khashoggi's second phone in April 2018. Based upon my preliminary review, I am unable to state with certainty that those attempts resulted in installation of the final Pegasus payload, for the reasons stated above, but also have no evidence to believe they were not successful.

13.     On July 10, 2018, the WhatsApp application on Mrs. Khashoggi's phone experienced two crashes. The nature of these crashes appears suspicious. The crashes occurred while WhatsApp was handling multiple incoming video call requests from a Cypriot number unknown to Mrs. Khashoggi. The WhatsApp application further experienced several more events from the Cypriot number between August 1, 2018, and October 14, 2018. The WhatsApp crashes appear consistent with a "zero-click" exploit deployed against WhatsApp users by NSO Group customers via a WhatsApp video call request.

14.     In May 2019, WhatsApp released a public disclosure regarding this exploit as well as an updated version of WhatsApp containing a fix for the underlying vulnerability. In October 2019, WhatsApp sued NSO Group regarding the exploit. WhatsApp's lawsuit states that NSO Group customers deployed the exploit using call requests initiated from WhatsApp accounts with phone numbers registered in "Cyprus, Israel, Brazil, Indonesia, Sweden, and the Netherlands," and that WhatsApp accounts used to deploy the exploit were registered as early as January 2018. The exploit did not require the targeted user to take any action (such as accepting or declining the call) for Pegasus spyware installation to succeed.

15.     Further, I am aware that representatives of NSO Group have made the dual claims that the Pegasus spyware 1) generally cannot be installed on phone numbers associated with the United States (for example, if an installation attempt is issued for a phone number, and that

phone number has a country code of +1 – a telephone country code used by various countries in North America and the Caribbean, including the U.S. and Canada – as well as an area code assigned to the U.S., then the attempt should generally be denied by the Pegasus system), and 2) is generally ineffective or otherwise non-functional within the geographic boundaries of the United States. Though, the precise application of these restrictions and the availability of exceptions remains somewhat unclear. Such restrictions do not appear to be applicable in certain cases, for example, a product demonstration of Pegasus to the United States Federal Bureau of Investigation (FBI) cited in WhatsApp's lawsuit and reported in the New York Times involved the use of the spyware against a +1 phone number with a U.S. area code.

16.    Additionally, as no public analysis of a full Pegasus spyware sample has been published since 2016, it is not possible to conclude whether or not recent versions of Pegasus contain technology designed to prevent its use within the geographic borders of the United States, whether such technology existed during the time period of Mrs. Khashoggi's targeting, whether such technology would have been applicable to all of the various manners in which Mrs. Khashoggi was targeted, and if so, whether such technology was likely to be effective in all cases.

17.    While such technology, if implemented and consistently enforced, could theoretically block most usage of Pegasus in the United States, in my professional opinion, it would be very difficult, if not wholly impossible, to guarantee that *no data* would *ever* be transmitted by Pegasus after a target hacked with Pegasus abroad entered the geographic bounds of the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Dated: October 13, 2023

_____

Bill Marczak

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

HANAN ELATR KHASHOGGI,

   Plaintiff,

  v.

NSO GROUP TECHNOLOGIES LTD.
and Q CYBER TECHNOLOGIES LTD.,

   Defendants.

Case No. 1:23-cv-779-LMB-LRVVAED

Action Filed:  June 15, 2023

---

## SUPPLEMENTAL DECLARATION OF JOSEPH N. AKROTIRIANAKIS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

I, Joseph N. Akrotirianakis, declare as follows:

1. I am an attorney licensed to practice law in the State of California.  I am a partner at the law firm of King & Spalding LLP, and I am counsel for Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (collectively "NSO Defendants") in the above-entitled action and, since February 2020, I have been NSO's lead counsel in other litigation pending in the United States District Court for the Northern District of California.  I submit this supplemental declaration in support of the NSO Defendants' Motion to Dismiss.  Except as otherwise stated, I have personal knowledge of the facts set forth below and could competently testify to each fact averred.

2. Attached as **Exhibit A** is a true and correct transcription of portions of a podcast titled *Shoot the Messenger: Espionage, Murder & Pegasus Spyware*, Episode 1: What Happened to Jamal Khashoggi?  A recording of the full podcast is available at https://beta.prx.org/stories/451491.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 18, 2023, at Atlanta, Georgia.

     */s/Joseph N. Akrotirianakis*
     JOSEPH N. AKROTIRIANAKIS

# EXHIBIT A

SHOOT THE MESSENGER PODCAST, EPISODE 1, WHAT HAPPENED TO JAMAL

KHASHOGGI?

RELEVANT EXCERPTS RE PLAINTIFF'S RESIDENCE


1.   Hanan El-Atr was a resident of UAE until Khashoggi's death


00:28:  ROSE REID (host): It was a night like this on April 21st, 2018, when Hanan Elatr

landed in her hometown of Dubai. After 22 years as a flight attendant with Emirates Airlines, the

routine had long turned to muscle memory. On this Saturday night, Hanan had just finished a long

flight from Toronto. Her shift was over, and she was tired, and ready to go home.


30:22:  ROSE: When Hanan was taken by UAE government officials [on April 21, 2018],

they were looking for something on Hanan's phone during her interrogation…In the middle of

Hanan's interrogation, she received a text from Jamal Khashoggi.  The officials saw the text, and

their questions took a different turn.  They asked about Khashoggi's colleagues, his friends, his

plans.  They wanted to know what he was working on, and who he was working with.

31:05:  NANDO VILA (co-host): This interrogation continued into the morning.  After 17

hours, she was given back her devices, and taken home.

31:13:  HANAN EL-ATR: They [UAE government officials] put me under house arrest.

They have my passport. They blacklisted me and my family. My entire family couldn't fly. And

after that I couldn't know how to communicate with him.


31:40:  DANA PRIEST (New York Times): After she was detained, she did not tell Jamal

JA145

right away. She didn't want to tell him on the phone. Well, she didn't know who was listening to her, how they knew where to come and get her, and you know, so she was so afraid to talk to him and tell him what had happened.

31:57:  NANDO: Hanan was under house arrest for several weeks after she was detained and interrogated by the Emirati intelligence, and could not meet Jamal Khashoggi as they had planned in Washington DC, but she didn't know how to tell him what had happened.

32:10:  HANAN: Jamal went to airport, Washington, DC airport, was waiting for me in the airport. And then he called me in Dubai. He told me, "Hanan, I'm waiting for you in airport. Where are you?" I said, "Jamal, I'm not coming." He said, "Why?" I said, "Suad Hosny." Just I told him a code to understand what is my situation.

2. Hanan El-Atr traveled to Washington, DC in June 2018 and married Jamal Khashoggi in a religious ceremony only; Hanan El-Atr was not a resident of the US at the time

33:38:  ROSE: After two months on house arrest, Hanan was released and got her passport back. She was back to work and went on a trip to the United States to meet Khashoggi.  They had plans to get married.

33:49:  HANAN: We got married in June 2018.

33:53:  DANA: They had gotten married, here in Washington where Jamal had a house, an apartment, in McLean, Virginia. And they were married in an Islamic ceremony only, in part to protect her. They didn't want to have any record in the civil courts that she even existed here in the United States.

34:15:  ROSE: Hanan and Khashoggi were married at a mosque, but they decided not to

get a civil license as Hanan did not have residence in the US at the time. The summer of 2018 Hanan tried to put her detention behind her. She was cautious, but not paranoid.

3.   Hanan El-Atr moved to the US only after Khashoggi was killed in October 2018

35:20:   ROSE: Hanan did not know what to do after Khashoggi was murdered – and occasionally Emirati intelligence officers would come by and ask her questions –

35:29:   DANA: And then Jamal's killed [in October 2018], and she has nowhere to go. She's frightened for her life. She can't live in the UAE anymore. So she comes to the United States to talk to her lawyer, and her lawyer suggests, "Just stay here, and we'll apply for political asylum."

```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3    -------------------------x
     HANAN ELATR KHASHOGGI,      :    Civil Action No.:
4                                :    1:23-cv-779
               Plaintiff,        :
5         versus                 :    Friday, October 20, 2023
                                 :    Alexandria, Virginia
6    NSO GROUP TECHNOLOGIES      :
     LIMITED, et al.,            :    Pages 1-32
7              Defendants.       :
     -------------------------x
8
          The above-entitled motions hearing was heard before
9    the Honorable Leonie M. Brinkema, United States District
     Judge.  This proceeding commenced at 10:20 a.m.
10
                      A P P E A R A N C E S:
11
     FOR THE PLAINTIFF:     MICHAEL PENDELL, ESQUIRE
12                          RILEY BREAKELL, ESQUIRE
                            MOTLEY RICE, LLC
13                          ONE CORPORATE CENTER
                            20 Church Street
14                          17th Floor
                            Hartford, Connecticut 06103
15                          (860) 882-1681

16                          ANNIE KOUBA, ESQUIRE
                            MOTLEY RICE, LLC
17                          28 Bridgeside Boulevard
                            Mount Pleasant, South Carolina  29464
18                          (843) 216-9000

19                          STEVEN WEBSTER, ESQUIRE
                            WEBSTER BOOK LLP
20                          300 N Washington Street
                            Suite 404
21                          Alexandria, Virginia  22314
                            (888) 987-9991
22

23

24

25
                                                              1
```

```
 1                      A P P E A R A N C E S:

 2   FOR THE DEFENDANTS:    EDMUND POWER, ESQUIRE
                            ASHLEY PARRISH, ESQUIRE
 3                          KING & SPALDING
                            1700 Pennsylvania Avenue, NW
 4                          Suite 900
                            Washington, D.C.  20006
 5                          (202) 626-9256

 6                          JOSEPH AKROTIRIANAKIS, ESQUIRE
                            KING & SPALDING
 7                          633 West Fifth Street
                            Suite 1600
 8                          Los Angeles, California  90071
                            (213) 443-4355
 9
     COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
10                          Official Court Reporter
                            United States District Court
11                          401 Courthouse Square
                            Alexandria, Virginia  22314
12                          (571) 298-1649
                            S.AustinReporting@gmail.com
13
            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
14

15

16

17

18

19

20

21

22

23

24

25
                                                            2
```

```
1                    P R O C E E D I N G S

2           THE DEPUTY CLERK:  Civil Action 23-779, Hanan

3    Elatr Khashoggi versus NSO Group Technologies Limited, et

4    al.

5           Would counsel please note their appearances for

6    the record.

7           MR. PENDELL:  Good morning, Your Honor.  Mike

8    Pendell, Motley Rice, for Ms. Khashoggi.  With me is Annie

9    Kouba, who, Your Honor, I will be splitting and arguing it

10   with, obviously subject to what Your Honor would like to

11   discuss.

12          I'd like to introduce you to Mrs. Hanan Khashoggi,

13   who is the client in this case.  Mr. Steven Webster is our

14   local.  And this is Riley Breakell.  Riley just passed the

15   bar recently, is not yet sworn in yet, but this is Riley's

16   first court appearance.  So thank you, Your Honor.

17          THE COURT:  Which bar did you pass?

18          MS. BREAKELL:  The Connecticut bar.

19          THE COURT:  Oh, then we can't swear you in.  Okay.

20   Although, we do do remote swearing-ins for out-of-state

21   folks if they cannot get back to their home state.  All

22   right.

23          MS. BREAKELL:  Wonderful.  Thank you.

24          THE COURT:  And for the defense.

25          MR. POWER:  Good morning, Your Honor.  Ed Power of
```
                                                        3

1  King & Spalding for the NSO Group Technologies Limited and Q

2  Cyber Technologies for the defendants.  I'm joined by Ashley

3  Parrish and Mr. Joseph Akrotirianakis.

4          Mr. Parrish can speak to the jurisdictional

5  sovereign immunity and state action claims, and

6  Mr. Akrotirianakis can address the remaining issues.

7          THE COURT:  Well, the only issue I want to hear

8  about is personal jurisdiction.

9          MR. POWER:  Understood, Your Honor.

10          THE COURT:  I think that's the heart and soul of

11  the dispute between you all, and that's where I think the

12  plaintiff has the biggest problem.  So whoever is the point

13  person on that.

14          And, actually, who among the plaintiff's team is

15  going to address personal jurisdiction?

16          MR. PENDELL:  That would be me, Your Honor.

17          THE COURT:  All right.  Well, why don't you just

18  stay right there.

19          In the reply brief by the defendants, they've

20  pointed out, once again, in very specific detail, the

21  reality that Mrs. Khashoggi has not been able to show that

22  she had sufficient, frankly, presence in Virginia during

23  this time frame when she alleges that the Pegasus product

24  was installed on her phones.

25          You need to be able to tell the Court -- because

4

1   you certainly do not have it now in this complaint --

2   exactly what the actual connections were between

3   Mrs. Khashoggi and Virginia during the critical time period

4   that precedes the murder of her husband.

5          MR. PENDELL:  Will do, Your Honor.

6          So Mrs. Khashoggi was living in Virginia with her

7   husband in Tysons Corner at the time.  And I noticed Your

8   Honor mentioned the reply brief.  What is cited to in the

9   reply brief is a transcript from a podcast that was

10  transcribed by counsel, and it was a conversation between

11  two journalists.  Mrs. Khashoggi was not quoted in that

12  piece about where she was living and at what time.

13         It was her intent that her and Mr. Khashoggi got

14  married in June of 2018, and they lived together -- now,

15  Mrs. Khashoggi was a flight attendant and traveled all over

16  the world, so obviously when she was away for her job, she

17  was not here.  But in the instances when she was not

18  working, they lived together in Tysons Corner, they

19  directed -- they decorated the house together, they bought

20  the house together, she saw doctors here.  It was her intent

21  to remain here through that entire period.

22         THE COURT:  All right.  But you're saying they

23  were married in June of 2018?

24         MR. PENDELL:  Correct.

25         THE COURT:  All right.  The murder occurred just

5

 1  two or three months later.

 2          MR. PENDELL:  In October of 2018, that's correct.

 3          THE COURT:  That's right.  That's right.

 4          So before June of 2018, you don't have evidence

 5  that Mrs. Khashoggi was present in Virginia?

 6          MR. PENDELL:  Well, she was present in Virginia.

 7  She was coming here all the time to be with Mr. Khashoggi

 8  and to spend time with him.

 9          Because -- obviously Mrs. Khashoggi is a Muslim.

10  They have a very conservative religion.  They were not

11  living together prior to the marriage, but she was here with

12  him spending time planning the marriage and intent on being

13  married.

14          THE COURT:  But she was also a flight attendant

15  during that time period; correct?

16          MR. PENDELL:  That's correct.  And when she was

17  working, she was not, obviously, in the state of Virginia.

18          THE COURT:  Because one of the problems you've got

19  in this case -- I mean, I think there are quite a few

20  problems with this complaint, but the biggest problem is

21  that you have not put in the complaint sufficiently specific

22  facts, not surmises or hypotheses, but facts showing,

23  number one, that Mrs. Khashoggi had the kind of presence in

24  Virginia that would make it, you know, plausible that this

25  intrusion into her phones occurred even in Virginia.

                                                        6

```
1              As you know, a big argument that the defendants
2     are making, and not the least of which is that there's just
3     absolutely no evidence that any of the intrusions -- leaving
4     aside this issue about whether the intrusion was done by the
5     named defendant or other actors -- occurred in Virginia.
6     And it has to have occurred in Virginia for this Court to
7     have jurisdiction.
8              MR. PENDELL:  Okay.  Your Honor, I'm being told
9     that -- so June 2nd of 2018, they were married.  Her address
10    was 1625 International Drive in McLean, Virginia, and that
11    address was listed as her home address as of the 25th of
12    March 2018.  They were engaged in early -- it looks like
13    April 2nd of 2018.
14             And I want to step back a moment, Your Honor,
15    because I think that it is misdirection to focus on
16    installation and where the Pegasus spyware may have been
17    installed on her phone, because the intent here was -- the
18    entire reason Mrs. Khashoggi was targeted was because of her
19    connection to Virginia.
20             With all due respect to Mrs. Khashoggi, she was a
21    flight attendant.  They wanted to target her because they
22    knew that she was here in Virginia and spending her time
23    here and living here with Jamal Khashoggi, who was
24    ultimately their target.  They wanted to spy on him and his
25    associates here in Virginia, and that is why she was
```

7

```
1   targeted.
2           So -- and, by the way, the way that Pegasus works,
3   Your Honor, this is not like a typical data breach case,
4   okay, where the defendant breaks into a computer, steals
5   some information and then they're gone.  This was continuous
6   and systematic.
7           So what happens is, they're accessing, every
8   minute of every day, data from her phone.  They're turning
9   on to hear what's going on in her home.  They can turn the
10  camera on in the home to see what's going on, to listen, to
11  share the bedroom with them.  That was their intent.  If she
12  had no connection to Virginia, she wouldn't have been
13  targeted here.  That was the entire thing.
14          And so this is no different than -- what they did
15  was, they targeted her, and she unknowingly carried it into
16  Virginia, which is different than a bandit -- if they had
17  hired a bandit to come into Virginia, break into the home
18  and put a listening device or a camera.
19          But the fact that she unknowingly carried it into
20  this state, I think that's misdirection.  Because, again,
21  the intent was always to target Virginia because they were
22  looking for -- to target Mr. Khashoggi and his associates.
23  And every time it collects that data from her phone in real
24  time, minute by minute, it sends it back, and that's
25  intrusion.
```
                                                                    8

1          The WhatsApp court was very apt in describing
2     this.  This is a digital breaking and entering.  Except in
3     this case, after the breaking and entering, they're
4     loitering.  They don't leave.  They're with her everywhere
5     she goes.  She goes to cafes here in Virginia to talk with
6     friends, they get to listen, they get to be part of that.
7     She goes to her doctor's appointments, they're listening,
8     they get to be a part of that.
9          So I do think there are sufficient connections to
10    Virginia, because, again, had she had no connection to
11    Virginia at all, she wouldn't have been the target here.
12    That was the intent.  That was the direct reaching into
13    Virginia.  That is what they intended to do.  And I do
14    think, with all due respect, Your Honor, that the complaint
15    does set out those facts to support that.
16          THE COURT:  Well, the other problem you have that
17    the defendants have pointed out is that you -- in fact, in
18    your oral argument today, you keep saying they, they, they.
19    But your complaint itself clearly alleges that it was either
20    Saudi Arabia or the other country that were the ones who
21    actually were targeting Mr. Khashoggi, and Pegasus was
22    potentially used to do that.
23          But the evidence -- or even the facts that you've
24    alleged that would suggest that Pegasus -- that NSO -- which
25    I keep thinking of the National Symphony Orchestra, that

                                                              9

```
 1  acronym was driving me crazy in this case.  But that the NSO
 2  people themselves were involved.
 3          Because, you know, to have personal jurisdiction,
 4  there has to be purposeful availment.  So you have to be
 5  able to allege, not just surmise, but have alleged some
 6  facts to show that Pegasus -- I'm sorry, that NSO itself was
 7  purposefully availing itself of the forum.
 8          And the facts in the -- in the Ninth Circuit case
 9  are very, very different, and I'm concerned that you
10  actually misread and misrely upon that case, because, in
11  that case, it was NSO itself, not acting through some third
12  party, that was doing the targeting of the WhatsApp features
13  in California.  You don't have that same thing here.
14          MR. PENDELL:  So I agree, Your Honor, that they
15  had to have some purposeful contact -- conduct in the state.
16  And I believe that they didn't, and I believe that the
17  complaint alleges it sufficiently.
18          And I want to point you, Your Honor, to two pieces
19  of evidence, both of which come from the defendants in this
20  case, that establish that, that -- especially at the
21  pleading stage.
22          The first is, the affidavit of Mr. Shohat, who is
23  the current CEO of the company, and that was Docket
24  Number 23-1, and it was filed by defendants in support of
25  this motion.
```

                                                                      10

```
 1              Interestingly, it's a different CEO, but it is the
 2    same affidavit that was filed in the WhatsApp case.  And in
 3    that, it is paragraph -- what is the paragraph.  It's
 4    paragraph 11.  And it states in that under penalty of
 5    perjury:  "NSO markets and licenses the Pegasus technology
 6    to its sovereign customers, which then operate the
 7    technology themselves.  Defendants' role is limited to NSO
 8    providing advice and technical support to assist customers
 9    in setting up, not operating, the Pegasus technology."
10    Here's the important part:  "When defendants provide those
11    support services, they do so entirely at the direction of
12    their government customers, and defendants follow those
13    directions completely."
14              That -- as opposed to just selling and licensing
15    spyware, that language itself leaves open the possibility
16    that NSO had some involvement in the intentional conduct
17    that serves the basis of this complaint.
18              The second one that I want to point you to, Your
19    Honor, which I think is even more telling, this was
20    Exhibit 1 to our complaint.  And this was the defendants'
21    own marketing brochure.  This brochure was put together long
22    before there was any litigation, long before they were being
23    sued.  They used this to market the product to their clients
24    all over the world.  And in that -- and it is at, Your
25    Honor, Figure 5, and I brought a copy if it would be easier
```

                                                                11

1      for Your Honor.

2                THE COURT:  That's all right.

3                MR. PENDELL:  Do you have it, or would you like --

4                THE COURT:  We've seen it.

5                MR. PENDELL:  In Figure 5, the data transmission

6      process, according to their own marketing materials, they

7      make it clear that between every step of data extraction, so

8      reaching into Mrs. Khashoggi's devices and pulling out the

9      information, from data extraction to delivery, to the client

10     who hired them, NSO is involved in that process.  And they

11     also do a preservation and analysis of that data that is

12     then presented to their client.

13               So the idea that they had no involvement, their

14     own submissions in this case, their own brochures undermines

15     that entire -- that claim here.  They were involved in the

16     process.  They had servers located in their headquarters.

17     Their clients could not operate that spyware without their

18     technical assistance and their own data stuff.  They -- and

19     Your Honor saw it in our complaint.  They bragged publicly

20     that not a single person was hacked in the world using their

21     program without them knowing about it at the time.  They

22     told people if somebody's misusing our product, we can shut

23     them down.  Why is that?  Because they're gaining the

24     information.  They are privy to all of the information that

25     is being extracted in real time.  That's conduct.

                                                                12

1          THE COURT:  All right.  Let me hear from the

2    defense.

3          MR. PARRISH:  Thank you, Your Honor.  Ashley

4    Parrish.

5          Let me respond with a few things.  First of all,

6    Your Honor is absolutely correct about the analysis in the

7    sense that the purposeful availment focuses on defendants'

8    contacts.  But, Your Honor, we also agree with your point

9    that there just aren't sufficient allegations about the

10   plaintiff's contacts with Virginia either.  And I think Your

11   Honor focused on the timeline, which is exactly right, which

12   is that it's not enough that there just be connections to

13   Virginia, but it has to be claim-specific connections.  And

14   here, of course, the key allegation is that the Pegasus

15   software was installed on her phone, and that that was

16   then -- ultimately led to the death of her husband.  None of

17   that is shown to be connected to Virginia because the

18   allegations in 101, 102, 103 relating to when they tried to

19   install it all took place elsewhere.

20          But, Your Honor, as you rightly pointed out under

21   Supreme Court precedent *Walden v. Fiore,* it really is the

22   question of purposeful availment.  Again, what are the

23   connections that defendant has to Virginia, and I thought my

24   friend on the other side's comments were very telling.  He

25   referred to Mr. Shohat's declaration, and he says -- and I

13

```
 1   quote, it says "leaves open some possibility."  But I'm sure
 2   Your Honor picked up by that, which is that possibility is
 3   exactly the wrong standard; there has to be --
 4             THE COURT:  Plausibility.
 5             MR. PARRISH:  -- plausibility.  Exactly, Your
 6   Honor.
 7             And of course, Your Honor, if you take a look at
 8   this, there just isn't anything that connects us to Virginia
 9   to suggest that we targeted Virginia.  And the cases they
10   cite showed the very big difference between the type of case
11   where there has been purposeful availment, where some
12   company is targeting Virginia to get customers and doing
13   business, and there's that eight-factor test that I'm sure
14   you're familiar with.
15             So, Your Honor, the problem, as you've undoubtedly
16   pointed out -- and I don't want to belabor the Court's
17   time -- which is that there aren't enough allegations at all
18   to show that we're connected.  To the extent that there are
19   allegations, they're very conclusory in summary; they're not
20   the types of allegations that represent proper factual
21   allegations as opposed to just legal conclusions, and there
22   aren't even enough allegations, as Your Honor pointed out,
23   to show that the timeline is consistent with their theory of
24   their claims.
25             The only thing I would say, Your Honor, just to
```
                                                              14

1   add to all of that is of course -- and I think you've hinted

2   at this, is that the personal jurisdiction arguments we do

3   think is a straightforward way to revolve this case, but one

4   of the reasons why their allegations are deliberately murky

5   is because that is book-ended by this act-of-state doctrine

6   and also by the question of foreign sovereign immunity and

7   derivative sovereign immunity.  And of course Your Honor

8   doesn't have to reach that if there's no personal

9   jurisdiction, but the more that their allegations are pled

10  with specificity in the complaint, the only allegations

11  are -- with specificity show that this, in fact, is a

12  complaint about what has happened by somebody else.

13          And I'll just conclude, Your Honor, as a way of

14  thinking about this case, is that if there were usually some

15  government entity that, for example, put a wire tap -- which

16  is different from what we're talking about here.  But

17  usually you would not think that the party subject to the

18  wire tap would have an objection, whether it was lawful or

19  unlawful, against the company that supplied the hardware or

20  the software.  There would certainly have to be something

21  more than just the allegation that there had been a wire tap

22  in order to justify that.

23          And here, Your Honor, if you take a look at the

24  declaration that the other side referenced, you can see in

25  paragraphs 13 and 14 the evidence specifically that, A, this

                                                              15

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

1   Pegasus software is not operable in the United States; and

2   B, that we actually do not monitor it.  And despite the

3   inferences, there's no response to that.  You'll notice in

4   their brief, they do try to suggest that that's wrong, but

5   if you look at their citations to their own declarations,

6   their declarant merely says there's some uncertainty here,

7   he does not know, and so there's no counter evidence before

8   the Court that would rebut those two factual points that are

9   now properly before the Court.

10          Your Honor, I don't want to belabor my time or

11  yours, so if you have any questions, I would be happy to

12  answer them.

13          THE COURT:  No, I don't think so.  I know counsel

14  wants to respond.

15          MR. PARRISH:  Thank you, Your Honor.

16          MR. PENDELL:  Your Honor, so there's a lot there,

17  and I also wanted to, if Your Honor would indulge me, talk

18  about a couple of cases.

19          But first I'll start, I guess, with counsel's last

20  point first, about the idea that it doesn't work in the

21  United States.

22          There's lots of public information out there that

23  suggests that's not true.  In their brief, defendants talk

24  about how the United States is one of the five eyes of the

25  intelligence world, and because they're one of them, as is

16

1   Israel, that they make sure the technology doesn't work

2   here.

3            We know for sure Canada is also one.  And there

4   was a gentleman there, Mr. Omar Abdulaziz, who was being

5   spied on using Pegasus in Canada.  We also -- it was also

6   wildly reported England, another country that is one of the

7   five eyes, they found evidence that Pegasus was inside

8   10 Downing Street spying on Boris Johnson when he was the

9   prime minister.

10           Our expert, Bill Marczak, is a very careful

11  person.  His burden at this stage, and actually in this

12  entire trial, if this was to go to trial, is not to be

13  100 percent certain; it's more likely than not.  And

14  Mr. Marczak --

15           THE COURT:  Yes, but hasn't he actually said that

16  the -- that Pegasus was installed when your client was taken

17  into custody?

18           MR. PENDELL:  He says that is the one -- as of

19  right now, that is the one that he can definitively say that

20  happened.

21           THE COURT:  And that certainly was not in the

22  Eastern District of Virginia.

23           MR. PENDELL:  I agree.  But again, Your Honor, I

24  think that focusing on where the installation occurred --

25  the intent was for them to spy on her in Virginia.  And how

                                                        17

 1  do we know that --

 2          THE COURT:  Wait.  Wait.

 3          MR. PENDELL:  Sorry.

 4          THE COURT:  The intent, given the whole theory of

 5  this case -- first of all, there's nothing in the complaint

 6  that alleges or suggests that NSO had any interest in

 7  harming Mr. Khashoggi.  Your whole theory of the case is

 8  that there was this -- Saudi Arabia wanted to harm him.

 9  That's the whole case, and that they would -- they enlisted

10  or they used the Pegasus technology to gather information

11  about the location of Mr. Khashoggi.

12          Well, the problem is, NSO's not involved in that

13  intent, which is critical to the case.  And, again,

14  purposeful availment, purposeful conduct, the federal

15  statute -- the only federal statute you've got in this case

16  in every one of the ways in which that statute could be

17  violated has the word intentional or knowing.  And then even

18  in the knowing, the third way in which it can be violated by

19  causing it to happen, knowingly doing it with the intent to

20  cause harm.

21          Everything in this case focuses on the wrong

22  actor.  NSO provides the technology, they may assist, but,

23  at best, they are assisting somebody else in doing something

24  that is perhaps wrong or horrible, but you don't have enough

25  in your complaint of facts rather than hypotheses to have

                                                              18

1  this case go forward.  Again -- because the subject matter

2  jurisdiction -- I'm sorry, the personal jurisdiction here is

3  just so weakly pled, you just don't have it.  And the only

4  case you can point to where personal jurisdiction over NSO

5  has been found, the California case actually goes strongly

6  against you in this case because the facts are so different

7  in that case.

8          MR. PENDELL:  Well, Your Honor, so this technology

9  is very new, and I will concede to you that there are not

10  cases that are 100 percent parallel to this.  But when you

11  look at the Internet cases that -- not only that we cited,

12  but that defendants cited in their own brief -- but, for

13  example, the *UMG Recordings* case, that case involved music

14  piracy, and there was defendants who were in Russia, who

15  never stepped foot in Virginia a day in their life, who set

16  up a music piracy website.  And what happened in that case

17  was, it was -- the Court determined it was a semi

18  interactive website in that it was up.  Anybody anywhere in

19  the world, including people outside of Virginia, could go to

20  that website and use it to steal music.  And when you went

21  to that website to steal music, in order to get in, you had

22  to put in information about yourself, and the defendant in

23  that case collected information about the people who went in

24  there.  Some of those people who went to that website were

25  residents of Virginia who accessed it from Virginia and --

19

1          THE COURT:  Be careful.  It wasn't some.  As I
2     recall that case, it was a significant number.
3          MR. PENDELL:  It was.  You're correct, Your Honor.
4     I think it was upwards of a million.  But when you're
5     dealing with the Internet and music piracy, I don't know how
6     many people in total went to that website, but I'm willing
7     to bet it was a lot more than a million people who went to
8     that website to steal music.
9          In that instance, though, the defendants never --
10    they didn't target Virginia.  They put this out for
11    everybody in the world to go to, and some Virginia residents
12    went to it, and the Court found that was enough for personal
13    jurisdiction.
14          Similarly in the *Verizon* case -- and that was the
15    case that Your Honor may remember where the defendant in
16    that case was a bulk email person, where they sent out bulk
17    email trying to guilt people into buying things.  And they
18    were located in Michigan, and all they did was send emails
19    to anyone who had an @verizon email address.  A lot of
20    people had @verizon email addresses.  Verizon was located in
21    Virginia, it went through some servers in Virginia, it went
22    into inboxes of some people in Virginia.  In that case, the
23    Court found there was jurisdiction.  The defendant's intent
24    in that instance wasn't just to go to -- I mean, they sent
25    it out there with the intent of getting to any single person
                                                              20

1    who had a Verizon email address.

2              THE COURT:  Here's your problem, though --

3              MR. PENDELL:  Yeah.

4              THE COURT:  -- the defendant was the one who was

5    doing the sending.  NSO wasn't doing the sending.  It was

6    whoever bought the NSO product, they were the ones who did

7    the sending.

8              MR. PENDELL:  But if a defendant is aiding and

9    helping somebody commit a tort, they are liable just like

10   the party who's -- their intent was, yes, they did intend to

11   spy on Jamal Khashoggi.  Why?  Because that's what their

12   client wanted them to do.  They were getting paid to help

13   them do that.  That is what they did.  And their conduct was

14   not simply selling a product and helping set it up.  They

15   were involved from soup to nuts.  The data transmission, the

16   data analysis.  The complaint alleges that their own

17   brochure, which is a part of the complaint, shows that

18   that's true, and at the pleading stage, the plaintiff is

19   entitled to have the facts resolved in her favor.  And there

20   are competing facts here.

21             Their own evidence suggests that their involvement

22   did not stop.  And this is -- by the way, the UN -- the

23   UN -- I think we cited to it in our brief.  The UN did a

24   whole report on this, and they, too, determined that NSO's

25   conduct is not limited to just selling a product.  This is

                                                              21

```
1   not the traditional stream of commerce case where somebody
2   just sold a product that just happened to end up in
3   Virginia.  They made and sold a product that they operated,
4   the defendants could -- or Saudi Arabia, the United Arab
5   Emirates, could not have operated it without them.
6           In other cases where they found out -- for
7   example, Your Honor, there's a New Yorker article where the
8   crown prince of the United Arab Emirates was spying on his
9   ex-wife in London, and it was ongoing, and when the Court
10  found out about it, and after it became very well publicized
11  and the Court was very angry, NSO jumped in and shut it off.
12  They were able to shut the system down and prevent the
13  defendant in that case from spying on his wife.  Why?
14  Because they had control of the product, they were involved
15  in the process, they did not just hand it off to somebody
16  else who operated it on its own.  That is not the case, and
17  I think the complaint pleads those facts.  I think the
18  brochure that we've attached to the complaint plead those
19  facts.  I think all of the citations to evidence in our
20  papers prove that, and, again, the defendants' own papers
21  leave open that.
22          THE COURT:  All right.  Well, I think I'm going to
23  take this case, and it's a sufficiently serious case that it
24  needs an opinion rather than an oral ruling.
25          Just to summarize a few other things, though, the
```
                                                         22

1   rest of the arguments that were made, I'm going to tell you

2   right now, I don't find that the derivative foreign

3   sovereign immunity works as a good defense, so I would not

4   be granting any relief on that request.

5           There are other problems in this case.  There are

6   problems about extraterritorial reach of Virginia state law,

7   such as negligence and intentional infliction of emotional

8   distress, which are in this complaint.  There are statute of

9   limitations issues with the federal statute, the computer

10  statute, which has a two-year statute of limitations, and I

11  would like to have that one addressed because that was

12  raised in the papers.

13          Yes, Ms. Kouba.

14          MS. KOUBA:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MS. KOUBA:  In regards to the statute of

17  limitations issue that you raise with the CFAA, it's my

18  understanding that that period begins to run at the time of

19  the discovery of the damage as defined under that act on her

20  phone.

21          Mrs. Khashoggi did not discover the damage to her

22  phone until around December of 2021.  That would make our

23  filing of this case in June of this year timely, according

24  to the way that statute is interpreting damage and discovery

25  of damage.

                                                          23

```
 1              THE COURT:  All right.  Short and sweet.  I'll
 2    hear a response to that.
 3              MR. AKROTIRIANAKIS:  Good morning, Your Honor.
 4    Joe Akrotirianakis, pro hac vice.
 5              There are two means to violate -- available means
 6    that -- for a violation of the statute.  One is damage, one
 7    is loss.
 8              THE COURT:  No.  No.  I'm talking about statute of
 9    limitations.  That's the issue.
10              MR. AKROTIRIANAKIS:  Yes, Your Honor.  But the
11    statute of limitations would operate differently if it is
12    damage versus loss.  This is in the -- discussed in the
13    Court's own decision in State Analysis, Inc. v. American
14    Financial Services, 621 F. Supp. 2d 309 at 313.
15              Here, the only damage that is pleaded does not
16    fall within the statutory definition of damage in this case,
17    which requires the alteration or loss of data.  Since the
18    plaintiff doesn't allege that she has the type of damage
19    that falls within the statutory definition, she doesn't get
20    the benefit of that discovery period.  And so, therefore,
21    the statute of limitations runs from the last -- from the
22    act complained of, which is the installation.  Here, the
23    latest date alleged -- and I think this is paragraph 135 of
24    the complaint -- is in June 2018, or even October 2018, at
25    the latest, which would still be outside the two-year
```

                                                          24

```
1    limitations period.
2            There are other issues with the pleading of loss,
3    but I don't think that they'd go to the statute of
4    limitations, Your Honor.
5            THE COURT:  All right.  Thank you.
6            Did you want to respond to that?
7            MS. KOUBA:  Yes, Your Honor.
8            Your Honor, we disagree with the assumption that
9    we did not adequately plead damage as it's defined under the
10   CFAA and interpreted by Van Buren and other courts in this
11   district and cross the country.
12           Damage does have to be related to technological
13   harm.  We agree with defendants on that.  But I don't see a
14   universe wherein the most sophisticated spyware in the world
15   like Pegasus does not cause technological damage to the
16   phone by becoming installed on the phone running
17   continuously in the background.  That's changing the way the
18   phone works.  It's taking it from a personal communication
19   device with an expectation of privacy and turning it into a
20   different device entirely.  It's being controlled by a third
21   party.  It can turn the camera on and off at will.  It is
22   rewriting the system of her phone and creating a back door
23   that allows information to be extracted from the phone, and
24   not just copied, as most of the cases that defendants' cite
25   allude to.
```

25

```
 1              Copying data off of a website and leaving it
 2    unharmed with no further action taken is a very different
 3    situation than what occurred in this case, with the ultimate
 4    damage being that she -- her phone became unusable.  When
 5    she discovered the damage, she got rid of that phone.  All
 6    of the data on that phone was then useless to her and the
 7    phone was as well.  And so the damage would be the device
 8    itself was completely damaged to the point that it was
 9    unusable, its integrity had been violated, and she had to
10    move on from that device.
11            THE COURT:  And do you have any case law that
12    supports that theory of damage under that statute?
13            MS. KOUBA:  Yes, Your Honor.
14            So Phreesia, which is actually cited by the
15    defendants out of the District of Maryland, states:  Any
16    diminution in the completeness or usability of the data is
17    the standard for wholeness or soundness of the data and
18    information that defendants were saying did not cause any
19    damage.
20            THE COURT:  Well, what data have you alleged was
21    somehow injured or damaged?
22            MS. KOUBA:  All of the data on her phone, Your
23    Honor, was lost to her.  That was data that when her device
24    no longer functioned and she discovered the damage, she no
25    longer had control over.
```

26

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA173

```
 1            THE COURT:  Well, I'm sorry.  You have not alleged
 2   when your client first discovered that her phone had been
 3   infiltrated.  I've got to assume -- and it's certainly not
 4   in the complaint, but you have not alleged in the complaint
 5   when it was that your client sent her two phones -- and I
 6   think it's just two phones you've talked about in this
 7   case -- to Canada to have them evaluated.  But obviously at
 8   some point she must have become suspicious or concerned
 9   about perhaps the phones had been used.  We don't know that.
10   But obviously was that a few weeks, a few months, a few
11   years before the phones were sent to Canada.  I don't know
12   again, from this record, how long the phone was evaluated.
13   Did it take several months?
14            So, you know, again, we've got this very distinct
15   two-year time period that's the normal time limit for
16   bringing these types of actions.  This case would appear to
17   be -- you know, from the events, from the intrusion and even
18   the use of the data, by the assassination in October of
19   2018, at that point, that would appear to be over.  And so
20   you're talking about almost five years after the incident
21   now in 2023.  And so I think that's a problem the way the
22   complaint is written.  Again, you know, we're not supposed
23   to be surmising a whole lot of things at this stage.
24            MS. KOUBA:  Yes, Your Honor.  If I may respond to
25   two points that you mentioned.
```

<div align="right">27</div>

1          The first is that the complaint does mention that
2   Mrs. Khashoggi was approached by a reporter from the
3   Washington Post in July of 2021.  And I don't remember that
4   exact date, but I believe it was around the 16th or 18th or
5   so of July, but it was certainly July of 2021.
6          At that point, the reporter wanted to give
7   Mrs. Khashoggi a couple days heads-up that she was about to
8   publish a piece that had been kept entirely private for the
9   reasons that we allege in the complaint of the way Pegasus
10  is used.
11         A consortium of reporters around the world got
12  together for something called the Pegasus Project.
13  Mrs. Hanan was approached earlier -- I'm sorry.
14  Mrs. Khashoggi was approached earlier that year by the same
15  reporter who asked for her devices; however, Mrs. Khashoggi
16  had no reason at that time to think that the reporter was
17  asking for her devices for something related to NSO Group or
18  even spyware and infiltration.  In fact, Mrs. Khashoggi had
19  recently had a series of articles written about her by the
20  same reporter discussing her marriage to Mr. Khashoggi, and
21  Mrs. Khashoggi assumed that that was the reason she wanted
22  the phones, to look at texts between her and her late
23  husband.
24         So when she was told in July of 2021 that a piece
25  was coming out and Amnesty International was not able to

                                                        28

1    conclusively say whether or not her phone had been

2    infiltrated, but it looked likely it had, that was the first

3    Mrs. Khashoggi heard that her phone even may have been

4    compromised.

5           Promptly after she received that information is

6    when she partnered with Citizen Lab, although I believe the

7    phones were actually physically sent to them in August of

8    2021.  Mr. Marczak then reviewed and investigated the phones

9    for a period of a couple of months and gave his analysis to

10   Mrs. Khashoggi in late November or early December of 2021.

11          So, as far as what the complaint alleges, you're

12   certainly correct, Your Honor, that it doesn't go into that

13   much detail, but it does say that that reporter first

14   approached her with the possibility her phone had been

15   infiltrated -- thank you.  My colleague has pointed out that

16   that is alleged in paragraph 124 of the complaint and 125.

17   And then it does also say that the more in-depth analysis

18   was performed by Citizen Lab confirmed that suspicion in

19   November of 2021.

20          THE COURT:  All right.

21          MS. KOUBA:  And so may I address the second part

22   of --

23          THE COURT:  Yes.

24          MS. KOUBA:  All right.  So, Your Honor, the second

25   part of this issue that you mentioned is that the

                                                          29

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

```
 1   surveilling of Mrs. Khashoggi ended upon Mr. Khashoggi's
 2   death.  We have reason to believe that's not true either.
 3   Mrs. Khashoggi is not the only person in Jamal's very close
 4   circle that was targeted; although she is the only person
 5   romantically or a family member that was targeted in the
 6   months before his death, which we do think is crucial to our
 7   causation theory.  But several other associates after
 8   Mr. Khashoggi's death were targeted by NSO Technology as
 9   well, we believe with the intent to keep track of those that
10   were close to him and essentially see what they were going
11   to do next.
12            THE COURT:  All right.  Counsel, do you want to
13   respond?
14            MR. AKROTIRIANAKIS:  Just very briefly, Your
15   Honor.
16            Counsel referred to the Phreesia decision in the
17   District of Maryland.  I would respectfully refer the Court
18   to pages *7 and *8 of that decision.  And the quote there
19   is:  "More than copying and transmission of data is required
20   to allege damage under the CFAA."  And without the damage
21   theory, the -- that is alleged -- because she doesn't
22   adequately allege damage as defined by that statute in all
23   the cases, including Van Buren, that talk about that
24   requirement, the statute of limitations runs from the date
25   of loss, which, putting aside the issues as a matter of the
```

                                                              30

```
 1   statutory elements that come up with loss but just focusing

 2   on the statute of limitations, the loss here is claimed,

 3   based on the complaint, to have occurred, paragraph 135,

 4   between November 8, 2017 and July 10, 2018, almost five

 5   years before the action was filed.

 6              THE COURT:  All right.  Thank you.

 7              MR. AKROTIRIANAKIS:  Thank you, Your Honor.

 8              THE COURT:  All right.  As I said, this case is

 9   rich with fascinating legal issues, and we'll get an opinion

10   out shortly.  But, at this point, I'll take this under

11   advisement, and we'll move on from there.  Thank you.

12              MR. PENDELL:  Your Honor, I did want to thank you

13   for accommodating our schedule on oral argument.  We

14   appreciate it.

15              THE COURT:  No problem with that.  All right.

16              And you don't need leave of court to have

17   different attorneys make different arguments.  All right.

18   The only thing we don't permit is two attorneys making the

19   same argument.  And the same thing at trial, were the case

20   to go to trial, we only allow, you know, if you start the

21   direct examination of a witness, on cross, you have to do

22   the objecting, and you would have to do the redirect.  All

23   right.  That's the practice in this court.

24              MR. WEBSTER:  Understood.

25              MR. PENDELL:  That was my idea, Your Honor.  I
```

31

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

1    just extrapolated from the one-witness ruling in an

2    abundance of caution.

3            THE COURT:  All right.  That's fine.  That

4    concludes the docket for the day.  We'll recess court.

5            (Proceedings adjourned at 10:59 a.m.)

6            ----------------------------------

7    I certify that the foregoing is a true and accurate

8    transcription of my stenographic notes.

9                                    *Stephanie Austin*

10                        Stephanie M. Austin, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                            32

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| HANAN ELATR KHASHOGGI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:23-cv-779 (LMB/LRV) |
| | ) |
| NSO GROUP TECHNOLOGIES LIMITED and | ) |
| Q CYBER TECHNOLOGIES LIMITED, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This civil action arises out of the brutal assassination of journalist and human rights

activist Jamal Khashoggi in the Saudi Arabian consulate in Istanbul, Turkey.  On June 15, 2023,

his wife, plaintiff Hanan Elatr Khashoggi ("plaintiff" or "Hanan")[1] filed a seven-count

Complaint in which she alleges that for nearly a year leading up to her husband's October 2,

2018 murder, her phones had been infiltrated by spyware designed, sold, and maintained by

defendants NSO Group Technologies Limited ("NSO Group") and Q Cyber Technologies

Limited ("Q Cyber") (collectively, "defendants" or "NSO Group").  The spyware allegedly was

used by agents of the governments of the Kingdom of Saudi Arabia ("Saudi Arabia") and the

United Arab Emirates ("UAE") to obtain information from two of plaintiff's phones that was

then used to carry out the surveillance and assassination of her husband.

Before the Court is defendants' Motion to Dismiss the Complaint ("Motion to Dismiss")

for lack of jurisdiction and for failure to state a claim upon which relief can be granted.  [Dkt.

No. 23].  Defendants' Motion to Dismiss is fully briefed and oral argument has been held.  For

the reasons that follow, defendants' Motion to Dismiss will be granted.

---

[1] In the Complaint, plaintiff is primarily referred to as "Hanan."

## I. BACKGROUND

### A. Procedural History

In her Complaint, plaintiff alleges seven causes of action against defendants: violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq. (Count I); violation of the Virginia Computer Crimes Act, Va. Code § 18.2-152.1 et seq. (Count II); negligence (Count III); trespass to chattels (Count IV); intentional infliction of emotional distress (Count V); negligent infliction of emotional distress (Count VI); and a demand for equitable relief to identify defendants' clients and agents (Count VII).  [Dkt. No. 1] at ¶¶ 134-193.  Defendants' Motion to Dismiss offers six arguments to support dismissal of plaintiff's Complaint: 1) derivative foreign sovereign immunity and lack of subject-matter jurisdiction; 2) lack of personal jurisdiction; 3) the act of state doctrine; 4) forum non conveniens; 5) extraterritorial application of state law; and 6) failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).  See [Dkt. No. 26].  Because defendants have satisfactorily demonstrated that the alleged facts and governing law support their position with respect to subject-matter and personal jurisdiction, their Motion to Dismiss will be granted, and the Court will not address defendants' act of state, forum non conveniens, and Rule 12(b)(6) arguments.[2]

### B. Factual Allegations

According to the Complaint, plaintiff is a citizen of Egypt and a lawful resident of the United States currently seeking political asylum.  [Dkt. No. 1] at ¶¶ 6-7.  She is the widow of Jamal Khashoggi, a "writer, editor, and activist who was well-known for his thoughtful opinions on the rights of women and other minorities, and his calls for governmental reform in Saudi

---

[2] Despite resolving the Motion to Dismiss on jurisdictional grounds alone, the Court recognizes that defendants posit strong arguments that a more appropriate forum for this civil action would be in Israel and plaintiff likely fails to state claims upon which relief can be granted.

Arabia and the Middle East." Id. at ¶ 8.  Plaintiff is legally employed through a work visa and lives full-time in Virginia.  Id. at ¶ 9.

Defendant NSO Group is a limited liability company incorporated in Israel, which "create[s], develop[s], [sells], and assist[s] in the deployment and use of cutting-edge spyware technology to clients around the world." Id. at ¶ 20.  NSO Group is a subsidiary of defendant Q Cyber, a private company also incorporated in Israel.  Id. at ¶¶ 21-22.[3]  Plaintiff alleges that NSO Group "has been primarily funded and controlled by California-based investment funds and . . . has a U.S. subsidiary company, Westbridge Technologies, Inc. ("Westbridge"), that is headquartered in Virginia." Id. at ¶ 30.[4]

The spyware alleged to have aided in the collection of information that ultimately led to the assassination of Jamal Khashoggi is known as "Pegasus," which the Complaint describes as "an advanced surveillance tool designed to be undetectable—it evades traditional security measures and it is installed on the user's device without their knowledge or consent." [Dkt. No. 1] at ¶ 40.  While Pegasus can remotely infect a target's cell phone using only a simple text message, it also has a remote "zero click" feature which enables a phone to be compromised even where there has been no interaction by its user.  Id. at ¶ 41.  Instead, a party employing Pegasus need only target the phone number in order to see "every piece of data stored on the

---

[3] Plaintiff alleges that NSO Group and Q Cyber are managed, in all respects, by one of the companies' founders, Omri Lavie.  [Dkt. No. 1] at ¶¶ 23-25.

[4] NSO is alleged to have created Westbridge to help sell its spyware to the United States market, [Dkt. No. 1] at ¶ 30; however, plaintiff does not allege that Westbridge had any involvement in the conduct underlying this civil action.  Defendants argue that Westbridge is not actually a subsidiary of NSO Group but a "corporate affiliate owned by the same ultimate parent company" as NSO Group.  [Dkt. No. 48] at 4 n.4.

phone."[5] Installation of the spyware can be done using various remote "installation vectors," including remote installation "over-the-air" ("OTA") or through Enhanced Social Engineering Messages ("ESEM"). Id. at ¶ 49.[6]

In the cyber security context, "social engineering" refers to a manipulative tactic to induce the target to provide their own vulnerabilities to a bad actor. This is commonly referred to as "phishing," where a website, email, or text message appears to be legitimate, but in fact induces the target to click on a link that exposes the device to malware or spyware. Quoting from NSO Group's alleged "sales brochure," the Complaint describes Pegasus as providing "a wide range of tools to compose a tailored and innocent message to lure the target to open the message." Id. at ¶ 52 (quoting Ex. 1 at 13). These phishing messages are designed to be sent either to a primary or direct target or to a "relational" or "off-center" target, usually a spouse, sibling, parent, staff member, or close associate of the primary target. Id. at ¶ 54 (citations omitted). According to the Complaint, infiltrating the device of a relational target allows "NSO Group's clients to circumvent the security features that are typically utilized by hyper-vigilant primary targets, like Jamal Khashoggi." Id. at ¶ 54 (citations omitted).[7]

The Complaint alleges three technical ways for NSO Group's clients to gain total control of a device using Pegasus: "(1) remote, zero-click entry via software exploit; (2) physical

---

[5] See [Dkt. No. 1] at ¶ 41; see also Ronen Bergman & Mark Mazzetti, "The Battle for the World's Most Powerful Cyberweapon," N.Y. TIMES (Jan. 28, 2022), https://www.nytimes.com/2022/01/28/magazine/nsogroup-israel-spyware.html.

[6] Plaintiff has attached to her Complaint as Exhibit 1 a purported Pegasus "sales brochure" allegedly created by NSO Group. See generally [Dkt. No. 1] Ex. 1.

[7] NSO Group publicly contends that it can identify and stop any "misuse" of Pegasus, such as the targeting of activists' family members; however, plaintiff alleges that NSO Group has failed to do so, "as evidenced by the number of times Pegasus has been used to spy on innocent individuals." [Dkt. No. 1] at ¶ 60 (citing examples).

4

installation on the device; and/or (3) inducing the target to unwittingly install Pegasus on their device via ESEM. To maximize the chance of successful infiltration, clients can utilize one or more of these methods." [Dkt. No. 1] at ¶ 65.

The Complaint alleges that NSO Group has sold its Pegasus software or other spyware to the governments of Ghana, Rwanda, the United Arab Emirates, and Saudi Arabia, among others, id. at ¶ 39 n.6, and works to analyze data on behalf of clients and generates reports based on the data obtained from targets' devices, id. at ¶ 46; see also [Dkt. No. 45] at 1-2 ("NSO [Group] configures and maintains the infrastructure that supports the operation of Pegasus, trains clients in its use, and assists those clients throughout every stage of the deployment and operation of the spyware.").

Although the Complaint provides extensive details about the events that gave rise to the assassination of Jamal Khashoggi, the only allegations relevant to resolving defendants' Motion to Dismiss are the following:

- "[I]n November 2017, the first Pegasus attempts were made on one of Hanan's cell phones, just as she was growing closer with Jamal. These were ESEM text messages that were personalized to induce her to follow the malicious link containing Pegasus." Id. at ¶ 101.

- "[A]t 06:46:59 GMT on November 26, 2017, Hanan received a text message stating that a flower bouquet was sent to her. She later clicked and followed the link and was rerouted to a disabled Pegasus link. Citizen Lab attributed the domain name in these links to an agency of the UAE." Id. at ¶ 102.

- "At least five more attempts were made via ESEM text messages sent to Hanan's phone in November 2017." Id. at ¶ 103.

- "In April 2018, while working as a flight attendant, Hanan arrived at the Dubai International Airport and found seven Emirati intelligence officers waiting for her. Hanan was blindfolded, handcuffed, and transported to a remote interrogation cell where she was questioned about Jamal and his activities for over 17 hours. Hanan was detained and her captors took both of her cell phones that

5

JA184

she had been using to communicate with Jamal. Citizen Lab later confirmed in its analysis that it was likely during this time that Pegasus was manually installed onto at least one of her phones." Id. at ¶ 106.[8]

- "Hanan was placed under house arrest in the UAE until May 2018, when she returned to the United States to be with Jamal." Id. at ¶ 107.

- "On June 2, 2018, Hanan and Jamal were married . . . in Alexandria, VA. . . . They spent the next weeks moving into and decorating their shared apartment in Virginia and making it her home." Id. at ¶ 110.

- "When the two were forced to be apart, they were in frequent contact through text messages, WhatsApp, phone calls, and various other apps Jamal insisted they use for privacy. Unfortunately, Jamal's suspicions were well-founded, but use of multiple apps or frequently changing SIM cards was no match for NSO Group's technology. Neither suspected that Hanan herself might become a target." Id. at ¶ 111.

- "Upon information and belief, all of Jamal and Hanan's conversations—by phone, message, or in person—were available to NSO Group and ultimately relayed to the Saudis, via the UAE, providing key information and proof of Jamal's persistent belief that Saudi Arabia needed reform." Id. at ¶ 113.

See generally [Dkt. No. 1] at ¶¶ 101-13.

On October 2, 2018, Jamal Khashoggi disappeared after visiting the Saudi consulate in Istanbul. The United States Office of the Director of National Intelligence released a report concluding that "Saudi Arabia's Crown Prince Muhammad bin Salman approved an operation in Istanbul, Turkey to capture or kill Saudi journalist Jamal Khashoggi."[9]

---

[8] The Complaint alleges that "the Kingdom of Saudi Arabia had leveraged its relationship with a key ally, the United Arab Emirates, to install Pegasus on [plaintiff's] phones, which would then allow [Crown Prince Muhammad bin Salman] to monitor and track Jamal." [Dkt. No. 1] at ¶ 108 n.55.

[9] See Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi (Feb. 11, 2021), https://www.dni.gov/files/ODNI/documents/assessments/Assessment-Saudi-Gov-Role-in-JK-Death-20210226v2.pdf.

Nearly three years later, a forensic investigation performed by Citizen Lab, a research

laboratory based out of the University of Toronto's Munk School of Global Affairs, provided

evidence that both of plaintiff's Android phones were infected with Pegasus by April 2018, "and

likely earlier, with attempts on her devices dating back to November 2017." [Dkt. No. 1] at ¶ 42.

> The infiltration allowed for all information stored on Plaintiff's
> phones to become accessible. However, it also granted access to all
> future phone calls, communication activity through apps, and text
> messages in perpetuity. Further, the infiltration gave NSO [Group]
> and [its] client(s) the ability to activate the cameras and microphones
> of Plaintiff's phones without her knowledge, turning her phones into
> sophisticated listening and recording devices.

Id. Citizen Lab found evidence that the Pegasus software was likely installed via physical

installation on plaintiff's phones while she was in the Dubai airport in April 2018 and that she

received a number of malicious ESEM texts containing links that would also install Pegasus on

her phones in 2017. Id. at ¶ 65. Neither the Complaint nor the Citizen Lab report detailed the

location of either plaintiff or the devices when the messages were received or opened.

## II. DISCUSSION

Defendants argue that the Complaint should be dismissed under Rules 12(b)(1) and

12(b)(2) for lack of jurisdiction, in addition to arguments asserting the act of state doctrine,

forum non conveniens, extraterritoriality, and failure to state a claim under Rule 12(b)(6). As

previously mentioned, the Court will address only the jurisdictional arguments and grant the

Motion to Dismiss with prejudice.

### A. **Standard of Review**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, an action must be dismissed

if the court lacks subject-matter jurisdiction. The plaintiff, as the party asserting jurisdiction,

bears the ultimate burden of proving such jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th

Cir. 1982). If "a complaint simply fails to allege facts upon which subject matter jurisdiction can

7

be based[,] . . . all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Id. But in the event of a factual dispute over the jurisdictional allegations in the complaint, the court may consider evidence outside the complaint "without converting the proceeding to one for summary judgment." Id.

Moreover, a federal court may dismiss an action under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. A plaintiff need only make a "prima facie showing of a sufficient jurisdictional basis," and "the court must construe all relevant allegations in the light most favorable to the plaintiff and draw the most favorable inferences for the existence of jurisdiction." Verizon Online Servs., Inc. v. Ralsky, 203 F. Supp. 2d 601, 609 (E.D. Va. 2002) (citing Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)).

**B. Analysis**

1. Derivative Foreign Sovereign Immunity

In their Motion to Dismiss, defendants first contend that the Court lacks subject-matter jurisdiction to consider plaintiff's claims because they represent an attempted end-run around the foreign sovereign immunity of Saudi Arabia and the UAE. [Dkt. No. 23] at 6-7. The Foreign Sovereign Immunities Act ("FSIA") deprives federal courts of jurisdiction over claims brought against a foreign state. See 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States . . . ."). Specifically, defendants argue that the Court lacks subject-matter jurisdiction over plaintiff's claims because all of NSO Group's alleged actions at issue in this civil action were taken on behalf of Saudi Arabia and the UAE. [Dkt. No. 23] at 7. Defendants concede that they are not covered by the express text of the FSIA, which immunizes only foreign states, not private companies; however, they contend that they are entitled to "common-law foreign sovereign immunity," id., which is extended "to

8

an individual acting in his official capacity on behalf of a foreign state," <u>Velasco v. Gov't of Indonesia</u>, 370 F.3d 398, 399 (4th Cir. 2004).  Defendants' argument fails in two respects.

First, the FSIA governs all foreign sovereign immunity claims brought by private entities. <u>See</u> <u>WhatsApp Inc. v. NSO Group Techs. Ltd.</u>, 17 F.4th 930, 940 (9th Cir. 2021) (differentiating the FSIA's application between "entities" and "individuals").  NSO Group's attempt to refashion itself as an individual—and not an entity—is unavailing.  NSO Group is a private corporation that designs spyware technology used by governments for law enforcement purposes.  Second, it is clear that NSO Group cannot meet the FSIA's definition of "foreign state," because it is neither a foreign sovereign, 28 U.S.C. § 1603(a), nor "an organ . . . or political subdivision" of a foreign sovereign.  <u>Id.</u> § 1603(b)(2).  Instead, NSO Group is a private corporation that provides products and services to sovereigns.  No matter the use to which its customers put NSO Group's technology, its services do not render it an "agency or instrumentality of a foreign state," as Congress has defined that term in the FSIA.  For these reasons, defendants are not entitled to the protection of foreign sovereign immunity under the FSIA.

This conclusion is supported by a decision of the U.S. Court of Appeals for the Ninth Circuit which held the same when it squarely rejected NSO Group's claim of derivative common law foreign sovereign immunity.

> There is no need to analyze whether NSO [Group] is entitled to immunity under the common law and inquire how the State Department would resolve this case.  <u>See</u> <u>WhatsApp Inc. v. NSO Grp. Techs. Ltd.</u>, 472 F. Supp. 3d 649, 665 (N.D. Cal. 2020).  Nor is it necessary to explain that neither the State Department nor any court has ever applied foreign official immunity to a foreign private corporation under the common law, although this is a compelling fact indeed.  The proper analysis begins and ends with the FSIA, the comprehensive framework Congress enacted for resolving any entity's claim of foreign sovereign immunity.

9

WhatsApp, 17 F.4th at 940 (cleaned up). Since the FSIA is the sole source for NSO Group's purported immunity claim, and the FSIA does not reach the commercial conduct of privately-owned companies, NSO Group lacks a foundation on which to assert a derivative sovereign immunity claim.

Despite this door being closed, NSO Group points to several cases addressing the derivative immunity of foreign government "officials." See [Dkt. No. 23] at 7 (citing Velasco, 370 F.3d at 399; Yousuf v. Samantar, 699 F.3d 763, 769 (4th Cir. 2012); Doğan v. Barak, 932 F.3d 888, 893-94 (9th Cir. 2019); Rishikof v. Mortada, 70 F. Supp. 3d 8, 13 (D.D.C. 2014); Herbage v. Meese, 747 F. Supp. 60, 66 (D.D.C. 1990); Butters v. Vance Int'l, Inc., 225 F.3d 462, 466 (4th Cir. 2000)). None support NSO Group's argument.

NSO Group bases its argument primarily on Butters v. Vance International, Inc., in which a United States-based employee sued her employer, a United States corporation. Id. at 464. The employer provided "security services to corporations and foreign sovereigns," specifically to the wife of the king of Saudi Arabia while she was undergoing medical treatment in California. Id. The employee was hired to provide security services but, because of the religious beliefs of the visiting Saudi officials, was not permitted to work in the command post and eventually filed a gender discrimination suit against her employer. Id.

The Fourth Circuit determined that the United States company could assert derivative sovereign immunity. Id. at 466. The court relied on Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 21-22 (1940), for the proposition that "contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity." Butters, 225 F.3d at 466. The Fourth Circuit then extended the rule of derivative sovereign immunity to American private agents of foreign governments:

10

JA189

> It is but a small step to extend this privilege to the private agents of foreign governments. All sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions. This is especially true for foreign sovereigns given their lack of human resources while operating within the United States. To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts.

Butters, 225 F.3d at 466. NSO Group likens this civil action to Butters; in that, plaintiff alleges that the UAE monitored her devices on behalf of Saudi Arabia and did so using NSO Group's technology, and a "foreign government's deployment of clandestine agents to collect foreign intelligence . . . is peculiarly sovereign conduct." [Dkt. No. 23] at 7-8 (cleaned up).

NSO Group's argument, including its analogy to the holding of Butters, comes up short. First, in Butters, the Fourth Circuit extended the doctrine of "domestic derivative sovereign immunity," applicable to United States contractors, to a United States corporation acting as an agent of a foreign sovereign while in the territorial United States. Butters, 255 F.3d at 466. In that case, the defendant asserting derivative sovereign immunity was a United States corporation and the Fourth Circuit's reasoning indicated that the United States citizenship of the company was necessary to its holding. See Butters, 225 F.3d at 466 ("To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts."). None of the other cases cited by NSO Group involve the application of derivative sovereign immunity to foreign entities. And Butters did not reach whether this purported common-law doctrine also extends to foreign contractors acting on behalf of foreign states for alleged conduct that occurred outside of the borders of the United States. Moreover, the holding of Butters was put into question after the United States Supreme Court instructed that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the [FSIA's] text. Or it must fall." Republic of Argentina v.

NML Cap., Ltd., 573 U.S. 134, 142 (2014).  Because NSO Group is a private foreign entity that

is not entitled to sovereign immunity under the FSIA, the Court will deny defendants' Motion to

Dismiss with respect to this argument.

     2. Personal Jurisdiction

     Although the Court rejects NSO Group's sovereign immunity argument, its argument that

plaintiff has failed to plead sufficient facts to support personal jurisdiction in Virginia is

meritorious.  Plaintiff has the burden to allege plausible facts that indicate a significant

connection between NSO Group and its alleged conduct and this forum.

     To start, defendants are not subject to general personal jurisdiction in Virginia—a point

that plaintiff concedes.  As a company incorporated and with its principal place of business in

Israel, NSO Group's contacts with Virginia are not "so constant and pervasive to render it

essentially at home."  Daimler AG v. Bauman, 571 U.S. 117, 122 (2014) (cleaned up).

Therefore, this civil action may only proceed if the Court has specific personal jurisdiction over

defendants.

     The inquiry into whether a forum state may assert specific personal jurisdiction over a

nonresident defendant focuses on the relationship among the defendant, the forum, and the

litigation.  Walden v. Fiore, 571 U.S. 277, 283–84 (2014) (citation omitted).  "Federal courts

ordinarily follow state law in determining the bounds of their jurisdiction over persons."

Daimler, 571 U.S. 117 (2014); see Fed. R. Civ. P. 4(k)(1)(a).  Virginia's long-arm statute

extends personal jurisdiction over nonresident defendants to the full extent permitted by the

Fourteenth Amendment's Due Process Clause.  See, e.g., CFA Inst. v. Inst. of Chartered Fin.

Analysts of India, 551 F.3d 285, 293 (4th Cir. 2009); Peninsula Cruise, Inc. v. New River Yacht

Sales, Inc., 512 S.E. 2d 560 (Va. 1999).  "Because Virginia's long-arm statute is intended to

extend personal jurisdiction to the extent permissible under the due process clause," the statutory and constitutional questions merge into one inquiry. Consulting Eng'rs Corp., 561 F.3d 273, 277 (4th Cir. 2009) (citation omitted). Thus, to establish specific personal jurisdiction the Complaint must allege facts showing that plaintiff's claims "arise out of" activities by which NSO Group "purposefully availed itself of the privilege of conducting activities in" Virginia. Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003); see also Hanson v. Denckla, 357 U.S. 235, 250-53 (1958); Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924-25 (2011).

To meet the constitutional due process requirements for personal jurisdiction, NSO Group must have "minimum contacts" such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Consulting Eng'rs Corp., 561 F.3d at 277 (quoting Int'l Shoe Co. v. Wash., 326 U.S. 310 (1945)). The minimum contacts inquiry requires plaintiff to allege facts that make a plausible showing that NSO Group "purposefully directed [its] activities at the residents of the forum" and that plaintiff's causes of action "arise out of" those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (citation and quotation omitted). The inquiry is designed to ensure that a foreign defendant, like NSO Group, is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." Id. at 475. In other words, it protects defendants from having to defend themselves in a forum where they did not anticipate being sued. See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); see also ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 623 (4th Cir. 1997) (underscoring that minimum contacts must have been so substantial that "they amount to a surrogate for presence and thus render the exercise of sovereignty just").

13

JA192

The Fourth Circuit has synthesized the requirements for asserting specific personal jurisdiction into a three-prong test: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Consulting Eng'rs Corp., 561 F.3d at 278 (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (quotations and citations omitted)).

a. Purposeful availment

The first prong, purposeful availment, concerns whether and to what extent the defendants purposefully availed themselves of the privilege of conducting activities in Virginia. Carefirst of Md., 334 F.3d 390, 397. The Fourth Circuit has previously held that this prong is not susceptible to a mechanical application. Consulting Eng'r Corp., 561 F.3d at 278. It is necessary to consider how the alleged facts apply to the particular circumstance in which, as here, out-of-state defendants have acted outside of the forum in a manner that allegedly injures someone residing in the forum. In Calder v. Jones, 465 U.S. 783 (1984), the Supreme Court held that a court may exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that its conduct would cause harm to a forum resident. Id. at 789–902.[10] Applying that test to the libel suit before it, the Calder court held that California possessed jurisdiction over Florida reporters who had written an allegedly libelous article for the

---

[10] In their briefs, the parties base their arguments mainly on Consulting Engineers Corporation; however, that case is more appropriate in the context of a personal jurisdiction inquiry related to a business or contractual dispute. The more appropriate analysis for an alleged intentional tort committed by an out-of-state defendant is Calder.

14

National Enquirer about a California actress, because "California [was] the focal point both of the story and of the harm suffered." Id. at 789. The writers' "actions were expressly aimed at California," the Court said, "[a]nd they knew that the brunt of [the potentially devastating] injury would be felt by [the actress] in the State in which she lives and works and in which the National Enquirer has its largest circulation." Id. at 789–90; see also ESAB Group, 126 F.3d at 625–26 (emphasizing the importance, in light of Calder, of evidence that defendant expressly aimed or directed its conduct toward forum state and noting that business activities focusing "generally on customers located throughout the United States and Canada without focusing on and targeting" forum state cannot yield personal jurisdiction).

Even though plaintiff asserts that NSO Group "intentionally target[ed] . . . her devices in Virginia," [Dkt. No. 1] at ¶ 30, she does not support that allegation with sufficient, non-conclusory facts or plausible assertions. For example, plaintiff claims that NSO Group created a substantial connection with Virginia and "purposefully direct[ed] surveillance activities towards [plaintiff's] devices while she resided in Virginia." [Dkt. No. 45] at 3. Despite alleging that the surveillance was ongoing in this district, and that NSO Group "and its clients" targeted plaintiff, the Complaint fails to include any non-conclusory allegations regarding how long and where plaintiff had been living in the district, and how NSO Group specifically participated in the surveillance of her phones while she was in Virginia, as opposed to conduct that may have happened while she was overseas or travelling for work as a flight attendant for Emirates Airlines. Nor does the Complaint allege facts that counter defendants' argument that the non-party Saudi and Emirati governments were the ones using the Pegasus technology to surveil plaintiff.

15

JA194

NSO Group is an Israeli corporation, which plaintiff is suing because it licensed its technology to foreign sovereigns that plaintiff alleges used the technology to monitor her devices. The Complaint never pleads with specificity that any of this monitoring occurred while plaintiff was in this forum. Defendants have no offices in Virginia and there are no allegations that they solicit business in Virginia. The Complaint does not allege that NSO Group solicited the business of the Saudi or Emirati governments in Virginia, nor does it allege that defendants made in-person contact with plaintiff in Virginia. Moreover, the only direct contact alleged between NSO Group and Saudi Arabia and the UAE is that NSO Group, with the Israeli government's approval, licensed its technology to those sovereign nations.

The Complaint alleges that an agent of the UAE sent plaintiff a "text message" containing a "disabled Pegasus link" in November 2017, [Dkt. No. 1] at ¶ 102; however, it does not specifically allege that plaintiff was either in Virginia when she received that message or clicked on that link. Instead, the Complaint states that Jamal Khashoggi "invited her to reconnect with him in his new home in Virginia . . . after the summer of 2017." Id. at ¶ 12. When asked in open court about how long plaintiff was living in Virginia, counsel indicated that plaintiff regularly entered and exited the Commonwealth because of her work schedule as a flight attendant, but counsel was unable to link specific dates to specific alleged conduct by NSO Group occurring in Virginia. For example, the alleged manual installation of Pegasus on plaintiff's phones is repeatedly described as occurring in the Dubai airport, not in Virginia. See, e.g., [Dkt. No. 1] at ¶¶ 14, 106. Even if plaintiff could plead sufficient facts supporting a claim that Pegasus was installed on her phones while she was in Virginia, or that Pegasus captured data from her phones while plaintiff was in Virginia, those actions were carried out by third-parties who plaintiff alleges were using Pegasus, not by defendants.

16

JA195

The weakness of plaintiff's argument that the Court has personal jurisdiction over these defendants is demonstrated by the inaccurate way in which plaintiff's briefing cites authorities. To support plaintiff's claim that defendants purposefully availed themselves of this forum, plaintiff cites to UMG Recordings, in which the Fourth Circuit reversed a district court's order granting a motion to dismiss based on a lack of personal jurisdiction. In that case, the defendant was a Russian citizen who resided outside the United States but operated a website that illegally streamed audio tracks from YouTube videos. UMG Recs., Inc. v. Kurbanov, 963 F.3d 344, 348 (4th Cir. 202). The Fourth Circuit found that the defendant's contacts with Virginia were "plentiful," such that the defendant had "fair warning that his forum related activities could subject him to Virginia's jurisdiction." Id. at 353 (cleaned up). Among the evidence in that case was that, in a one-year period, more than half a million unique visitors went to the defendant's website, totaling nearly 1.5 million visits, with Virginia being one of the most popular states in terms of unique visitors as well as the number of visits. Id. The Fourth Circuit also pointed to the defendant's collection of IP addresses and personally-identifying-data from the users who chose to engage with his website as a basis for finding that the defendant personally availed himself of Virginia's jurisdiction. Id.

Moreover, in UMG Recordings, unlike this civil action, the defendant was the direct actor who injured the plaintiff. By contrast, plaintiff's Complaint describes the UAE and Saudi Arabia as the entities that targeted her phones—and ultimately her husband—and collected information from her devices. Plaintiff does not allege that NSO Group knowingly directed or guided Saudi Arabia and the UAE to use Pegasus to monitor plaintiff in Virginia. "[T]he mere act of aiding and abetting is not always enough to provide minimum contacts" because "aiding-and-abetting

17

JA196

. . . does not necessarily involve the sort of 'express aiming' at the forum that the effects test

requires." <u>Hawkins v. i-TV Digitalis Tavkozlesi zrt.</u>, 935 F.3d 211, 230-31 (4th Cir. 2019).

Next, plaintiff cites to <u>Verizon Online Services v. Ralsky</u>, which involved the

transmission of millions of unsolicited bulk e-mail ("UBE" or "spam") passing through seven of

Verizon's Virginia servers to Verizon's subscribers through its proprietary on-line network.  The

court found these contacts with Virginia were sufficient to support specific personal jurisdiction

over the foreign defendant in Virginia.  The facts in that case demonstrate how significantly

plaintiff's allegations fail.   In <u>Verizon Online Services</u>, the defendants themselves engaged

directly in constructing thousands of spam messages and transmitted them to customers via

servers located in Virginia.  As the court found, "Defendants solicited business from Verizon's

subscribers for pecuniary gain, while at the same time trespassing on Verizon's proprietary

network causing harm to its servers located in Virginia." 203 F. Supp. 2d 601, 604 (E.D. Va.

2002).   Ultimately, the court found that allowing defendants to "escape personal jurisdiction in a

forum they have exploited for pecuniary gain while causing a tort to a Virginia resident would

constitute a manifest unfairness to the rights of Verizon and the interests of Virginia." <u>Id.</u>  Once

again, the defendants in that case were the direct actors, rather than, at best, aiders and abettors.

At oral argument, plaintiff's counsel repeatedly characterized plaintiff's claims as ones

leaving open the "possibility" that NSO Group purposefully targeted plaintiff while she was in

Virginia.  But, as defense counsel responded, "possibility" is precisely the wrong standard.  The

Complaint must make plausible allegations that NSO Group purposefully aimed its conduct at

18

plaintiff in Virginia. Plaintiff does not plausibly allege any specific Virginia-related conduct by NSO Group.[11]

> b. Claims arising out of conduct in Virginia

The second prong, whether plaintiff's claims arise out of the activities directed at the forum, concerns to what extent NSO Group's contacts with Virginia form the basis of the suit, i.e., the federal Computer Fraud and Abuse Act and state claims. Consulting Eng'g, 561 F.3d at 278–79 (citations omitted). Here, defendants contend that the limited conduct plaintiff attributes to them has no connection to Virginia and that they took no action to subject themselves to suit in the Commonwealth.

The Complaint alleges that NSO Group "utilized . . . [plaintiff's] personal devices" on an ongoing basis and "caused tortious injury to [plaintiff] in Virginia when they infiltrated and continuously monitored [her] through her devices." [Dkt. No. 1] at ¶¶ 36-42. The Complaint continues, claiming "NSO Group laid every intimate detail of her life bare," including her messages, medical and financial information, and private conversations in her Virginia home. Id. at ¶ 47. Plaintiff's theory as to who and how this conduct was committed is somewhat opaque. For example, plaintiff alleges that NSO Group "configures and maintains the infrastructure that supports the operation of Pegasus, trains clients in its use, and assists those clients throughout every stage of the deployment and operation of the spyware." [Dkt. No. 1] at

---

[11] As previously discussed, the conduct described in the Complaint was allegedly committed by Saudi Arabia and the UAE, [Dkt. No. 1] at ¶ 108 ("Saudi Arabia . . . leveraged its relationship with a key ally, the United Arab Emirates, to install Pegasus on her phones."); the "text message" with a "disabled Pegasus link" was sent by "an agency of the UAE," id. at ¶ 102; Pegasus was "manually installed" in the UAE by "Emirati intelligence officers," id. at ¶¶ 106 & n.54; plaintiff's private communications were "relayed to the Saudis, via the UAE," id. at ¶ 113, and "invaded by agents of an authoritarian government," id. at ¶ 129. None of these allegations establish a sufficient connection between NSO Group and Virginia, or provide a sufficient plausible basis for the Court to conclude that plaintiff was in Virginia at this time.

19

¶¶ 46-48, 66-71, 77.  But plaintiff fails to link that allegation to the conduct of the Saudi and Emirati officials who were NSO Group's customers and the end users of the Pegasus technology that surveilled her.

Defendants also contend that plaintiff has failed to allege she actually lived in Virginia when her devices were accessed.  According to defendants, "[plaintiff] did not move to the [United States] until she decided to seek asylum after Jamal Khashoggi was killed in October 2018." [Dkt. No. 46] at 2 (quoting Supp. Akro. Decl. Ex. A).  They argue that plaintiff "lived in Dubai in April 2018; traveled to Washington, D.C. in June 2018 to marry Mr. Khashoggi in a religious ceremony but 'did not have residence in the [United States] at that time'; and only moved to the United States after Mr. Khashoggi was killed." See [Dkt. No. 46] at 3.

During oral argument, plaintiff's counsel proffered new arguments and facts that were not contained in the Complaint.  For example, counsel claimed that plaintiff began living in Virginia some time before her engagement to Jamal in April 2018, and regularly visited the Commonwealth before that time.  Moreover, counsel asserted that plaintiff and Jamal were married in June 2018, after which time they moved into a home together in Virginia.  Despite these newly postulated facts, counsel did not clarify plaintiff's location when the alleged Pegasus links were sent to her phones or precisely where she was located between the alleged installation of Pegasus on her phones in the Dubai airport in April 2018 and her moving in with her husband later that summer.

Additionally, plaintiff fails to rebut defendants' persuasive argument that at best she has pleaded that NSO Group's Pegasus technology infiltrated her devices in Virginia only because of intervening acts by third-party sovereigns.  See St. Jarre v. Heidelberger Druckmaschinen, A.G., 19 F.3d 1430 (4th Cir. 1994) ("The exercise of personal jurisdiction over a foreign manufacturer,

20

whose product reached the forum state because of intervening sales by third parties, would be unfair and unreasonable."). On this record, plaintiff has not adequately alleged that her claims arose out of conduct defendants directed at and conducted in Virginia.

c. Constitutional due process

Due process requires that a court's exercise of specific jurisdiction "be constitutionally reasonable." Consulting Eng'rs Corp, 561 F.3d at 278. Under that requirement, courts "consider additional factors to ensure the appropriateness of the forum," including "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." Id. at 279; see also Burger King, 471 U.S. at 477. At this step of the specific personal jurisdiction analysis, the burden shifts to defendants to present a compelling case that jurisdiction would be unreasonable. Burger King, 471 U.S. at 477. The more attenuated the contacts with the forum state, the less a defendant must show in terms of unreasonableness to defeat the court's exercise of jurisdiction.

Plaintiff argues that Virginia has a strong interest in resolving this dispute, "as declining to assert jurisdiction would grant hackers who have invaded the privacy of Virginia residents 'carte balance to [surveil] with impunity.'" [Dkt. No. 1] at 5 (quoting Verizon Online Servs., 203 F. Supp. 2d at 612). Plaintiff further contends that, as a Virginia resident, she has a substantial interest in vindicating her rights in this Court and would be burdened if forced to litigate her claims in Israel.

The factors counseling against personal jurisdiction being constitutionally reasonable are substantial. First, NSO Group is incorporated in Israel, owns no property in Virginia, and has no

21

JA200

employees or persons authorized to act on its behalf in Virginia.[12]  Additionally, NSO Group is

without evidence or witnesses in Virginia, most of which are located in Israel, Saudi Arabia, and

the UAE.[13]  The foreign relations implications involved in this civil action would likely impose

substantial restrictions on parties' discovery and impair their abilities to access relevant

documents to present or defend a position.  Plaintiff is correct that litigating this civil action in

Virginia would be more convenient for her, but that alone does not automatically outweigh the

burden on defendants if they were forced to litigate in this district.  See Grizzard v. LG Chem

Ltd., 641 F. Supp. 3d 282, 292 (E.D. Va. 2022) (finding jurisdiction unreasonable even though

"a number of . . . factors may point in [p]laintiff's favor" because "'[d]ue process limits on the

State's adjudicative authority principally protect the liberty of the nonresident defendant—not

the convenience of the plaintiffs or third parties'" (quoting Walden, 571 U.S. at 284)).

     Moreover, NSO Group argues that this action "poses severe threats to Israel's

sovereignty because Israel regulates and reviews [NSO Group's] operations—including the

licensing decisions that plaintiff seeks to challenge under Virginia law—and details of Israel's

decisions would have to be disclosed for [NSO Group] to defend this action."  [Dkt. No. 13] at

13; Ex. 1 at ¶¶ 6-11, 16.  Israel likewise has "a strong national-security interest in the subject-

matter of this action, and [the Israeli government] prohibits NSO [Group] from disclosing in this

action broad swaths of information relevant to refuting plaintiff's claims."  [Dkt. No. 13] at 13.

The United States Supreme Court has also cautioned against extending state long arm statutes in

---

[12] The Complaint has not alleged that Westbridge was involved in surveilling plaintiff.

[13] Defendants argue that requiring this civil action to be litigated in the United States would unduly interfere with the sovereignty of the foreign nations which may be required to participate. "Where, as here, the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction."  Amoco Egypt Oil Co. v. Leonis Nav. Co., 1 F.3d 848, 852 (9th Cir. 1993).

an international context. See Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty., 480

U.S. 102, 115 (1987). Here, while defendants have presented no evidence as to a particular

interest, the state of Israel has some presumable interest in adjudicating conflicts concerning its

corporate citizens. See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd., 328 F.3d 1122,

1133 (9th Cir. 2003) ("While [defendant] has presented no evidence of the United Kingdom's

particular interest in adjudicating this suit, we may presume for present purposes that there is

such an interest."). On balance—factoring in plaintiff's inability to plausibly demonstrate that

NSO Group directed its alleged conduct at her in Virginia—the Court finds that exercising

specific personal jurisdiction over defendants in this district would offend constitutional due

process.

### d. Fed. R. Civ. P. 4(k)(2)

Plaintiff's alternative argument for personal jurisdiction under Fed. R. Civ. P. 4(k)(2)

fares no better. Under Rule 4(k)(2), personal jurisdiction can be found where 1) the case arises

under federal law, 2) the defendant is not subject to personal jurisdiction in any other state, and

3) the defendant's "contacts with the United States as a whole" are sufficient to satisfy due

process requirements. Base Metal Trading, Ltd. v. OJSC Novokuznetsky Aluminum Factory,

283 F.3d 208, 215 (4th Cir. 2002). Plaintiff's argument for personal jurisdiction under Rule

4(k)(2) fails to meet all three of Base Metal's requirements.[14]

To satisfy the second requirement for Rule 4(k)(2) jurisdiction, plaintiff must

demonstrate that NSO Group is not subject to personal jurisdiction in any state; however,

---

[14] Although the Court declines to address defendants' Motion to Dismiss with respect to Fed. R.
Civ. P. 12(b)(6), defendants have made a strong argument that plaintiff's only federal claim is
time barred. If this were so, it would provide an additional basis for concluding that personal
jurisdiction over the defendants is not available under Rule 4(k)(2).

plaintiff has actually cited to the case WhatsApp, Inc. v. NSO Group Technologies Limited, 472 F. Supp. 3d 649 (N.D. Cal. 2020), in which the district court found that NSO Group is subject to specific personal jurisdiction in California based on its direct targeting of WhatsApp's servers in that forum. That finding was not disturbed on appeal. WhatsApp, Inc. v. NSO Grp. Techs. Ltd., 17 F.4th 930 (9th Cir. 2021). The California civil action alone destroys plaintiff's reliance on Rule 4(k)(2) for personal jurisdiction. In addition, plaintiff's primary argument in this civil action is that NSO Group is subject to personal jurisdiction in Virginia, which directly contradicts her reliance on Rule 4(k)(2). In Base Metal, the Fourth Circuit refused to allow a plaintiff to "present inconsistent alternative positions in a case" when invoking Rule 4(k)(2). Id.

As to the final requirement, the same constitutional due process analysis conducted with respect to specific personal jurisdiction counsels against plaintiff's argument under Rule 4(k)(2). The notions of "fair play and substantial justice" do not favor suit in Virginia. For all these reasons, plaintiff has failed to satisfy the requirements of Rule 4(k)(2). Therefore, she has failed to establish that the Court has personal jurisdiction over defendants. [15]

---

[15] In her briefing and at oral argument, plaintiff did not request leave to amend should the Court grant defendants' Motion to Dismiss. Accordingly, the Complaint will be dismissed with prejudice.

24

III. CONCLUSION

The Court has a responsibility to decide preliminary issues, such as jurisdiction, before reaching the merits of a claim.  Although plaintiff presents a compelling description of her loss from the alleged conduct of defendants, the Court must nevertheless evaluate the issue of jurisdiction under established legal principles, which lead the Court to conclude that it does not have personal jurisdiction over defendants.  For these reasons, defendants' Motion to Dismiss will be granted by an Order to be issued with this Memorandum Opinion.

Entered this 26th day of October, 2023.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

25

JA204

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

HANAN ELATR KHASHOGGI,                    )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )        1:23-cv-779 (LMB/LRV)
                                          )
NSO GROUP TECHNOLOGIES LIMITED and        )
   Q CYBER TECHNOLOGIES LIMITED,          )
                                          )
            Defendants.                   )

ORDER

For the reasons stated in the accompanying Memorandum Opinion, defendants' Motion

to Dismiss [Dkt. No. 26] is GRANTED; and it is hereby

ORDERED that plaintiff's Complaint be and is DISMISSED WITH PREJUDICE.

The Clerk is directed to forward copies of this Order and the accompanying

Memorandum Opinion to counsel of record, enter judgment in favor of defendants pursuant to

Fed. R. Civ. P. 58, and close this civil action.

Entered this 26th day of October, 2023.

Alexandria, Virginia

                                          /s/ _____
                                          Leonie M. Brinkema
                                          United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| Hanan Elatr Khashoggi | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-00779-LMB-LRV |
| | ) | |
| | ) | |
| NSO Group Technologies Limited, et al | ) | |
| | ) | |
| Defendant | ) | |

**<u>JUDGMENT</u>**

Pursuant to the Order of this Court entered on October 26, 2023 and in accordance with Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited and against the Plaintiff Hanan Elatr Khashoggi.

FERNANDO GALINDO, CLERK OF COURT

By: _____/s/_____
S. Williams
Deputy Clerk

Dated: 10/26/2023
Alexandria, Virginia

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| HANAN ELATR KHASHOGGI, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-779 (LMB/LRV) |
| NSO GROUP TECHNOLOGIES LIMITED, et al., | |
| Defendants. | |

**PLAINTIFF'S NOTICE OF APPEAL**

Notice is hereby given that Plaintiff Hanan Elatr Khashoggi hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Judgment entered by the District Court on October 26, 2023 (Civil Action No. 1:23-CV-779 (LMB/LRV), Dkt. 52) in the above-captioned action, and from the order incorporated in that Judgment.

Dated: November 21, 2023

Respectfully submitted,

/s/ *Annie Elizabeth Kouba*
Annie Elizabeth Kouba
C. Ross Heyl
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC
Tel: (843) 216-9000
Fax: (843) 216-9450
akouba@motleyrice.com
rheyl@motleyrice.com

Michael J. Pendell
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Tel: (860) 882-1681
mpendell@motleyrice.com

Michael Quirk
MOTLEY RICE LLC
40 W. Evergreen Avenue, Suite 104
Philadelphia, PA 19118
Tel: (610) 579-9932
Fax: (856) 667-5133
mquirk@motleyrice.com

*/s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
WEBSTER BOOK LLP
300 N. Washington Street, Suite 404
Alexandria, Virginia 22314
Telephone and Fax: (888) 987-9991
Email: swebster@websterbook.com

## CERTIFICATE OF SERVICE

I certify that on November 21, 2023, I will electronically file the foregoing document with the Clerk of the Court using the CM/ECF system, which will notify all counsel of record.

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
Webster Book LLP

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| HANAN ELATR KHASHOGGI, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-779-LMB-LRV |
| NSO GROUP TECHNOLOGIES LTD. and Q CYBER TECHNOLOGIES LTD., | |
| Defendants. | |

**DEFENDANTS' NOTICE OF CROSS-APPEAL**

Notice is hereby given that Defendants NSO Group Technologies Ltd. and Q Cyber Technologies Ltd. hereby cross-appeal to the United States Court of Appeals for the Fourth Circuit from the Judgment entered in this action on October 26, 2023 (Dkt. 52) and from the order incorporated in that judgment (Dkt. 50).

Dated: November 28, 2023

Respectfully submitted,

  /s/ *Ashley C. Parrish*
ASHLEY C. PARRISH
  *aparrish@kslaw.com*
EDMUND POWER
  *epower@kslaw.com*
KING & SPALDING LLP
1700 Washington Avenue NW, Suite 900
Washington, DC 20006
Telephone:    (202) 737-0500
Facsimile:    (202) 626-3737

JOSEPH N. AKROTIRIANAKIS (*pro hac vice*)
  *jakro@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:    (213) 443-4310

*Attorneys for Defendants NSO GROUP*
*TECHNOLOGIES LTD. and Q CYBER*
*TECHNOLOGIES LTD*

JA210

## **CERTIFICATE OF SERVICE**

I certify that on November 28, 2023, I will electronically file the foregoing document with

the Clerk of the Court using the CM/ECF system, which will notify all counsel of record.


 /s/ Ashley C. Parrish
ASHLEY C. PARRISH

*Attorney for Defendants NSO GROUP
TECHNOLOGIES LTD. and Q CYBER
TECHNOLOGIES LTD*